IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| STORAGECRAFT TECHNOLOGY | ) |
| a Utah corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:08-CV-00921 |
| | ) |
| JAMES KIRBY, an | ) |
| individual, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE THE HONORABLE DAVID NUFFER

August 9, 2012

Reporter's Transcript of Jury Trial

Laura W. Robinson, CSR, RPR, CP, FCRR
Kelly Brown Hicken, CSR, RPR, RM
350 S. Main Street
144 U.S. Courthouse
Salt Lake City, Utah 84101-2180
(801)328-4800

**Appearances of Counsel:**

For the Plaintiff:        Thomas R. Karrenberg
                                  Heather M. Sneddon
                                  Attorneys at Law
                                  Anderson & Karrenberg
                                  50 W. Broadway
                                  Suite 700
                                  Salt Lake City, Utah 84101

                                  Brett P. Johnson
                                  Attorney at Law
                                  StorageCraft Technology Corp
                                  11850 Election Road
                                  Suite 120
                                  Draper, Utah 84020

For the Defendant:       Richard F. Ensor
                                  Attorney at Law
                                  Vantus Law Group
                                  6995 Union Park Center
                                  Suite 100
                                  Salt Lake City, Utah 84047

```
                     I N D E X
```

| Examinations | Page |
|---|---|
| CROSS-EXAMINATION | 10 |
| BY MR. ENSOR | |
| REDIRECT EXAMINATION | 80 |
| BY MR. KARRENBERG | |
| RECROSS-EXAMINATION | 91 |
| BY MR. ENSOR | |
| **SCOTT BARNES** | 94 |
| DIRECT EXAMINATION | 94 |
| BY MS. SNEDDON | |
| CROSS-EXAMINATION | 134 |
| BY MR. ENSOR | |
| REDIRECT EXAMINATION | 163 |
| BY MS SNEDDON | |
| RECROSS-EXAMINATION | 169 |
| BY MR. ENSOR | |
| FURTHER DIRECT EXAMINATION | 173 |
| BY MS. SNEDDON | |
| **PATRICK KILBOURNE** | |
| DIRECT BY MR. KARRENBERG | 178 |
| CROSS BY MR. ENSOR | 202 |
| REDIRECT BY MR. KARRENBERG | 226 |
| RECROSS BY MR. ENSOR | 230 |
| FURTHER DIRECT BY MR. KARRENBERG | 232 |
| **BRETT JOHNSON** | |
| DIRECT BY MR. ENSOR | 236 |
| CROSS BY MR. KARRENBERG | 240 |
| REDIRECT BY MR. ENSOR | 243 |
| RECROSS BY MR. KARRENBERG | 245 |
| SEALED PORTION | 192 |
| SEALED PORTION | 218 |

```
               E X H I B I T S
```

| No. | Description | Page |
|---|---|---|
| | Plaintiff's Exhibit 33 | 108 |
| | Plaintiff's Exhibit 4 | 110 |
| | Plaintiff's Exhibit 11 | 112 |
| | Plaintiff's Exhibit 13 | 113 |
| | Plaintiff's Exhibit 16 | 114 |
| | Plaintiff's Exhibit 18 | 115 |
| | Plaintiff's Exhibit 24 | 117 |
| | Plaintiff's Exhibit 26 | 118 |
| | Plaintiff's Exhibit 28 | 119 |
| | Plaintiff's Exhibit 30 | 120 |
| | Plaintiff's Exhibit 223 | 145 |
| | Plaintiff's Exhibit 224 | 169 |
| | Plaintiff's Exhibit 165 | 182 |

```
 1              Salt Lake City, Utah August 9, 2012

 2                        * * * * *

 3          THE COURT:  Good morning.  Do you know if we have the

 4     jury here this morning, Anndrea?  Do you know if we have the

 5     jury here?

 6          THE CLERK:  We do.

 7          THE COURT:  Okay.  Anything we ought to handle before

 8     we bring the jury in?

 9          MR. KARRENBERG:  Two quick things, Your Honor.  One,

10     I'm just assuming we have some issues with attorney's fees

11     and we stipulate those can be dealt with post verdict.  Any

12     problem with that?

13          MR. ENSOR:  I think my understanding would be that the

14     decision on attorney's fees would be the Court's decision.

15          THE COURT:  Right.  I will take the issue of

16     attorney's fees following the verdict.

17          MR. KARRENBERG:  Thank you, Your Honor.  And just

18     going through the jury instructions last night, I noticed,

19     it is not a big thing, but Instruction Number 20 is about us

20     introducing a request for admission.  So far we haven't had

21     to do that.  I don't know if it is going to be confusing to

22     keep it in or not.

23          THE COURT:  We'll take it out and we'll also take out

24     the question about the judge asking questions.

25          MR. KARRENBERG:  That was the second one I had because
```

1    you haven't had to do that yet anyway.

2        THE COURT:  Those are just in case instructions.

3        MR. KARRENBERG:  Thank you, sir.

4        THE COURT:  We also won't have to give the instruction

5    about censuring counsel in front of the jury.  That hasn't

6    come up.

7        MR. KARRENBERG:  Well not yet.

8        MR. JOHNSON:  Not yet.

9        MS. SNEDDON:  The day is young.

10       THE COURT:  Anything you have, Mr. Ensor, before we

11   get the jury?

12       MR. ENSOR:  I gave Mr. Karrenberg and Ms. Sneddon a

13   patent from IBM on sector tracking that I planned on using

14   with Mr. Barnes yesterday morning.  I brought the tag pull

15   up from the website from the PTO if the Court wants to take

16   judicial notice.  I don't know if Mr. Karrenberg or

17   Ms. Sneddon or Mr. Karrenberg have an objection or if that

18   is even necessary.

19       MS. SNEDDON:  Your Honor, we do plan to object to

20   those exhibits.  They were given to us yesterday, they

21   weren't identified in the pretrial disclosures.  They're

22   patents.  They have nothing to do with the copyright case.

23   We don't see the relevance.

24       THE COURT:  How do they tie in, Mr. Ensor?

25       MR. ENSOR:  It is a patent from 2003 by IBM that

1    directly talks about incremental sector tracking, part two

2    of the trade secret.  I mean it is public knowledge, you can

3    pull it up on the PTO.  As soon as I found it, as part of my

4    work on Tuesday night, I gave it to them Wednesday morning

5    and the pretrial order recognized that there might be

6    additional documents that come up and we do our best to get

7    it to each other.

8          THE COURT:  Do you intend to use it on cross of

9    Mr. Barnes?

10         MR. ENSOR:  That is my intent, Your Honor.

11         THE COURT:  Do you have any indication -- well, I am

12   going to let you use it on cross of Mr. Barnes and ask

13   questions about it.  Whether it is admitted or not is

14   another question that I haven't confronted yet and we'll see

15   what his testimony about it is.

16         MR. ENSOR:  Your Honor, in that case, can I give you

17   the URL link to it so if you wish to take judicial notice of

18   it you can?

19         THE COURT:  That is a separate issue as well.  So

20   whether I'm going to take judicial notice of it, because I'm

21   not deciding any issues that have to do with it, and I'm not

22   inclined to instruct the jury on it.  If it works in

23   testimony you'll be able to use it.  Let's see where it goes

24   with Mr. Barnes.

25         MR. ENSOR:  I guess my concern is if he says he

1      doesn't, has never seen it, and I don't know whether he has

2      or he hasn't, it still is a valid U.S. patent and there is

3      no question about its authenticity.

4           THE COURT:  Authenticity.

5           MR. ENSOR:  Authenticity at all.  So it ought to --

6      and the only objection is relevance.  But clearly it

7      undercuts this idea that the incremental sector tracking is

8      something that no one else can ever figure out.

9           THE COURT:  I'll deal with the question when it comes

10     up.  If he doesn't recognize it, you ask me to take judicial

11     notice.  Give me the -- I have no reason to doubt that if

12     there is a URL it is really there, and if it is a patent,

13     you don't dispute it is a patent?

14          MS. SNEDDON:  I don't believe so.  And honestly I

15     haven't pulled it up.  But I assume that what Mr. Ensor is

16     representing is true.  You know that said, you know, we have

17     -- we think it will be confusing for the jury.  I don't know

18     what Mr. Barnes is going to be able to say about it.  It is

19     not a StorageCraft patent and there is no -- there is

20     certainly no dispute on our end that there are other --

21     there are other types of products that are out there that

22     use incremental sector tracking.  This case is about how

23     StorageCraft does it.

24          THE COURT:  Right.

25          MR. ENSOR:  But my response to that, Your Honor, would

1    be that more people that use it out there the more likely it

2    is Mr. Campbell's testimony is truthful.  He wrote it

3    himself.

4        THE COURT:  Well, let's -- let's see how it comes out

5    with Mr. Barnes.  And there are two issues there.  First of

6    all, I'm saying that you can ask him questions about it.

7    Second, I am not saying whether it would be received as an

8    exhibit or that I will take judicial notice of it.  So that

9    will come out.  And we'll deal with it right at the time.

10   Somehow these things ripen and become clear.  Are there

11   other issues, Mr. Ensor?

12       MR. ENSOR:  Your Honor, I still have a problem with

13   the way the reasonable royalty jury instruction is written

14   and my position is clear we briefed it again last night.

15       THE COURT:  That it has to be use.

16       MR. ENSOR:  Yeah.  Other than that I have nothing

17   else.

18       THE COURT:  I agree with you there.  And I'm sure I

19   will be hearing motions on that for a while.  So the point

20   is well made.  Okay.  Let's bring the jury in.

21       Somehow these microphones always get in the way.  When

22   I turn pages I hit them.  When I stand up.  The witness

23   microphone is terrible that way.

24       MR. KARRENBERG:  The new courthouse hopefully will

25   have it figured out.

1          THE COURT:  I think we'll just have a new set of

2    problems over there.  Gosh, that is on the record.

3          MR. ENSOR:  Move to strike.

4          THE COURT:  Your motion is granted, Mr. Ensor.  We are

5    doing an experiment here this morning counsel with realtime

6    court reporting.  Laura Robinson, who is here, is a

7    Certified Realtime Reporter, and we have discovered within

8    the last couple of days that there is an iPad ap that will

9    let me read her realtime transcript.  And we hope to get the

10   bugs worked out and have it available to counsel in the

11   future.

12         MR. KARRENBERG:  Oh.

13         MR. ENSOR:  I didn't know that.  Great.

14         THE COURT:  It is brand new.

15         MR. KARRENBERG:  Part of the problem with that is then

16   you end up paying attention to the screen and not to the

17   witness.

18         THE COURT:  That is why there are two of you.  I don't

19   know how Mr. Ensor does it.

20         MR. ENSOR:  One eye on each, Your Honor.

21         THE COURT:  Yeah.

22         THE CLERK:  All rise for the jury.

23         (Whereupon, the jury returned to the courtroom.)

24         THE COURT:  Good morning.  We're convened again in

25   StorageCraft versus Kirby.  The jury is now present.  We

1    will resume this morning with the cross-examination of

2    Mr. Kirby by Mr. Ensor.  Go ahead, please.

3                    **CROSS-EXAMINATION**

4    BY MR. ENSOR:

5        Q.    Good morning, Mr. Kirby.

6        A.    Good morning.

7        Q.    What year were you born?

8        A.    1964.

9        Q.    And about when did you start writing or

10    developing software?

11        A.    Oh, probably around 1976 or '78.

12        Q.    So sometime in your mid teens?

13        A.    Yes, that is correct.

14        Q.    And how did you get started doing that?

15        A.    Um, I stumbled into a Radio Shack with my parents

16    once and saw these new computer things that had come out.

17    And I had always been a technical guy, I was a big Star Trek

18    fan, and I just thought they were really cool.  And I

19    started going to the Radio Shack on the weekends.  And the

20    guy that owned the local Radio Shack was generous enough to

21    let me stay in there all day Saturday and all day Sunday

22    reading the programming books and I would stand in the

23    corner.  That is how I started to learn to program.

24        Q.    And from Radio Shack, where was it -- were you

25    able to get better access to better technology?

1        A.    Yes.  During high school, they finally built a

2    computer lab in our school, and it was, you know, basic

3    simple Radio Shack computers, no graphics, not very

4    sophisticated.  After I graduated, the summer before I went

5    off to college, my mother was a director of early childhood

6    development at our local college, excuse me, and they had a

7    computer programming department.  So my mom went to the

8    director of that department and said, you know, can my son

9    come in here sometimes over the summer and kind of play with

10   computers.  It is something he likes to do.  And he is

11   thinking about doing that for a career.  So I think I was

12   five days a week, ten hours a day, for three months, you

13   know, I was in there every day and I met some other

14   programmers who were taking classes.  So we all kind of got

15   to know each other and, you know, it was kind of like a

16   little community.  So I spent almost all of my time, from

17   the summer before college, just learning how to program, to

18   get better and better at what I do.

19        Q.    Did you write any full programs over that summer?

20        A.    I did.  I wrote a program that we called it Micro

21   Test and it was just a little program that teachers at the

22   school could use to administer tests to other students on

23   the computer.  It was very simple, nothing fancy, but, you

24   know, I was kind of proud of it.  It was my first real

25   complete development effort that wasn't just playing around

1     on the computer.

2          Q.   And you actually hit run and it worked?

3          A.   Oh, yes.  The school used it for a while.

4          Q.   Okay.  And then you went off to college?

5          A.   I did.

6          Q.   Where did you go to school?

7          A.   I went to Louisburg College.  It was an -- I had

8     planned on going into medicine, um, I was interested in that

9     field.  I was one of the youngest people ever certified as

10    an Emergency Medical Technician in the State of North

11    Carolina.  I had a passion for that sort of thing, too.

12         So when I was real young, I started like a junior fire

13    department in my town and sort of got all of the kids

14    together and got the local sheriff's department and fire

15    department to back us and so that is what I was going to do.

16    And I went and took some classes.  And when I was 16, um,

17    the local guy that ran the course for certifying Emergency

18    Medical Technicians allowed me to come in and take the

19    class.  And he said you have to be 17 years old to get

20    certified, but the certification lasts for two years.  So he

21    said if you come in at 16 and you take the class and you

22    finish it, you know, when you turn 17 we'll issue the

23    certification.  So I was the youngest person at that time to

24    ever be certified as an Emergency Medical Technician.

25         Q.   Where did you go off to college?

1           A.   Louisburg College.

2           Q.   How long did you stay there?

3           A.   I was there for -- it was a two year college, I

4      did three semesters.

5           Q.   Tell me about where -- did you get involved with

6      software development or writing code while you were there?

7           A.   I did.  Of course they had -- they had a computer

8      class, it was only one class, it was a basic programming

9      class.  And so I went to take that class.  And the first day

10     of the class, the professor put the syllabus up on the white

11     board and said these are the subject matters we're going to

12     cover, and these are the programs we're going to write this

13     semester.  So I went back that night and completed the whole

14     syllabus in my dorm room, I wrote all of the software, I

15     come back to class the next day and I said I have done my

16     semester's worth of work.

17          Q.   What did the professor say?

18          A.   Well, he wanted to see my work.  So he started

19     going through and red-lining stuff, don't do this, you

20     shouldn't do that.  This is not how you do that.  And at the

21     bottom he wrote very good work and put an A+ on all my

22     programs.

23          Q.   Well, congratulations.  Did you write any

24     programs that you intended to sell or market while you were

25     at college?

1          A.    Not while I was at college.  After my first

2     semester, our professor who was teaching computer

3     programming got offered a really good job, a little bit more

4     money than the school was paying him, so the Dean of

5     Students called me into his office one day and said we would

6     like you to teach the class the next semester.  You know, I

7     had never done anything like that in my life.  So I agreed

8     to do it.  And so the next semester I actually taught the

9     computer programming class at my school.

10          Q.    Just take it -- the court reporter needs to take

11     down every word and when you're moving quickly it is a

12     little bit hard.

13          A.    Sorry.

14          Q.    But we do also want to cover a lot of ground

15     quickly so it is sort of competing interests.  You left

16     Louisburg after three or four semesters?

17          A.    Three semesters.

18          Q.    And at that point, did you continue with the

19     computer writing code, developing software?

20          A.    I did.  I met a guy that I had met when I was

21     working in the computer lab at the college before I -- the

22     college my mom worked at before I went off to school --

23          Q.    Mr. Kirby, just so we have a benchmark, about

24     what year are we talking about here?

25          A.    1980 -- let's see I went -- I graduated high

1     school in 1982.

2          Q.   Okay.  So I apologize for cutting you off so

3     about 1984 you were -- you were working with this guy you

4     met in the computer lab at college?

5          A.   That is correct.

6          Q.   What did you -- what did you do with him?

7          A.   Um, he had a small software company working out

8     of his apartment.  And he had started working on a couple of

9     projects.  And so he asked me if I would come in and help

10    him.  And so we developed, at that time, two products.  One

11    was called Vidicat, and it was a software package that would

12    manage video stores, the rentals, you know, all of the

13    billing, which titles were coming in and out of the store.

14    So that was the first product that we developed.

15         Then we developed a product to manage pawn shops.  I

16    lived near Fort Bragg which is a big army base and there

17    were lots of pawn shops.  And so my friend and I said why

18    don't we -- there are lots of legal issues with running a

19    pawn shop.  Accountability, tracking merchandise that comes

20    in and out, and those reports have to be given to local

21    police and things like that.

22         So we developed a software package that did that, that

23    managed pawn shops, the tracking of inventory coming in and

24    out, things like that.

25         Q.   And did you and your business colleague actually

1    go out and try to sell these programs to video stores in the

2    pawn shops?

3         A.   Yes, we did.

4         Q.   Are were you successful?

5         A.   Yes, we were.  We didn't get rich but, you know,

6    it was fun.

7         Q.   Now, Mr. Kirby except for your time in the energy

8    drink business, 2005 up to 2009, prior to that time you were

9    involved in the software development industry the entire

10   time?

11        A.   That is correct.

12        Q.   And I just want to go quickly through sort of the

13   middle of your career leading up to when you got more

14   involved with backup technology.

15        A.   Okay.

16        Q.   So real quick, if you could hit the highlights of

17   say well after you left North Carolina you went to Florida,

18   didn't you?

19        A.   That is correct.  I took a job with a software

20   company called Precision Software.  They were a wholly owned

21   subsidiary of the Home Shopping Network.

22        Q.   What did you do for them?

23        A.   We developed a system call Tootie.  And Tootie

24   was a system when you were watching the Home Shopping

25   Network on television and you want to place an order once

1      you have an account, you dial on your phone your account

2      number, then you can put in I want to buy this product and

3      this number, so it was all driven through your telephone so

4      that you could place orders.  And we built -- it was -- it

5      wasn't Windows, we had to write our own operating system.

6      We had to write everything.  But we built the hardware

7      ourselves, custom hardware, and there were racks of them in

8      rooms because millions of people were calling Home Shopping

9      Network and placing orders every day.  So --

10          Q.   And after the Home Shopping Network, you moved up

11     to New Jersey where you worked for Dun & Bradstreet?

12          A.   That is correct.  I worked for Dun & Bradstreet

13     as a --

14          Q.   Dun & Bradstreet is a big company related to the

15     finance industry?

16          A.   That is correct.

17          Q.   And how long did you work for Dun & Bradstreet?

18          A.   I believe it was almost three years.

19          Q.   And what did do you for Dun & Bradstreet?

20          A.   They wanted me to help them build a new product

21     for credit reporting.  I managed a team of five developers

22     and we built a product.  And one of our biggest clients at

23     the time was DuPont.  Our first install was 30,000 computers

24     in Wilmington, Delaware for the software.

25          Q.   How long were you with Dun & Bradstreet?

1          A.   Again, almost three years.

2          Q.   And then you were lucky enough to go to Rome,

3     right?

4          A.   That is correct.  A friend of mine who lived in

5     Austin had gotten a job with IBM and they sent him to Rome,

6     Italy.  And he had been there for about six months and he

7     called me and said, you know, how would you like to come to

8     Rome and write software?  And, of course, I was 25, 26 years

9     old and that was the greatest opportunity of my life.  So I

10    packed my bags and off to Europe I went.

11         Q.   And then you worked for IBM for nine months?

12         A.   Nine months; that is correct.

13         Q.   In Rome?

14         A.   That is correct.

15         Q.   And you were writing code?

16         A.   That is correct, device drivers.

17         Q.   Were you also being involved in the architecture

18    of the software at this time?

19         A.   Not so much at IBM.  IBM, you know, I was -- I

20    was green in a big company like that, you know, with real

21    power house technologies.  I was a senior software

22    developer, but it was actually my friend was my boss.

23         Q.   What is the difference between software

24    development and software architecture because those terms

25    have been tossed around a little bit?

1          A.    Actually, in the building business they're very

2    analogous.   The architect in -- when you build a house the

3    architect comes in, draws up the plans, decides how

4    everything is supposed to look, how it is supposed to

5    connect together, that is meets the requirements.   And the

6    developer would be the equivalent of the contractor or the

7    builder.   They would take the architecture's plan --

8          Q.    Slow down a little bit.

9          A.    I'm sorry.   So the builder is like the developer.

10   They look at the architect's plan and they say okay, let's

11   go build this, build the product.

12         Q.    And back in IBM and the others, you were more of

13   a developer as opposed to the architect?

14         A.    That is correct.

15         Q.    Now, you stayed in Italy after IBM?

16         A.    Yes, I did, for maybe a year.   A little over a

17   year.

18         Q.    And you opened a company?

19         A.    That is correct.   I started a company with an

20   Italian friend of mine the company we called PrinTel.

21         Q.    About what year was this?

22         A.    It was the early 90s, maybe 1992.

23         Q.    And ball park is fine?

24         A.    '92, '93 time frame.

25         Q.    This was sort of your first foray into sort of

1    the back-up technology concepts?

2        A.   It was.

3        Q.   And what was the idea that PrinTel was going to

4    bring into the market?

5        A.   I had come up with a concept of being able to

6    write a device driver that there -- as you saw in the

7    evidence, there are these things called zip files.  And a

8    zip file is an archive file where you can take a whole bunch

9    of files and compress them down and put them in one file so

10   that those files can be easily transferred and e-mailed or

11   copied or moved around on CDs and stuff like that.  If you

12   wanted to access those files, you had to decompress those

13   files which means that you had to have a lot of disk space

14   to copy that data.  I came up with a device driver that

15   would allow the system to think that that zip file was

16   actually a disk so that you could actually just -- you could

17   go into your like Explorer and Windows and you could browse

18   through your zip file and run programs from it and things

19   like that.  Those features are all built into Windows now,

20   but I was the first person to build technology like that.

21       Q.   And you were actually -- you actually wrote the

22   code for a driver to do all of that?

23       A.   I wrote 100 percent of all of it myself.

24       Q.   And was this your -- was this your million dollar

25   idea?  Did it take off?

1          A.    I thought it was and I was very excited about it.

2    I scraped up a bunch of money and from some friends of mine

3    and we ran ads in PC Magazine.  About two months after we

4    released the product, Microsoft came out with something very

5    similar that was free and my business dried up overnight and

6    so I had to move on.

7          Q.    And one of the places you moved on to is a fairly

8    large company called Stack?

9          A.    That is correct.

10         Q.    That is in California?

11         A.    That is correct.

12         Q.    And are they in the back-up industry?

13         A.    At the time I joined, they were not.  They were

14    in the data storage business.  They had a very famous

15    software package called Stacker.  And when you loaded

16    Stacker on the computer, it would double the size of your

17    hard drive.  The founders of Stack owned all kinds of

18    patents on compression technology so they had built this

19    data storage compression.  And then eventually Stack went

20    out and purchased a back-up company, I believe they were

21    from Florida, and so they said we want -- we wanted to bring

22    this code up, make it more modern, we want it to now run

23    under Windows 98 and we want it to run under Windows NT.

24         Q.    This is the code from the back-up company that

25    they bought?

1          A.    That is correct, yes.

2          Q.    That is where you came into the picture?

3          A.    That is correct.

4          Q.    And did you help write code and develop code for

5     Stack?

6          A.    Yes, I did.

7          Q.    How long were you there?

8          A.    I was at Stack between two and a half, maybe two

9     and a half years, I think.  I don't remember exactly.  In

10    this business you don't stay anywhere very long.  You need

11    to get experience so you move on.

12         Q.    In fact, after Stack you got to go to the UK for

13    a couple of weeks and do some code writing there for a big

14    UK company; isn't that right?

15         A.    That is correct.

16         Q.    And then now that kind of gets us to the area of

17    where your company, not StorageCraft Technology Company the

18    merged company, but your original company StorageCraft,

19    Inc.; is that right?

20         A.    That is correct.

21         Q.    How did StorageCraft, Inc. come about?

22         A.    A friend and I started the business.  At the time

23    we called it MKA and Associates that was Magnuson Kirby and

24    Associates.  My friend's name was Tom Magnuson and we

25    started a consulting business for software.  And our first

1     project was the UK project which paid very well and I got to

2     go to Europe again three or four times during that summer to

3     work on that project.

4          Q.   Did MKA eventually become StorageCraft,

5     Incorporated?

6          A.   That is correct.  We wanted to come up with a

7     more brandable marketing name that sort of told more about

8     what our company did because we were in data storage and

9     back-up kind of thing so I came up with the name

10    StorageCraft.

11         Q.   Who was the Magnuson in MKA?

12         A.   A friend of mine who handled the business side of

13    things.  I have known him since I was a teenager.  He was

14    sort of like a surrogate father to me because my father

15    traveled for his business a lot so he wasn't home a lot.

16         Q.   Did Mr. Magnuson eventually kind of bow out of

17    StorageCraft, Inc.?

18         A.   Yes, he did.  He was starting a nonprofit at the

19    time and he wanted to dedicate himself full-time to that.

20         Q.   Now, I'm going to get to the VSnap code in a

21    second but what was StorageCraft, Inc. doing?  Well, I know

22    the ball park, but when was StorageCraft, Inc. when did it

23    come into existence?

24         A.   I believe it was -- I think we started working on

25    forming the company around December of 1999 and I think we

1    formed the corporation in 2000, January 2000, or in that

2    time frame.  I don't remember the exact dates.

3         Q.   Now, we're going to get to VSnap code in a

4    second, but what was StorageCraft, Inc. doing between the

5    time it was formed and the time VSnap came along?

6         A.   Consulting work.  I started --

7         Q.   Who were you working for?

8         A.   Um, gosh, I had so many clients I did work for

9    Compaq, I did work for Fujitsu, you know, many companies.

10   It is hard, you know, eventually we had so many projects

11   coming in that I had to hire Max and then I eventually had

12   to hire Alexey and Denis.  We worked on a massive project

13   for -- it was a collaboration between Quantum, the hard

14   drive manufacturer, and a company called Jabil Circuit, they

15   are a publicly traded company that builds hardware

16   components for people and it was a storage product.

17        Q.   The late 90s was a pretty exciting time in the

18   technology field, wasn't it?

19        A.   Yeah, early 2000s.

20        Q.   Now, let's go to the VSnap.  Do you recall how

21   that idea came to you?

22        A.   Yes.  I was working for a company in San Diego,

23   consulting through our business.  The company was called St.

24   Bernard Software.  And they had a product called open file

25   manager, it was OFM.  And it was the precursor to a current

1    modern day SnapShot technology, but it was file based

2    SnapShotting and not a disk based SnapShotting.  So as the

3    back-up is going through files to make the back-up, it would

4    grab a file, if the file was open it would make a SnapShot

5    of the file, it would back-up the file and it would let the

6    SnapShot of the file go and it would go to the next file.

7    So that was the precursor to modern day image based

8    SnapShotting.

9         Q.   You were consulting for a company who did

10   SnapShotting the old way?

11        A.   That is correct, yes.

12        Q.   I take it VSnap is the new way?

13        A.   Yes.  I was driving home on the 15 one afternoon

14   from that job, and it was just one of those crazy moments.

15   I had this epiphany.  All of a sudden this image popped in

16   my head.  I said I know how to do this.  I was so excited I

17   had to pull off on the side of the freeway and I had to call

18   one of my friends.  I was jumping up and down and saying you

19   can't believe what I just figured out how to do.

20        Q.   You actually pulled over on the side of the I-15?

21        A.   That is correct, yes.

22        Q.   Who did you call?

23        A.   I called my friend Paul from UltraBac.

24        Q.   What did you tell Paul?

25        A.   I said I figured it out, you know, and I just had

1    to tell someone.  I just had to tell someone that understood

2    what I was talking about.  I couldn't go home and like tell

3    my wife guess what I did because she wouldn't understand the

4    technology.  So I had to call so I called my friend Paul.  I

5    had done work -- StorageCraft had done work for Paul and

6    actually some old style SnapShotting technology file based

7    as well before this.  So I already had a good working

8    relationship.  He owns a company that had a back-up product.

9    It was an image based back-up product.  So he was the only

10   person I could think of that I could call at that moment

11   where I could express the excitement I was having.

12        Q.   It sounds like you were pretty excited?

13        A.   I was very excited.  I couldn't drive.  I had to

14   pull over.  I would have crashed.

15        Q.   So you carefully merged back on to I-15, right?

16        A.   After about 10 minutes I talked to Paul, I calmed

17   down, got back on the road, drove home and started writing

18   code.

19        Q.   So you were actually writing the SnapShot code

20   for VSnap?

21        A.   That is correct.

22        Q.   And how many days did it take you to do that?

23        A.   I am going to say somewhere between seven and

24   10 days.  I basically worked for a solid week with hardly

25   any sleep, writing code, almost there and then my wife and

1    I -- I am guessing this was probably around October or

2    November of that year, I don't remember the year.

3        Q.    Which year?

4        A.    Oh, that is a tough question.  I don't remember.

5    2000, 2001, something like that.  It was in that time frame.

6    And so any way, you know, I started working on the code and

7    then my wife and I had to fly to Cleveland because it was

8    thanks -- it was right around Thanksgiving time and so we

9    had to --

10        Q.    Mr. Kirby, was that the year of 9-11?  Does that

11    refresh your recollection on what year it was?

12        A.    It may have been.  That may have been the year

13    before 9-11.  It may have been 2000 because we were flying

14    to Cleveland, I had my laptop, and I was getting close to

15    finishing the code.  And I had finally got the code and I

16    ran a test and it worked.  And I was so excited I got up and

17    started running up and down the aisle of the airplane.  Had

18    that been post 9-11 I probably would have been arrested.

19        Q.    So you actually -- you worked on it for 10 days

20    or whatever straight, and then you're on airplane you hit

21    run and it works?

22        A.    That is correct.

23        Q.    Now, just so we're clear, writing code is a work

24    in progress, right?

25        A.    That is correct, yes.

1          Q.   And the VSnap code writing development didn't

2     stop when you hit run on the airplane, it continued forward

3     afterwards?

4          A.   Oh, yes.  I mean it needed to be tested,

5     compatibility with lots of software, with lots of versions.

6     It was more like proof of concept.  Here is the code, it

7     works.  I can take a SnapShot, I can make a back-up, the

8     SnapShot is consistent.  It crashed occasionally, you know,

9     I would run a back-up ap and I would get a blue screen.  I

10    mean those are expected that early in the development of a

11    product, but it was working.  And so I knew that the idea

12    was valid.  And I knew that I was on to something.

13         Q.   By the time you are going up and down the

14    airplane not getting arrested, you think you had already

15    retained the Russian engineers Alexey, Denis and Max?

16         A.   I for sure had retained Max because we had and

17    Denis because we had worked on that project for Quantum and

18    Jabil.  And Jabil Circuit came to us and said it doesn't

19    matter what it costs to get this project done.  Hire whoever

20    you have to.  So at that time we hired -- I know we hired --

21    already had Mark, I know we hired Denis, and I think maybe

22    six months or three months after that, somewhere in that

23    time frame, we then also brought in Alexey.  And we were

24    billing an enormous amount of hours through these developers

25    because Jabil Circuit said put everything you had into this

1    project so we did.

2        Q.    Now, Max -- of these three Russian developers,

3    which one is the most talented?

4        A.    They're all talented.  Max was the most efficient

5    as far as being able to do the most amount of work, and

6    quality work in the shortest amount of time.  They were all

7    good developers, very good developers.

8        Q.    And as far as work on the VSnap, which of these

9    -- can you explain to the jury how these three Russian

10   engineers helped you take the idea from the airplane and

11   move it forward?

12       A.    Right.  And it didn't happen immediately.  I

13   didn't have really a customer for VSnap at that time, and we

14   had other projects we were working on.  So I couldn't

15   immediately take everybody off of their projects.  So we

16   finished up the projects that we were working on with our

17   various clients, and 9-11 came about.  And after 9-11, every

18   bit of our contract work dried up.  Nobody was spending any

19   money.  We couldn't pick up contracts anywhere.

20       Q.    So up to the time between the work on the plane

21   and 9-11, are you working on VSnap?

22       A.    In the background, spare time, you know, whenever

23   I had a chance to go into it and tinker with it and work on

24   it.  But mostly we were working on things that were paying

25   the bills at that time.

1          Q.    And after 9-11 it sounds like the development of

2     VSnap really took off?

3          A.    I made a commitment.  I talked to my friend Paul

4     and I said would you be interested in licensing this if we

5     complete it?  And he goes sure I'll license it from you.  So

6     I got -- the first thing I did is handed all of the

7     software, the driver over to Max, and I said this is now

8     your project.  So you need to -- you're going to be the

9     owner of the driver, the VSnap driver, so you need to work

10    on that.  So for six months or so, September to January, he

11    worked very, very diligently, both of us did, on the

12    project.

13         Q.    Denis, Alexey, Max and you?

14         A.    Yes, Max and I.

15         Q.    You were -- so you worked on the VSnap project.

16    What about Denis and Alexey, were they helping you guys out?

17         A.    At that time, no, they weren't.  Because with

18    device driver software, you almost have to have one

19    developer to do it.  It is hard to have two people working

20    on a single component that is so intricate.  You really need

21    to generally at least the way I have managed software

22    development, is I would have one person working on a driver.

23    If you have three or four people working on a device driver,

24    it can be problematic.  You know, with other types of

25    software, it is not that big of a deal.  Somebody makes a

1    bug and checks it in.  But with driver software, it is very

2    sophisticated, it is very delicate.  So you really don't

3    want a whole bunch of developers working on a device driver.

4    You want to have one good person that does that development

5    work.

6         Q.   Okay.  And Mr. Kirby, you're doing pretty well,

7    but you do want to slow it down a touch.  I'm worried she

8    might throw something at you?

9         THE COURT:  Mr. Ensor, you suffer from the same

10   disability.

11        MR. ENSOR:  I do, Your Honor.

12        THE COURT:  So just slow it down.

13        MR. ENSOR:  Yes, Your Honor.  Absolutely.

14        THE COURT:  Pretend you're old like me.

15        MR. ENSOR:  I appreciate that.  It is one thing to be

16   critical, but note well taken.  So thank you, Your Honor.  I

17   will slow things down.

18        Q.   (By Mr. Ensor)  Especially on that Crocker

19   transcript, Your Honor, I felt like I was moving pretty

20   quick.  But anyway, so it was primarily Max and you?

21        A.   That is correct.  And once we got the software

22   going, my friend Paul licensed it from us.  I don't remember

23   exactly what he paid, but I think it was about $120,000.00

24   and that gave him full source code access that he could do

25   anything with the software he wanted to.  But we also

1    retained our rights that we could do anything we wanted to.

2    And since he was the first customer, you know, he had a

3    little -- a little more liberty with what he could do with

4    the software than I would say give to subsequent clients.

5        Q.    And Denis and Alexey were not as involved in the

6    development of the VSnap?

7        A.    Not at that time.  After January, I wanted to do

8    some minor graphical interface.  There was no -- there was

9    no user interface to the product.  It was strictly designed

10   to be integrated into other back-up products.  So since Paul

11   had a back-up application, his programmers could go in and

12   communicate with our SnapShot driver.  But there was no

13   front end.  There was no way that a normal user could go in

14   and do anything with it.

15       Then I would ask Denis would he write a shell

16   extension software that -- so that if you right clicked on a

17   driver letter in Windows Explorer, like your C drive or your

18   D drive, it would, in the property dialogue box that comes

19   up, which normally tells you you have how much disk space

20   you have left, we added a tab that said SnapShot.  And we

21   had some check boxes and some features that would allow any

22   user to load the software, right click on their drive letter

23   in Explorer and hit the SnapShot button.

24       Q.    And so it sounds like you and Max were pretty

25   heavily involved, and Alexey and Demetri less so?

1           A.   And Denis, yes.

2           Q.   And Denis, yes?

3           A.   Denis, you know, it was such a simple component

4      for the user interface maybe -- maybe Denis had a week or

5      two worth of work in that piece.  And then as the project

6      moved forward, we licensed it to Dantz Corporation which was

7      subsequently purchased by EMC.  We licensed it to

8      PowerQuest.  So as the products started gaining traction,

9      then I started bringing those resources in here and there to

10     do things like, you know, I think at one point I had

11     everybody I had all of the resources dedicated to either

12     testing or developing or working on some component of the

13     software.  Because that is what we -- we weren't getting any

14     consulting work at that time so we had to sell what we had.

15          So by that time, I had the resources working.  And

16     when I say full-time, there wasn't enough work for eight

17     hours a day for everybody that was, you know, Max and I were

18     doing the eight hour days and, you know, what little things

19     we needed and also we had to support some of our previous

20     customers that we had as part of our contract.  So I had

21     Alexey and Denis were also handling some of that support

22     work during that time.  So everybody was busy doing

23     something.

24          Q.   Now you saw, when we talked with Mr. Thomas

25     Shreeve, about part of the business plan of STC was to use

```
 1        these Russian engineers in Moscow because they were cheaper

 2        than U.S. engineers; is that right?

 3              A.    That is correct.  That is not why we hired them,

 4        but if that was part of their business plan and why they

 5        wanted to use them, I can understand that and don't deny

 6        that.

 7              Q.    You hired them back in 1999 or 2000 because they

 8        were good?

 9              A.    Max was the best I had met and I didn't care if

10        he lived in Oshkosh or Moscow, it didn't matter.  I wanted

11        him.

12              Q.    But the fact of the matter is that they were

13        cheaper?

14              A.    They were.  We paid them more than the typical

15        Russians made any way.  I think at that time Max told me

16        that a typical doctor in Russia made $200 a week and we were

17        paying Max around $32,000 a year, something like that.  And

18        we were good to our employees.  When we did the big Quantum

19        project and we made a lot of money, we paid all of the

20        developers involved in that project 50 percent bonus on

21        their salary that year because we were making the money and

22        we wanted to show our appreciation for their hard work.

23              Q.    So Max was around 32,000 a year?

24              A.    That is correct.

25              Q.    And it sounds like one year he might have gotten
```

1      a $16,000 bonus?

2              A.   That is correct, yes.

3              Q.   What about Denis?  About what was he at per year?

4              A.   It was a little bit less than Max, but I don't

5      remember the exact number.  Maybe in the 20s maybe.

6              Q.   And what about Alexey?

7              A.   The same.

8              Q.   Somewhere in the 20s?

9              A.   Possibly.  I don't remember.  They were making

10     less than Max, but we weren't -- we weren't taking advantage

11     of them.  We wanted -- we made sure that they were making,

12     you know, what was a respectable wage in Moscow.  I think

13     Max was building a summer home with what we were paying him.

14             Q.   All in, how much do you think it cost your

15     company to develop the VSnap say up to the point where you

16     licensed it to PowerQuest in 2002?

17             A.   Just resources dedicated to VSnap, if you count

18     me, maybe 70, $80,000.00, something like that, maybe.

19      Again, I am not a business person and all I cared about was

20     developing good software.  I wasn't keeping track of hours

21     and who was doing what, and how much it was.  So it is a

22     really hard number.  But I know what we were paying them.

23     And even if we were paying, you know, let's be generous and

24     say that Max 32, Denis and Alexey 20 each, you know, 82,000

25     it would have been, you know, the max that it could have

1       possibly been in -- per year that was spent on it.

2              Q.    And Alexey and Denis, Alexey and Denis were not

3       fully dedicated to the VSnap development?

4              A.    No.   They were working on other projects.   We had

5       a Microsoft project going on that we eventually picked up

6       some work for.   So I kept everybody busy.

7              Q.    We saw some e-mails on your direct with

8       Mr. Karrenberg.   It sounds like e-mailing the entire source

9       code back and forth between you and your developers is

10      fairly standard?

11             A.    Yes.   When I first started the company, we didn't

12      have any source control.   First it was just me.   So I'm the

13      only one that was accessing the code.   I didn't need to

14      share it with anyone.   Then after we brought Max on, for a

15      while we were -- we would e-mail source code back and forth.

16      And then eventually I said we brought other developers in.

17      I said we need to have some control over our source now so

18      we installed a SourceSafe system.   But that did not preclude

19      us e-mailing source code back and forth.   Sometimes the

20      Russians couldn't connect to our server whether it was

21      because there was some problem with the internet connecting

22      across the ocean, or whatever, so what they would do is

23      package up an e-mail and send it, and, of course, e-mail is

24      one of those technologies that if you send an e-mail there

25      is no valid connection right now and it will just sit there

1     and keep trying and keep trying until a connection comes up.

2     So e-mail was used a lot for sharing code between us and all

3     of the code that we sent our customers was sent in e-mail.

4     We never gave our customers access to our source control.

5          Q.   And we'll talk about that in a second.  But how

6     many e-mails do you think, let's say 2001 to 2002, when the

7     VSnap code was really moving forward, how many e-mails do

8     you think you sent back and forth to Max and the other

9     Russian engineers?

10         A.   It is really not calculable.  It had to be

11    hundreds or thousands.

12         Q.   It was a frequent occurrence?

13         A.   Every day, you know, or every other day.  I mean

14    it was just -- it was just how we did business.

15         Q.   Now, you talked -- you talked a little bit about

16    the source code you send to clients?

17         A.   Correct.

18         Q.   You would also do that by e-mail?

19         A.   Yes.  That was the only way we had to send

20    customers, our customers, their software.

21         Q.   And we saw some of that with Mr. Karrenberg's

22    examination where he is putting up the e-mails back and

23    forth from PowerQuest?

24         A.   That is correct.  That was our standard process.

25         Q.   And you did that because you didn't want

1        PowerQuest to have access to your source code bank?

2            A.   Yeah, and they didn't want it.  You know, they

3        never requested it.  None of our customers did.  And so it

4        was just something we didn't do.

5            Q.   And then in the early days you had it licensed to

6        UltraBac?

7            A.   UltraBac, yeah, we did license it to UltraBac.

8            Q.   And that was somewhere in the 2001, 2002 time

9        period?

10           A.   Yeah, I believe that was January.  The dates are

11       fuzzy, but I want to think that was around January of 2002.

12       But I'm not perfectly clear on the days.  It was a long time

13       ago and I have no documents to --

14           Q.   Broadly speaking, what was that license for?

15           A.   The VSnap software.

16           Q.   And what did UltraBac pay you for that license?

17           A.   To the best of my recollection I believe it was

18       between 120,000 and $140,000.00.

19           Q.   You also negotiated a license with a company

20       called Dantz?

21           A.   Yes, that is correct.  They contacted us.

22           Q.   About what time period was that?

23           A.   I can't -- I really don't remember.  It was

24       probably some time in 2002.

25           Q.   Do you recall how much that license was?

1          A.   I do not.  It was probably somewhere around 120

2     or $150,000.00.  I don't remember.

3          Q.   Let me show you Exhibit 146 which I believe is

4     already in.  This is the Dantz agreement?

5          A.   Middle 2002.  That is the agreement, yes.

6          Q.   Let me show you the payment provision.

7          A.   Okay.

8          Q.   Can you read that Mr. Kirby?

9          A.   Yes.

10         Q.   Dantz pays you $120,000.00 for the license?

11         A.   That is correct.  And then we had an add-on

12    hourly rate for any custom work they wanted to have done.  I

13    don't know if we did any custom work, but they wanted to

14    have a provision in the contract that if they wanted us to

15    do -- they wanted us to do work for them that we would agree

16    to do so at a negotiated rate.

17         Q.   So the upfront license fee was 120,000?

18         A.   That seems to be correct, yes.

19         Q.   And then the next license you -- your company

20    entered into with regard to the VSnap was with PowerQuest?

21         A.   That is correct, yes.

22         Q.   That was just a little later than Dantz, right?

23         A.   Yes, it was.

24         Q.   Do you recall how much that license was?

25         A.   That was a more complicated license because it

1    required a lot of custom work.  I think when we, you know,

2    it was around 200 to $250,000.00 and there was a lot of

3    customization that we had to do.  They had a feature that

4    they wanted us to add to the SnapShot software called hot

5    rollback.  So we worked on that project for them.  So they

6    paid us a little bit more for the license in order for us to

7    do that extra development work for them.

8        Q.  Are those the three main licenses from the 2001,

9    2002, 2003 time period?

10       A.  UltraBac, Dantz, you know, there was one more

11   license.  We licensed the architecture to St. Bernard

12   Software.  The company that had the file by file

13   SnapShotting technology, once they saw our image based

14   SnapShotting technology, they wanted to license it but they

15   did not want to license the source code.  They had a full

16   team of developers, maybe 15, 20 developers, and a full test

17   lab and they said we just would like to license the

18   architecture from you and we will go build our own version

19   of the software.  And I think maybe that license was 100 to

20   120,000 or something.  I don't remember the specifics

21   because I wasn't involved in the day-to-day process of that.

22   They licensed the software, they paid us the money, and, you

23   know, we didn't really interact with them on it after that.

24       Q.  And during this time you're getting -- during

25   this 2000, 2001, 2002 time period, you're getting pretty

1    good recognition in the industry, aren't you?

2         A.    Yes.   That is the most important thing to me is

3    the -- is, you know, I take the software development

4    seriously in that we want to build the best products.

5    Because when you build a good product, it costs you less

6    money down the road.  If you build bad software, and you put

7    that on the market, you are going to spend 10 times as much

8    fixing issues that are reported from customers in the field.

9    So I had a strong ethic to create the best software possible

10   so that I didn't have to spend all of the money I made

11   supporting that product down the line.

12        Q.    And it is during this time period that Microsoft

13   took note of your work?

14        A.    I don't remember when the MVP came in.  I think I

15   was awarded the MVP -- it may have even been before Max

16   joined the company, or it was right after Max joined.  So it

17   would have been in the 2000-2001 time frame.  And because I

18   had been in the industry for many, many years and, you know,

19   everybody knew who I was.

20        Q.    How do you go about becoming an MVP?  How does

21   everybody know who you were?

22        A.    You have to -- there is no way you sign up for

23   it.  It is something that Microsoft chooses you.  And the

24   way they choose you is how you contribute to the community,

25   you know.  They look at all of the mailing lists and they

1       look at the blogs and they look at things like that and see

2       who are the people that are out here helping the most people

3       develop products for our platforms.  And they award MVPs to

4       people who do that.  So I didn't even -- I mean it came as a

5       complete shock.  I got an e-mail one day, you know, you have

6       been selected as a Microsoft MVP, and all of a sudden

7       thousands of dollars of free software, and I was getting

8       briefcases and jackets and, you know, they shower you with

9       gifts when you get those types of awards.

10           Q.   And then in your little part of the computer

11      development world, there were only how many MVPs at that

12      time?

13           A.   Once I -- you know, I -- I believe there was 12.

14      And I don't remember if that 12 included Max or if it was 12

15      before Max became an MVP.  I don't remember.

16           Q.   Now, the current owners of StorageCraft, several

17      of them worked at PowerQuest, correct?

18           A.   That is correct, yes.

19           Q.   And did you have interaction with them due to the

20      license between your company and PowerQuest?

21           A.   Yes, I had interactions with a guy named Nate

22      Bushman.  I think he was my -- our primary developer contact

23      in the company at that time.

24           Q.   And at some point the guys from -- some of the

25      guys from PowerQuest, now known as STC, they come to your

1    attention about wanting to do some business with you?

2        A.    Yes.  I don't remember exactly how the

3    conversation started between Nate and I, but I think I may

4    have once Symantec had purchased PowerQuest, I think I was

5    having some e-mails back and forth with Nate, and I don't

6    remember if I said to him hey, why don't you consider coming

7    to work for StorageCraft or whether he said something.  And

8    I believe it was me.  And then the next day he comes back

9    and he goes well, I have got some friends here at PowerQuest

10   we would all like to talk to you.  And that is when we set

11   up the meeting where the four guys drove up from Utah, up to

12   -- down to California to visit me on my ranch.

13       Q.    And who were the four guys?

14       A.    It was Nate Bushman, Scott Barnes, Kurt James, I

15   don't remember if he was there, and Brandon Nordquist and

16   Russ.  Maybe it was five.  I don't remember exactly if it

17   was four or five.  But I know that -- I know that Nate was

18   there.  I know that Scott Barnes was there.  And I know Russ

19   Shreeve was there for sure.  I remember those three for

20   sure.  I believe there was five of them.  Four or five of

21   them.  They all drove up in a big SUV.  I lived up on the

22   top of the mountains, it was kind of tough to get to.

23       Q.    What did they want to talk to you about?  Or

24   strike that.  What did you talk about?

25       A.    The possibility of forming some sort of a

1    relationship to work together.  You know, um, Russ and I

2    believe it is some of the guys on that side of the fence

3    were the business people that came and said, you know, we

4    are marketing and we helped build the PowerQuest brands and,

5    you know, I think Nate was a software developer.  And so,

6    you know, it was -- it was a group of -- they had various

7    talents that we thought they could contribute to our

8    business to help us grow.

9        Q.   And we have gone through in pretty good detail

10   over the last couple of days sort of how the former

11   PowerQuest guys formed their company and how it kind of

12   worked with your company.  So I don't want to go over that

13   in much detail at all.  What I do want to talk about is how

14   it fell apart.

15       And Mr. Kirby, this is a November 14, 2004 e-mail from

16   you.  It is Plaintiff's Exhibit 61.  This was sent on

17   November 14th, 2004?

18       A.   That is correct, yes.

19       Q.   And this is sent to Roland Whatcott?

20       A.   That is correct.

21       Q.   And he is at Symantec, right?

22       A.   Right.  He was at PowerQuest and he -- when

23   PowerQuest was purchased by Symantec, he became an employee

24   of Symantec.

25       Q.   This is written a couple of weeks after you

1    resigned from STC, correct?

2        A.   Correct, yes.

3        Q.   And only a couple of days after your formal

4    resignation letter?

5        A.   That is correct, yes.

6        Q.   And in this e-mail, you're talking about your

7    involvement with the former PowerQuest guys over the past

8    year?

9        A.   Yes, that is correct.

10       Q.   You say right here, I am also sure if there are

11   some NDA violations since their new product requirement

12   specifications for the V21 Protector documentation, I am

13   sure Scott Barnes is using PowerQuest knowledge to achieve

14   this goal.  Do you see that?

15       A.   Yes, I do.

16       Q.   Now, what basis did you have to tell that to

17   Symantec?

18       A.   Well, as -- in the fall of that year we started

19   in earnest thinking about building a back-up product.  And

20   we were going to -- at that time I think it was code named

21   ShadowBack.  Eventually I believe it became ShadowProtect

22   after I left.  And I had worked on designing some

23   screenshots.  And I am not an artist, so mine were done in

24   text characters with plus marks as corners and little

25   dashes.  But I had sort of put together what I thought was a

1    good layout for an image based back-up product.

2        And I passed those around to everybody, and I worked

3    on that for maybe a week.  And Scott went out and on his own

4    and developed his own graphical user interface and built a

5    prototype under a programming framework under Windows

6    called.NET.  And when he started presenting those

7    screenshots, they looked exactly like the screenshots from

8    the company that they just came from.  And I argued on

9    numerous occasions I said we don't have to make a product

10   exactly like somebody else's product.  We can create our own

11   product, right?  I mean we're, you know, those are going to

12   be the requirements for NetJapan and it is like, you know,

13   we don't have to do that, let's just create our own.  We can

14   still make a great product.  It doesn't have to look exactly

15   like the product from the company you just came from.  That

16   stuff made me nervous.

17       Q.   And then you go a little higher you say, they did

18   this to me, the guy who built the -- well, let's take it

19   back a step.  In the top paragraph you talk about some of

20   your issues that you were having with your new partners at

21   StorageCraft; is that right?

22       A.   Yes, that is correct.

23       Q.   And you assert that they stole my company from me

24   and they have acted in an unethical manner.  Do you see

25   that?

1          A.    Yes.   Yes.

2          Q.    Why did you make that assertion?

3          A.    Well, I want to make it clear I didn't think they

4     stole money from me, right.   Mr. Shreeve was very generous

5     to Hannah and I when this company wasn't making money, and

6     he put money in for us so that we could have salaries, so

7     that we could pay our mortgage, so that we could survive.

8     And we were very appreciative of that.   And in exchange for

9     that, the original agreement that we had with the guys that

10    came from PowerQuest was they would agree to generate a

11    million dollars in sales in 18 months or they would walk

12    away.

13         And when Mr. Shreeve started giving us money, you

14    know, to help us meet our financial obligations, to

15    reciprocate that, I accelerated that.   I think it was four

16    or five months or so into them working with us, I said we're

17    very appreciative of the money you gave us, we're going to

18    discount, we're just going to throw that 18 month clause out

19    and I'm just going to give you the 49 percent of the

20    company.

21         So it wasn't a financial issue when I said they stole

22    my company from me.   They stole -- the way I looked at it is

23    they took -- they took my soul.   I mean I had a way that I

24    had built that company, I had a way that I built software.

25    That software had a proven track record in the industry.

1     And I wanted to move the company forward under those same

2     principles.  And those principles weren't stealing some idea

3     of somebody else's software to try to duplicate a product

4     somebody else had.  So when I speak that they stole my

5     company from me, that is what I meant.  I didn't -- it

6     wasn't an -- I didn't mean they took my money from me,

7     right, I mean money is just money.

8          Q.   Did you feel they had taken control of the

9     software engineering and development and architecture away

10    from you?

11         A.   Yes.

12         Q.   How did they do that?

13         A.   Well, they were driving Max and Denis and Alexey.

14    They were telling them what to do.  I wasn't doing that any

15    more.  The job title they gave me was chief scientist.

16    Whatever that means.  And, you know, basically what I

17    thought that meant is we are going to put you in a backroom

18    and if you come up with a good idea every once in a while,

19    you can tell us about it.  And that wasn't, you know, I -- I

20    built that brand and that brand had a certain reputation

21    associated with it.  And that is what I wanted to protect,

22    right?  When people said StorageCraft in the industry,

23    people knew Jamey Kirby.

24         Q.   Were you having any other problems with your new

25    partners at this time?

1              A.   We got into some -- there is always head butting,

2         you know, and I was angry when I left.  I won't deny that.

3         I felt like, you know, I had sort of been taken advantage

4         of.  Not financially, but just I created this thing, right.

5         And, you know, when the NetJapan money came in they put an

6         at will employment agreement in front of me which meant that

7         they could fire me any time they wanted to.  They wanted me

8         to sign non-compete agreements and I'm like I built all of

9         this stuff, this is -- this is my thing.  It was an insult

10        to me.

11             Q.   So they asked you to sign an agreement that would

12        allow STC to fire you and then sign an agreement that says

13        you can't use your skills to go out and make a living?

14             A.    Not in that technology area, yes.  And in

15        addition to that, we had an agreement that all of the

16        members of the company had made back when we had a meeting

17        in Utah that said when the NetJapan -- if we -- Hannah and I

18        said that the only way we would agree to allow it to take

19        the NetJapan investment and to give up 10 percent which

20        would dilute Hannah and I below 31 -- 51 percent which means

21        we lose control, was that if out of that $1.25 million that

22        we were allocated somewhere between 60 or $80,000.00 because

23        we hadn't had a real paycheck in over a year, you know, we

24        took dribs and drabs of money to make sure that we could,

25        you know, that we didn't get kicked out of our house.  But

 1    other than that, there was no extra money laying around.

 2    And so we said that is -- that was a condition, you know,

 3    and everybody agreed to do that.  And when the NetJapan

 4    money came in, they presented these agreements to us.  And

 5    then I said well what about the 60 to $80,000.00?  And I

 6    think it was Jeff Shreeve said oh, we can't do that, there

 7    is no way NetJapan would tolerate that, that they weren't --

 8    they wouldn't allow that to happen.  We can't do that.  So

 9    at that point, what could I do?  Was I going to stay, you

10    know?  They sent Hannah and I both paychecks along with

11    those agreements.  We didn't even cash the paychecks.  We

12    sent them to our lawyer.  We said we don't want the money.

13    We didn't even want to be construed as tacitly agreeing to

14    the terms of the contracts that they put in front of us.

15         Q.   Now, you also discussed Plaintiff's Exhibit 59

16    with Mr. Karrenberg?

17         A.   Yes.

18         Q.   And you went through it a little bit.  This is

19    November 4, 2004, right?

20         A.   Yes.  That is a few days, maybe a week, after --

21    after I -- Hannah and I had resigned.

22         Q.   And how did you orally resign?

23         A.   Well, we got the paperwork and the documents, I

24    believe it was on the Thursday or a Friday, I don't remember

25    the specific day.  And, you know, I sat on it for the -- I

1    mean I sort of knew when I got the paperwork that it was

2    over.  But I wanted, you know, I gave myself the weekend to

3    think about it.  And on that Monday morning, Hannah called

4    and talked -- I believe -- I believe Hannah called and

5    talked to Jeff Shreeve and notified him that we were -- we

6    are not going to be working and we're stepping away, we're

7    resigning our board positions, we're not going to cash our

8    paychecks and we're done.  Then that following Thursday,

9    Kurt James called me on the phone.

10        Q.   He is with STC?

11        A.   Yes, he is.  He is one of the principal founders

12   of STC.  And he called me on the phone and said well what

13   can we do to convince you to come back?  And I said you

14   could get rid of Russ and Jeff Shreeve and Scott Barnes

15   because I felt like they were the ones who were pushing me

16   out of what I had created and what I had built.  And I guess

17   that wasn't an option.  So I never heard from anybody at

18   StorageCraft again regarding my termination until I

19   memorialized it.  You know, a friend of mine was an attorney

20   and he said, you know, you better put that in writing.  So

21   while I was up working for Paul, you know, I wrote a letter

22   that day and, you know, it was dated November -- I guess it

23   was November the 12th or 14th that made it official.  And I

24   also wanted NetJapan and all of the members of NetJapan to

25   know.  We had only told the principals of StorageCraft, of

1      STC at the time that we had resigned.  And I wanted to make

2      sure that the message was also conveyed to the investor

3      NetJapan.  So it was a combination of those reasons together

4      that my attorney, a friend of mine who was an attorney, he

5      wasn't acting as my attorney, he said you really should

6      memorialize your resignation in a writing and make sure you

7      copy everyone involved in this thing on what you're doing

8      and why you're doing it.

9           Q.   And we have looked at that exhibit already?

10          A.   Yes.

11          Q.   So this e-mail to your friend, Ralph, what is his

12     last name?

13          A.   Shnelbar.

14          Q.   And this occurs after you have told Kurt James

15     you're not coming back?

16          A.   Yes.

17          Q.   And you can tell from the first line that you're

18     thinking about opening a new company with Ralph; is that

19     right?

20          A.   Yeah.  We discussed it.  He had an image back-up

21     product and a company he was already working on.  The

22     product was near completion, but it was very buggy.  And he

23     didn't have any integration SnapShotting technology or

24     anything like that.  So, you know, he was like well let's --

25     I had known Ralph for 10 plus years from working with him

1    through business relationships with other companies that I

2    had worked for, and, you know, so we had a friendly

3    relationship and I think that StorageCraft even licensed him

4    our VSport technology so that he could use it to create a

5    mount driver for his image back-up product.  So I had a

6    relationship with him and he was very bright guy.

7        Q.   Were you under a noncompetition agreement at this

8    time?

9        A.   No, I was not.

10       Q.   Did this company go any where?  Did you actually

11   do anything with it?

12       A.   No, we did not.  He already had a company and so

13   I was coming in saying hey, these are some things that we

14   can do.  And we talked about it, you know.  And a lot of

15   that came out of the frustration and I mean, I think that

16   happened that note was written like I said a couple of days

17   after I had sent my resignations.  I was still angry, you

18   know, I did get angry and I was angry that my -- I was

19   losing my baby.  And you know, and so I said well I'm going

20   to go start another company and I'm going to compete with

21   these guys because I didn't sign a non-compete.

22       Q.   It never went anywhere?

23       A.   It fizzled out.  That anger eventually went away

24   and, you know, it is like, you know, whatever.

25       Q.   Now, we talked a good bit about your efforts when

1    you left STC to try to get rid of the confidential

2    information on your computers.  And as you stated in

3    Exhibit 46, you tried to do so right away, didn't you?

4         A.   Oh, yes.  Right after Hannah and I resigned, one

5    of the first things I did was packed up the SourceSafe

6    server that was in my home office.

7         Q.   That is the server that has all of the source

8    code?

9         A.   Has all of the source code.  Everybody from Utah

10   and Russia and it is where we all connected and we put all

11   of our source code and everything that was related to the

12   projects that we worked on.  So it was -- it was the goose

13   that held the golden egg.

14        Q.   What did you do with it?

15        A.   I packaged it up and sent it back to Utah, to

16   StorageCraft immediately.

17        Q.   And you also remember trying to scrub your

18   e-mails?

19        A.   Well, yes.  I removed all of the source code on

20   my hard drive, you know, because when you build software you

21   check out copies of the source code so it resides on your

22   local hard drive.  So I removed all of that because I didn't

23   want any of it.  I went through and did a preliminary scrub

24   of my e-mails.  I was really looking for source code.  I

25   wasn't really looking for e-mails between me and Max

1    because I just wanted to make sure I got rid of the source

2    code.  So thousands and potentially thousands of e-mails

3    that were passed around that had source code on it.

4    Obviously I missed 10 of them, or whatever the number is,

5    you know.  I mean I had over 100,000 e-mails in my inbox,

6    and, you know, when you do a search and the search result

7    comes back with 10,000 items, and you are sitting there

8    trying to go through each one of them, I mean, I guess I

9    could have spent 24 hours a day for the next two years

10   looking at every single e-mail to decide what it was.  But,

11   I mean, I think that was a bit of too much of a burden.  So

12   I tried to go through and get what I could.  And I

13   certainly -- I mean I'm the creative type, right?  The idea

14   of taking work I had done before, or somebody else's work

15   product and using it again as my work product is not how

16   creative people think.  It is not what I -- I didn't want

17   the code, right?  I could always go and create something

18   better if I wanted to.  That is what I do.  And I mean I

19   understand there are people like the guys at StorageCraft

20   who aren't the creative mind set, you know, that don't know

21   how to go out and innovate at the level that I do, right?

22   And so, you know, I know they have to hold on to what they

23   had with their hands.  To me I was okay to let it go.  Fine,

24   I will always invent something else.  That is just what I

25   do.

```
1              Q.   Did you try to get all of the source code off

2       your --

3              A.   I absolutely did.  I didn't want that stuff and

4       obviously it was there.  I apologize for it.  I am -- I fall

5       on my sword, you know, whatever, do what you have to do to

6       me.  It is not intentional.  It would have never been

7       intentional.  It is just not how I do business.  It was an

8       accident.

9              Q.   And we know now that you had -- StorageCraft had

10      also had already filed suit against you on the date you

11      responded to this e-mail?

12             A.   Um --

13             Q.   You didn't know that, right?

14             A.   I -- yes.  I don't -- I don't remember the

15      specifics.

16             Q.   Do you remember hiring Jeff Gross to be your

17      lawyer?

18             A.   I do.  I do.  I remember being served with the

19      lawsuit on Christmas Eve which I thought was a little bit in

20      bad taste.

21             Q.   And then you hired Mr. Gross?

22             A.   And then -- yes I -- my friend in Florida who

23      owned Columbia Data Products who also had a SnapShotting

24      technology, he has been a friend of mine for years.  Again

25      in this industry, especially in the back-up where it gets
```

1    very small, everybody knows everybody else, right.  So

2    you're friends with everybody.  Even though you're

3    competitors, you're friends, right?  You talk, right.

4    Because you do try to help each other out when you can, you

5    know.  It is like well my software doesn't support that, and

6    we're not going to support it, but gee, you can go down here

7    and talk to my friend Allen in Florida and he has some

8    software that can probably help you.  I mean that is how we,

9    you know, in that small circle that is how we worked.  So

10    any way my friend -- and I'm sorry, I'm talking too fast.

11        THE COURT:  Mr. Kirby?

12        THE WITNESS:  I'm very sorry.

13        THE COURT:  Mr. Kirby, if I were diagramming

14    sentences, I would have so many pairs of parenthesis in that

15    sentence.

16        THE WITNESS:  I apologize.  I am very sorry.  I get

17    carried away.

18        THE COURT:  No, I want you to listen.  I want you not

19    to talk.

20        THE WITNESS:  Okay.

21        THE COURT:  I want you to listen to the question and

22    pause before you answer it and answer the question.

23        THE WITNESS:  Yes, sir.  I'm sorry, Your Honor.

24        THE COURT:  Next question.

25        Q.   (By Mr. Ensor) So you hired Mr. Gross to

1     represent you?

2          A.   Yes, I did.

3          Q.   And at some point did you try to gather up any

4     remaining hard copies of stuff that might have related to

5     StorageCraft and give it to Mr. Gross?

6          A.   Yes, I did.

7          Q.   And was it your understanding that Mr. Gross was

8     going to turn that stuff over to StorageCraft?

9          A.   Yes, I did.

10         Q.   But at that point you had gone through your

11    office and CDs and printouts and whatever, and it was all

12    gone?

13         A.   Yes.

14         Q.   And you, in fact, you sent the -- you sent your

15    laptop back to STC, right?

16         A.   Yes, I did.

17         Q.   And you sent it certified mail, correct?

18         A.   That is correct.

19         Q.   And unfortunately, it got lost in the mail; is

20    that right?

21         A.   That appears to have happened, yes.

22         Q.   As part of Exhibit, Plaintiff's Exhibit 48, this

23    is Plaintiff's Exhibit 48, just so we're clear, it is the

24    Settlement Agreement for the first lawsuit.  Do you

25    recognize that, Mr. Kirby?

1          A.   Yes, I do.

2          Q.   And as part of that, there is a registered

3     receipt from the post office sending a package to Jeff

4     Gross.  Do you see that?

5          A.   Yes, I do.

6          Q.   And it is your understanding that that was the

7     receipt from the laptop that you were trying to return to

8     STC?

9          A.   It could be.  I can't look at it and tell.

10         Q.   Now, we also talked in detail that settlement

11    agreement with Mr. Karrenberg.  So let's talk real briefly

12    about selling your shares to NetJapan?

13         A.   Okay.

14         Q.   At the time you were thinking about selling your

15    shares to NetJapan, your understanding was NetJapan already

16    owned 10 percent of the company?

17         A.   That is correct.

18         Q.   And at the time -- and you still owned

19    31 percent?

20         A.   Something around that amount, yes.

21         Q.   So if you sold your shares to NetJapan, they

22    would be somewhere around 41 percent?

23         A.   Yes, that is correct.

24         Q.   And that would be the largest shareholder, to

25    your knowledge, in StorageCraft?

1          A.   To my knowledge, yes.

2          Q.   Now, you talked about -- you talked with

3     Mr. Karrenberg about how you had competing offers between --

4     from NetJapan and StorageCraft, correct?

5          A.   That is correct, yes.

6          Q.   And at the end of the day, you ended up with a

7     price of $550,000.00 that you sold your 31 percent to

8     NetJapan?

9          A.   Yes, that is correct.

10         Q.   And that was -- you got your 550,000 in a lump

11    sum payment, correct?

12         A.   One time payment, yes.

13         Q.   And whereas the deal with StorageCraft, they were

14    going to give you 100,000 lump sum and then pay you

15    $50,000.00 a month for the next 12 months; is that right?

16         A.   Yes, that is correct.

17         Q.   So how did you analyze those two offers and why

18    did you go with NetJapan?

19         A.   NetJapan gave me the impression that StorageCraft

20    wasn't selling software, that the valuation of the company

21    was incorrect because they weren't selling software, and

22    that, you know -- so I said well they may not be around in

23    12 months.  They may not be around in three months to

24    continue to make the payments.  And so I wanted the money

25    all in one lump sum.  That is why I accepted NetJapan's

1       offer.

2              Q.   So as of the date you sell it, late 2005, you're

3       not working for STC, you don't have any shares, what do you

4       go do?

5              A.   I thought about developing another computer

6       company.  We were considering building a hardware back-up

7       and storage appliance.

8              Q.   How far did you get into that process?

9              A.   I spent six months tinkering with it.  Spent

10      maybe $15,000 buying some prototype hardware, stuff like

11      that.

12             Q.   Did you get very far into that process?

13             A.   Not really.

14             Q.   What was your next endeavor after that?

15             A.   I went to Las Vegas to meet a guy, who was a

16      friend of a friend, who has expressed interest in investing

17      in this new hardware endeavor.  The guy I met was also in

18      the energy drink business.  And we sat and had a meeting for

19      a couple of hours that night and I was with a good friend of

20      mine.  As we were walking out of the hotel, I looked at my

21      friend and I said I am done with computers.  I am going to

22      enter the beverage industry.

23             Q.   And about what time period was that?

24             A.   Oh, it had been fall of 2005, maybe October,

25      November time frame.

1          Q.   And after you decided to get out of the computer

2     business, do you open a -- do you start an energy drink

3     business?

4          A.   Yes, I did.

5          Q.   What was that called?

6          A.   Redux Beverages.

7          Q.   And how long was Redux your primary focus?

8          A.   From probably October, November of 2005 until

9     March of 2009.

10         Q.   And March 2009 is when you got more actively

11    involved in the ActiveImage Protector product?

12         A.   I actually did get involved.  I wasn't really

13    involved at all before then, I answered a couple of e-mails

14    from NetJapan.

15         Q.   So for that three and a half year time period,

16    all of 2006, all of 2007, all of 2008, you were more focused

17    on your energy drink business?

18         A.   That is correct.  I did not write one line of

19    code.

20         Q.   That was your full-time job?

21         A.   It was.  Yes, it was.

22         Q.   Now, we heard a bit about Mr. Crocker and I'm not

23    going to replow the same terrain Mr. Karrenberg has plowed,

24    but I do want to talk about a couple of things.  I mean I

25    want to talk about what did you know about -- strike that.

1    NetJapan told you, and we have looked at the e-mails, that

2    David Crocker was their representative, correct?

3        A.    That is correct, yes.

4        Q.    And you knew that NetJapan was a major

5    shareholder in StorageCraft?

6        A.    Yes, I was still under the impression they were.

7        Q.    And we have looked at e-mails where Mr. Crocker

8    e-mails you in late October, and then we have read some

9    deposition testimony where he called you immediately after

10   the board meeting, the STC board meeting in Salt Lake when

11   Mr. Crocker was in San Francisco.  Did Mr. Crocker ever -- I

12   know this is a long time ago, did he ever make

13   representations to you about whether he was on the board or

14   going to be on the board of StorageCraft?

15       A.    To the best of my recollection, he told me he was

16   on the board.  I can imagine how else I would have known.

17       Q.    So when Mr. Crocker came out to see you in

18   December of 2006, you knew he worked for NetJapan, NetJapan

19   was a major shareholder of STC, and that Mr. Crocker had

20   told you that he was on the board or was going to be on the

21   board?

22       A.    Yes, that is correct.

23       Q.    Did Mr. Crocker ever tell you that he -- he was

24   on the board for just a week and then had left?

25       A.    No.  He never expressed that to me.

1          Q.   And you gave him, as Mr. Karrenberg pointed out,

2     your entire life of e-mails, right?

3          A.   That is correct, yes.

4          Q.   And that would have included some stuff with your

5     lawyer Jeff Gross about the first e-mail, about the first

6     lawsuit, right?

7          A.   Yes, that is correct.

8          Q.   Did you really think about that when you stuck

9     that disk in there and burned the PST for Mr. Crocker?

10         A.   I had no idea that you couldn't share your

11    e-mails with your attorney with somebody without losing your

12    privacy rights.  I wasn't a lawyer.

13         Q.   It wasn't really a consideration, right?

14         A.   It didn't -- no, I didn't know.

15         Q.   Why did you burn the PST file?

16         A.   He wanted documents.  He asked me for documents

17    relating to the time when I was being sued.  I had all of my

18    files and e-mails I believe from that time in a folder

19    called StorageCraft off of my inbox.  So I had my laptop and

20    I was like well, I can go and drag all these files out, I

21    can put them in the new file, you know, and I can do all

22    this work and I just didn't feel like doing it, right?  I

23    was -- I was doing other things.  I was having lunch with

24    the guy, but it was just like, you know, take my e-mail file

25    look in the folder called StorageCraft, you'll find the

1      documents you want, and delete everything else.

2           Q.   Do you regret giving him that PST file?

3           A.   I absolutely do.

4           Q.   Moving forward a couple of years, we all recall

5      the financial crisis of late 2007, early 2008.  Do you

6      remember that?

7           A.   Yes, I do.

8           Q.   How did that impact the energy -- well strike

9      that.  How did that impact your energy drink business?

10          A.   Well, it was terrible.

11          Q.   In what way?

12          A.   We had invested a lot of money anticipating

13     growth.  We had invested money into marketing.  We invested

14     a lot of money into product sitting in warehouses, you know,

15     we were sponsoring a motorcycle team.  We were sponsoring

16     some rock bands.  And we had contractual commitments to

17     these people.  And when sales dried up, I still had to pay

18     these people because I had contracts.  And all of the money

19     we had made just went away almost immediately with the

20     beverage company.  There was, you know, nothing.

21          Q.   Is that one of the reasons that you started

22     working again with NetJapan and LeapFrog in March of 2009?

23          A.   Yes, it was.

24          Q.   And I'm going to jump back a little bit but a

25     couple of times Mr. Campbell, and we looked at some e-mails,

1    he reached out to you and he asked you a couple of questions

2    in the 2007, 2008 period.  Do you remember that?

3         A.   Yes, that is correct.

4         Q.   How often did that happen?

5         A.   Once or twice.

6         Q.   And we looked at one of them.  This is for an

7    e-mail from you to Mr. Campbell on January 8, 2008.  Is that

8    right?

9         A.   Yes, that is correct.

10        Q.   And you have been talking about a mounting

11   driver; is that right?

12        A.   Yes, that is correct.

13        Q.   Now a mounting driver doesn't have anything to do

14   with the trade secrets in this case.  It doesn't relate to

15   the SnapShot and it doesn't relate to the incremental sector

16   tracking.  Is that correct or incorrect?

17        A.   That is correct, it does not.

18        Q.   And so this is actually almost a year before this

19   lawsuit was filed, is that right?  You probably don't know

20   when this lawsuit was filed.

21        A.   I don't know.

22        Q.   I'll represent to you it was filed in December

23   of 2008.  So prior to this lawsuit being filed, you're

24   telling Mr. Campbell that you wiped everything when you left

25   StorageCraft is that -- is that what you're telling him?

1          A.    Yes, that is correct.

2          Q.    And then what you're pointing to is some work you

3    did that is publicly available?

4          A.    Yes, I did some public domain software back in

5    1997.

6          Q.    Now in March 2009, had the ActiveImage Protector

7    product developed by NetJapan and LeapFrog been released?

8          A.    To the best of my knowledge it was being sold in

9    Japan.

10         Q.    And so when you -- and that wasn't a very good

11   question.  When you got involved, to your understanding had

12   the product been released or was it just getting ready to be

13   released?

14         A.    I was under the impression and was told that it

15   had been released.

16         Q.    And so you jumped into -- well, strike that.  But

17   what did NetJapan and LeapFrog want you to do in regard to

18   the ActiveImage Protector product?  What was the issue they

19   were bringing you in on?

20         A.    In a meeting NetJapan discussed with me they said

21   that the performance was abysmal.

22         Q.    Yeah.  But what aspect of the performance was

23   abysmal?

24         A.    They didn't know.  They just said we don't --

25   because, again, NetJapan doesn't understand that level of

1      software development, you know, so they asked me to come in

2      and figure out why.

3           Q.   So did you jump in and try to figure out why the

4      performance wasn't so good?

5           A.   Yes, I did.

6           Q.   What did you figure out?

7           A.   A couple of things, several things.  There were

8      two things first off that we could address right away that

9      would improve some of the performance, three things.  One

10     was the compression algorithm that they were using.

11          Q.   And the compression algorithm, what is that in

12     layman's terms relate to?

13          A.   It takes a piece of data and it squishes it down

14     as tight as it can so that it takes up less space.

15          Q.   How was that effecting performance?

16          A.   A poorly written algorithm takes along time to

17     compress the data.  So, you know, blah, blah, blah.

18          Q.   And the data that is being compressed here is the

19     SnapShot back-up?

20          A.   That is correct.

21          Q.   So this is how fast that SnapShot gets

22     compressed?

23          A.   That is correct.

24          Q.   And this is sometimes called the compression

25     engine?

1          A.    Yes, that is correct.

2          Q.    The compression engine doesn't relate to the

3    SnapShot technology.  I mean they are separate parts of the

4    program?

5          A.    Completely separate.

6          Q.    And the compression engine doesn't relate to the

7    incremental sector tracking part of the program?

8          A.    No, that is correct, they do not relate.

9          Q.    So this is part of one and what did you do to

10   help fix that problem?

11         A.    From my previous experience that we had discussed

12   earlier, I worked for a company called Stack in the 90s and

13   they were data compression experts.  So I went and tracked

14   down the founder of that company and he had a new company

15   and it was called Hifn, H-I-F-N.  It wasn't Hifi as Campbell

16   said in his discussion, it was called Hifn.  And I contacted

17   Doug and I said we are looking for some high-end compression

18   technology.

19         Q.    Did Doug have any available?

20         A.    Yes, he did.

21         Q.    And --

22         A.    He told me it was the same technology that

23   Symantec was using.

24         Q.    And did you go out and ask -- did you tell

25   NetJapan and LeapFrog that they should license that

1          technology?

2                    A.    Yes, I advised NetJapan to license that

3          technology.

4                    Q.    Did that happen?

5                    A.    Yes, it did.

6                    Q.    Did that help with the compression?

7                    A.    Yes, it improved the speed and the amount that

8          the data was being compressed.

9                    Q.    So that was a big improvement?

10                   A.    It was a big improvement.

11                   Q.    And you mentioned two other things that jumped

12         out at you that you were helping on.  What was number two?

13                   A.    Number two was encryption.

14                   Q.    And what does encryption mean?

15                   A.    Encryption means.

16                   Q.    Basic --

17                   A.    I will.

18                   Q.    Something I can understand.

19                   A.    You take a piece of data, for argument purposes,

20         let's say a word document, and you don't want somebody to

21         see -- be able to read the contents of that word document.

22         So you perform what in math terms is called a cipher where

23         you run through the data and mix it all up but you do it in

24         a method so that if you have a password you can unmix it.

25         But if you don't have that password, you can't unmix it.  It

1    is always scrambled.  So even if you pull up the word

2    document, it is just a bunch of garbage.

3         Q.   And how did you go about helping with that?  What

4    was the problem there?  Again, the short easy to understand

5    version?

6         A.   They were using a public domain open-sourced

7    version of the software that was very slow, it wasn't very

8    optimized.

9         Q.   So what did you think needed to be done?

10        A.   Well, I felt that we needed to go and find some

11   encryption technology and license that as well.

12        Q.   And did NetJapan and LeapFrog go license that

13   technology?

14        A.   NetJapan did, yes.

15        Q.   And then the third -- the third issue that jumped

16   out at you, what was that?

17        A.   It had to do with -- all modern computers now

18   have multiple cores which means they have multiple

19   processors in the computer.  So unless you specifically

20   write the software to be aware of multiple processors, the

21   systems -- your software is not going to use it, right.

22   Your software is going to run on one processor.  So I said

23   we can really improve the performance of the software if we

24   can detect the number of cores and while we're compressing,

25   like if we have eight cores and we're compressing data, we

1    can compress eight times as much data at one time which is a

2    very, very significant improvement in the software.

3         Q.   Did any of those three ideas have anything to do

4    with this SnapShot technology?

5         A.   No.  It had nothing to do with SnapShot.

6         Q.   And your understanding is that for every version

7    except for Windows 2000, the ActiveImage protector uses the

8    Microsoft standard SnapShot technology?

9         A.   That is correct.

10        Q.   And Microsoft Office 2000 is pretty old, but do

11   you know if NetJapan developed a SnapShot technology for

12   Microsoft 2000?

13        A.   Yes, they did.

14        Q.   And were you involved in any substantial way in

15   developing that?

16        A.   They asked me if I wanted to be and I refused on

17   multiple reasons.  I didn't want there to be a hint of

18   impropriety between the previous employment of StorageCraft.

19        Q.   You know who developed it for the ActiveImage

20   Protector?

21        A.   Yes, I do.

22        Q.   And you talked to him how many times about it?

23        A.   A couple of times, maybe.

24        Q.   Did he accept any of your ideas?

25        A.   No.  I came up with a new method, and because

1    I -- I couldn't stop thinking about it.

2         Q.   Did you pitch that new method to this guy?

3         A.   I did.

4         Q.   And he didn't go with that?

5         A.   He went with some other method he designed

6    himself.

7         Q.   Any of the three items that you helped NetJapan

8    with, did that have to do with incremental sector tracking

9    used in the ActiveImage Protector product?

10        A.   Not those three things, no.  Four things, no.

11        Q.   And, in fact, your understanding was Mr. Campbell

12   wrote the ActiveImage Protector products sector image

13   tracking; is that right?

14        A.   That is correct.

15        Q.   We talked a little bit about e-mails that you

16   produced and you haven't produced and I want to go through

17   that real quickly.  Redux -- strike that.  Redux, your

18   beverage company, and Rectiphy were both served with

19   subpoenas; is that correct?

20        A.   That is correct.

21        Q.   And you went through and you tried to find things

22   that might relate to SnapShot technology and such in your

23   e-mails for those two companies?

24        A.   Right.  Yes, I did.

25        Q.   And you had an e-mail account for Rectiphy

1    starting January of 2010?

2         A.    That is correct.

3         Q.    And Rectiphy produced e-mails?

4         A.    That is correct.

5         Q.    Now, you had a NetJapan e-mail account from

6    April 2009 to January 2010; is that correct?

7         A.    Yes, somewhere in that time frame, yes.

8         Q.    And you don't have those -- do you view those as

9    your e-mails to produce?

10        A.    No, I do not.

11        Q.    Why not?

12        A.    I was working as an employee for NetJapan as a

13   contractor.  The servers were in Japan.  They own those

14   e-mail accounts.  I had no authority whatsoever to produce

15   those e-mails.  I would have been sued.  I wasn't going to

16   do that.

17        Q.    Did you even remember your password?

18        A.    No, I did not.

19        Q.    Is there a reason why you didn't remember your

20   password?

21        A.    Yes.  NetJapan requires they -- when they create

22   a new e-mail account for you, they don't let you pick your

23   password.  They use a software package that generates a very

24   secure password for you.  It generates passwords like big Q

25   little V big T little I three Z, some big long string.  And

1    the purpose is to make sure that the password is secure so

2    that people can't guess at passwords and sneak into your

3    system.

4        Well, I'm bit of a scatterbrain and I think that from

5    March 2009 until December of that year when we started

6    Rectiphy, I think I must have had to call NetJapan five

7    times to say can you please tell me my password again,

8    because I mean I just couldn't remember it.  And you put it

9    into your outlook and if something happens like the internet

10   connection gets lost or something happens to the server or

11   it gets reset, your password gets reset in Outlook so it

12   pops up and it will ask you, you have to enter your password

13   again.  And of course I --

14       Q.   Did you use your NetJapan e-mail after you

15   started Rectiphy in January of 2010?

16       A.   No.  No, I did not.

17       Q.   Do you know if STC issued a subpoena to NetJapan

18   to try to get those e-mails?

19       A.   No, I do not.

20       Q.   We talked a little bit about the shared offices,

21   or Mr. Karrenberg asked you if your beverage drink company

22   shared offices with your software company Rectiphy.  Did

23   Redux and Rectiphy ever share offices?

24       A.   No, we never did.

25       Q.   But they both had the same office address; is

1          that right?

2                    A.    That is correct.

3                    Q.    Can you give me the chronology on that and

4          explain to the jury why you didn't share offices?

5                    A.    Yes.  In 2009, the beverage company was doing

6          terrible.  I had to lay off four employees and we had to let

7          our lease expire on our office building.  This was in

8          December of 2009.  And in January of 2009, as we were

9          forming Rectiphy, we were looking for office space.  So I

10         said well, my beverage company just terminated its lease, so

11         why don't we go over there and see if we can get a new lease

12         under Rectiphy and use the same office space.  But at no

13         time, not even for one second, did those two companies run

14         their businesses out of the same office space.

15                   Q.    It was used by Redux, it was empty, and then

16         Rectiphy came in?

17                   A.    That is correct.

18                   Q.    Just a couple of final questions, Mr. Kirby.  Did

19         you intentionally keep any of STC's confidential

20         information?

21                   A.    No, I did not.

22                   Q.    Did you intentionally disseminate any of STC's

23         confidential information?

24                   A.    No, I did not.

25                   Q.    Did you use STC's confidential information in any

```
 1     way for your work with the ActiveImage Protector?

 2          A.   No, I did not.

 3          Q.   Did you give LeapFrog any STC confidential

 4     information that they could use in working on NetJapan's

 5     product?

 6          A.   No, I did not.

 7          Q.   Did you give NetJapan any STC information,

 8     confidential information, for NetJapan to use in developing

 9     its new product?

10          A.   No, I did not.

11          Q.   Have you ever used any STC confidential

12     information since you left?

13          A.   No, I have not.

14          MR. ENSOR:   Thank you.   No more questions.

15          THE COURT:   Thank you.   Excuse me.   Mr. Karrenberg, I

16     would like to take a break right now, if we could.

17          MR. KARRENBERG:   I have one issue I have to raise with

18     you based on that testimony.

19          THE COURT:   Okay.   We'll take a break until 10 after

20     the hour.   All rise, please.

21          (Whereupon, the jury left the courtroom.)

22          MR. KARRENBERG:   I want to get into an area that I

23     think he opened up, but it affects the order you entered

24     about not talking about the AIP screenshots being the same

25     as ours.   And while I think he opened it up, I'm not in the
```

1      habit of violating your orders without getting -- he talked

2      about claiming that Scott Barnes took confidential

3      information from PowerQuest.  And his basis was he said the

4      screenshots were exactly the same.  Well, Judge, I think he

5      has opened that up and I think we're free to go into that

6      now.

7            THE COURT:  I appreciate you bringing it up.  I

8      disagree.  It was a different product, different time

9      period, different relationship.  So I'm not going to permit

10     it.

11           MR. KARRENBERG:  Now you know why I bring it up.

12           THE COURT:  Right.

13           MR. KARRENBERG:  I don't want to be held in contempt.

14           THE COURT:  You wouldn't be held in contempt, but you

15     have made a good record.  Thank you.  Anything else we

16     should cover before we recess?

17           MR. ENSOR:  No, Your Honor.

18           THE COURT:  Excuse me, I am sorry I had to slow you

19     down there, but we are burning out court reporters every two

20     hours and they go into rehab for a day and then they come

21     back.

22           THE WITNESS:  I apologize, Your Honor.  I get carried

23     away.  It is just my nature.

24           MR. ENSOR:  The court is right.  If you listen to the

25     question and you stop for a second or think about it, your

1    answer will be a little more concise and little more direct.

2         THE WITNESS:  I agree.  I understand.  I apologize to

3    the court.

4         MR. KARRENBERG:  You objected when I tried to tell him

5    to do that yesterday.

6         THE COURT:  Okay.  We're off the record.  We're in

7    recess.  I have one more issue I need to cover with you.  I

8    must have taken down the numbers of the instructions wrong.

9    I thought you told me 28 and 30 about using admissions and

10   questions from the judge.  It appears to me those are

11   actually 20 and --

12        MR. KARRENBERG:  The ones I had were 20 and --

13        THE COURT:  25.

14        MR. KARRENBERG:  Yeah.  On the latest set that is

15   correct, Your Honor.  That is what I have as well.

16        THE COURT:  Okay.  Then we're in agreement.  Now we're

17   in recess.

18        MR. KARRENBERG:  Thank you, sir.

19        (Recess.)

20        THE COURT:  The jury is on its way.

21        MR. KARRENBERG:  Judge, the jurors from like St.

22   George and Price, do you put them up in hotels?

23        THE COURT:  Yeah, the court pays for it.  We draw from

24   a statewide jury pool.

25        MR. KARRENBERG:  I was just curious.  I never knew

1    what we did with them.  I can't imagine them driving back

2    and forth every morning.

3         THE COURT:  Last year or last week during the outdoor

4    retailer convention we had a serious problem with jurors

5    from of the Wasatch front.  The closest hotel rooms were in

6    Brigham City -- no, actually Logan.  Logan and what is

7    beyond Fillmore.

8         MR. KARRENBERG:  Oh, my gosh.

9         THE COURT:  So we excused those people that didn't

10   have family to stay with.

11        THE CLERK:  All rise for the jury, please.

12        (Whereupon, the jury returned to the courtroom.)

13        THE COURT:  Just a moment, please.  We're convened

14   again in StorageCraft versus Kirby about to resume Mr. Kirby

15   as a witness with redirect examination.

16        MR. KARRENBERG:  Thank you, Your Honor.

17        THE COURT:  Go ahead.

18                    **REDIRECT EXAMINATION**

19   BY MR. KARRENBERG:

20        Q.   Good morning, Mr. Kirby.

21        A.   Good morning.

22        Q.   You were pretty animated this morning.  Were you

23   drinking your oddly named energy drink for breakfast?

24        A.   No.  Thank goodness I wasn't.

25        Q.   So it would have been worse?

1         A.   Yes.

2         Q.   Thank goodness you weren't.  Could we put up

3    Exhibit 61 please, Margaret.  This is the one we looked at.

4    Highlight this (indicating).

5         You said you wrote PowerQuest that you were sure that

6    Scott Barnes was using PowerQuest's knowledge and you told

7    that to the jury this morning, right?

8         A.   I felt confident that he was, yes.

9         Q.   Yeah.  And you also know that you have already

10   sworn that that is not true?

11        A.   I have?

12        Q.   Yeah.  Do you remember having your deposition

13   taken in the NetJapan case?

14        A.   Yeah, I think I do.  Yes.

15        Q.   Yeah.  In fact, it was on August 7th, 2007.  In

16   fact, it was noticed up by the lawyers for NetJapan, right?

17        A.   Possibly.

18        Q.   Yeah.  In fact, examination began with Mr. Gross,

19   your former lawyer, asking you questions, right?

20        A.   I don't recall.

21        Q.   Let's go to a page in that deposition, Margaret,

22   Page 164.  Here is where you're talking about the PowerQuest

23   non-competes and you were asked, this was actually by

24   Mr. Johnson at the bottom, I'm not asking whether you read

25   the non-competes or anything like that.  I'm just asking for

1      your general recollection during the time period whether it

2      ever -- whether it appeared to you that the four former

3      PowerQuest employees were trying to be mindful of their

4      obligations to their non-competes?  Mr. Gross objected and

5      you were asked if you should answer and he told you yes.

6      And you went on to say, okay, I know at the start of the

7      relationship, they were mindful to make sure that they were

8      doing things such that they weren't going to get into any

9      trouble.  I don't know what the specific terms of the

10     agreement with them were, so I can't make a judgment call on

11     how well, or how good, or how not well they, you know, were

12     mindful of that agreement.  Question, okay.  Answer, I don't

13     -- I don't recall what it is.  Question, so long story

14     short, you don't have any idea of whether -- answer, I

15     really don't.  Question, they were complying with those,

16     right, agreement or not.  Answer, and even if I read the

17     non-competes, I don't recall it now, so I don't, you know, I

18     just don't recall having read that agreement.  So I don't

19     have any grounds to or any boundaries to decide whether they

20     were within or without -- outside of those boundaries.  That

21     was your sworn testimony in 2007, correct?

22          A.   Yes, that is correct.

23          Q.   And you understand what it means to be under

24     oath, don't you?

25          A.   Yes, I do.

1          Q.   Let's also look at another section from that same

2     deposition.  Can we go to Page 270.  You were talking on

3     Exhibit 161 about the v2i protector system of PowerQuest and

4     here you were asked beginning on Line 16, and did Mr. Barnes

5     share with you his experiences in developing the v2i

6     protector at PowerQuest?  Answer, depends on what you mean

7     quote experiences quote.  You know, that's kind of -- I

8     don't know how you mean by his experiences.  Question, let

9     me take a step back.  In connection with discussing

10    ShadowProtect with you, and I realize that's a name that it

11    later acquired, in that context did he discuss any aspects

12    of Symantec v2i or PowerQuest v2i protector?  Answer, I

13    don't think he talked.  There was an objection Mr. Johnson.

14    Okay, I don't -- I don't recall him talking, ever disclosing

15    any of the specific information about what PowerQuest had

16    done in their product.  It was more of a look and feel issue

17    with the product that I was, you know, that concerned me.

18    Not that he was disclosing confidential information from his

19    previous employer.  So if that's where I -- I read that all

20    correctly didn't I, sir?

21         A.   Yes, you did.

22         Q.   That was your sworn testimony under oath in 2007,

23    correct?

24         A.   Yes, it was.

25         MR. ENSOR:  Your Honor, I ask that Mr. Karrenberg read

1    the next lines 12 to 18 on Page 271.

2         MR. KARRENBERG:  I'm not going to.  I would be

3    violating your order.  I think that it would open it up

4    more.  If you would like to look at those pages.

5         THE COURT:  I would like a copy.  I don't have them.

6         MR. KARRENBERG:  May I approach?

7         THE COURT:  Yes.  Lines 12 through 18, Mr. Ensor?

8         MR. ENSOR:  Correct, Your Honor.

9         THE COURT:  Stay right there.  It will not be read.

10        Q.    (By Mr. Karrenberg)  While we have got the

11    deposition out here, isn't it true you thought that you sold

12    the PowerQuest -- the source code license to PowerQuest for

13    too little money?

14        A.    Yes, I did.

15        Q.    In fact, you thought you got ripped off, right?

16        A.    Yeah.  It would have been nice to get a little

17    bit more.

18        Q.    Yeah, because you thought you didn't know what

19    you had at the time; isn't that right?

20        A.    That could be correct.

21        Q.    Yeah.  Could we put Exhibit 59 on.  You talked

22    about how much money that the Russians were owed and this

23    was the e-mail that you were sending in 2004 to a gentleman

24    named Ralph S. that you talked about possibly starting a new

25    business, correct?

1          A.    That is correct.

2          Q.    And you said you needed 160,000 a year, right?

3          A.    That is correct.

4          Q.    Let's go to the second page.  At the same time

5    you were trying to entice considering bringing over the

6    Russian engineers.  And there they had a little bit more

7    than you were saying.  They will need the following salaries

8    if they will bail and follow me.  4,700 per month.  That is

9    more than $32,000, isn't it?

10         A.    Yeah, that would give them a raise.

11         Q.    And $2,800 per month, that is more than

12   $20,000.00, isn't it?

13         A.    Sure.

14         Q.    And now you said that all you had into the price

15   of developing VSnap was about $80,000.00 based on what you

16   said you were paying them, right?

17         A.    That is correct.

18         Q.    Except you forgot that you also gave them

19   16 percent of StorageCraft Technology, Inc., correct?

20         A.    Yes, after we merged, yes.

21         Q.    Yeah.  And at that time you and everybody

22   involved had valued the company at 12 to $15,000,000.00?

23         A.    Sure.

24         Q.    So 16 percent of that is going to be somewhere in

25   the neighborhood of two or $3,000,000.00 in compensation,

```
 1    correct?

 2         A.   Could be, yes.

 3         Q.   Yeah.  And, in fact, you based it on what you

 4    paid them for a year, but you worked on the VSnap technology

 5    for 2000, right?

 6         A.   I don't understand the question.

 7         Q.   Well, you just said it was only about $80,000.00

 8    but that you had started working on the VSnap technology in

 9    2000?

10         A.   That is correct.

11         Q.   2001?

12         A.   That is correct.

13         Q.   2002?

14         A.   That is correct.

15         Q.   2003?

16         A.   That is correct.

17         Q.   And all the way to 2004?

18         A.   That is correct.

19         Q.   And during that period you were paying these

20    gentlemen all that salary?

21         A.   Yes, but they all weren't full-time.

22         Q.   But you don't have any time records either to say

23    exactly how little time, right?

24         A.   No, I do not.

25         Q.   And, in fact, you heard Mr. Campbell testify that
```

1    to get to where he even got with the LeapFrog product he

2    spent full-time for 18 months?

3          A.   Yes, he didn't have the driver experience.

4          Q.   Right.  And you also had to have the system

5    debugged, right?

6          A.   That is correct.

7          Q.   And Dantz did some of that for you, right?

8          A.   Most of it.

9          Q.   That is valuable, right?

10         A.   Sure.

11         Q.   And, in fact, PowerQuest did a lot of debugging

12   for you as well, didn't they?

13         A.   Sure, it didn't cost me anything.  That was

14   great.

15         Q.   But it is valuable, isn't it?

16         A.   Sure.

17         Q.   Now you mentioned at the very end of your

18   testimony that you couldn't get the NetJapan e-mails because

19   you were afraid NetJapan would sue you, right?

20         A.   Well, not afraid, just yeah it could have been an

21   issue, right.  I wouldn't have done it for fear.

22         Q.   You did get the Rectiphy e-mails that began in

23   2010, right?

24         A.   That is correct.

25         Q.   And the Rectiphy e-mails were maintained on the

1    NetJapan server in Japan, correct?

2         A.   Only to just recently.  They were not beforehand.

3         Q.   Just the one from earlier in 2012.  Certain

4    pages.  I need the other one there.  In your deposition that

5    you took in 2012, earlier this year in San Diego, we have

6    already looked at that, right?

7         A.   I guess so, yes.

8         Q.   Would you turn to Page 148, please.

9         A.   Okay.

10    MR. KARRENBERG:  Are you there, Rick?

11    MR. ENSOR:  I'm sorry, what page?

12    MR. KARRENBERG:  148.

13    MR. ENSOR:  Yeah.

14         Q.   (By Mr. Karrenberg)  Beginning on Line 17 I put

15    the question to you, do you only have one Rectiphy e-mail

16    account?  Answer, that's correct.  Do you know who is the

17    exchange provider on that?  Answer, NetJapan maintains that

18    server for us in Japan.

19         A.   That is correct.

20         Q.   And that was what you testified to on

21    February 27th, 2012?

22         A.   Of this year, yes.

23         Q.   Okay.  And so you had no problem getting the

24    Rectiphy e-mails, did you?

25         A.   Well, I'm the principal, I have the authority to

1    do that.

2         Q.   Okay.  But you didn't get the NetJapan e-mails

3    that you used while you were working on the development of

4    the AIP product from March of 2009 through December of 2009,

5    did you?

6         A.   I have no authority to do that.

7         Q.   But moreover, you didn't even ask NetJapan if

8    they would give you the password and allow you, would you?

9         A.   No, I didn't have the authority to.

10         Q.   I didn't ask you about authority.  You didn't

11    even ask them for the authority, did you?

12         A.   No, I did not.

13         Q.   And there was no reason you couldn't have asked

14    them, is there?

15         A.   No, there is not.

16         Q.   Now, you went through all your history early on

17    with your counsel of developing the computers, and it is

18    quite impressive, Mr. Kirby.  In fact, you even talked about

19    writing, I think the said, the first zip drive.  Do you

20    recall that?

21         A.   Correct, yes.

22         Q.   And you're aware that all of these VSnap source

23    codes on the e-mails that were contained on your disk that

24    you gave to Crocker, they're on zip drives, aren't they?

25         A.   They are on zip files.  I think I said that to

1      the jury.

2                Q.   So you were perfectly aware where the source code

3      was?

4                A.   I don't understand the question.

5                Q.   Well, you know very well when you were supposed

6      to clear your computer that you had a bunch of e-mails, in

7      fact, you said hundreds of thousands with Max Shatskih which

8      contained VSnap source code?

9                A.   No, I did not say that.

10               Q.   There is 19,000 pages right here.  That is not

11     one or two or even up to 10 like you testified, is it?

12               A.   I don't know how many you found.  I was told it

13     was 10.

14               Q.   It was over 3,000, sir?

15               A.   E-mails or zip files?

16               Q.   E-mails with source code, VSnap source code on

17     it.  Mr. Barnes will testify next.

18               A.   Okay.

19               Q.   But in any event, in all that experience, you

20     surely knew how to just do a word search, didn't you?

21               A.   Sure.

22               Q.   And a word search like you testified yesterday of

23     VSnap would just take seconds, wouldn't it?

24               A.   That is correct.

25               MR. KARRENBERG:  I have no further questions.

1          THE COURT:  Re-cross?

2                    **RECROSS-EXAMINATION**

3    BY MR. ENSOR:

4          Q.  Just a couple of points of clarification,

5    Mr. Kirby.  We looked at this with Mr. Karrenberg, it is

6    dated November 4, 2004, is that right?

7          A.  That is correct.

8          Q.  And this is kind of your wish list to your friend

9    Ralph if you're going to go into business together?

10         A.  That is correct, yes.

11         Q.  So in November of 2004, you were only suggesting

12   a salary for Max of less than $60,000.00 a year?

13         A.  Right.  I was going to offer him more than he was

14   getting previously.

15         Q.  Still less than $60,000.00 a year?

16         A.  That is correct, yes.

17         Q.  Certainly you weren't trying to get two or three

18   or $400,000.00 a year for him?

19         A.  No.

20         Q.  That is because you didn't have to pay him that

21   much.  $60,000.00 a year in Russia in 2004 was a lot of

22   money?

23         A.  I believe so.

24         Q.  And Denis you were going to pay a little under

25   $36,000.00 a year?

1          A.    That is correct.

2          Q.    And Alexey, you were going to pay a little bit

3     under $36,000.00 a year?

4          A.    That is correct.

5          Q.    This is 2004.  Now just so we're clear, your

6     testimony was in 2000, 2001, 2002, you paid them a little

7     less?

8          A.    Yes.

9          Q.    And we talked about -- Mr. Karrenberg asked you,

10    you know, VSnap was under development in 2000, 2001, 2002,

11    2003, 2004, and software is always under development, right?

12         A.    That is correct.

13         Q.    The primary development of -- and I know it was a

14    long time ago, Mr. Kirby, but the primary development of the

15    VSnap when you and Max were really going at it, what part of

16    that time period was that?

17         A.    I can't give the exact date, but I believe that

18    we were really going at it in 2001.

19         Q.    And as we saw by the exhibits, by 2002 you had a

20    product that you could license?

21         A.    Actually, we licensed it in the first one in

22    January of 2001.  Max, you know, I had written the original

23    code, and then Max helped me get it up to speed at the end

24    of 2000 along with the multitude of other products that he

25    was working on and projects to get it ready for Paul.  And

1    it wasn't until after we licensed it to Dantz that we --

2    that we really jumped in and said okay, this company has

3    high expectations from us so we have to do this contract

4    really well.  And Dantz was very good about helping us test

5    the software because we didn't have the resources to test it

6    as thoroughly as they could.

7        Q.   Did Max and Alexey and Denis work on other

8    projects besides the VSnap in 2001, 2002, 2003?

9        A.   I believe they did, yes.

10       Q.   And jumping to the e-mails, when the subpoena

11   came to Rectiphy, you were an officer and an owner in

12   Rectiphy, correct?

13       A.   That is correct.

14       Q.   You had the authority and the ability to produce

15   the e-mails, right?

16       A.   Absolutely, yes.

17       Q.   And you produced e-mails for January 2010

18   forward?

19       A.   Yes, I did.

20       Q.   If they were responsive, I guess.  And in

21   contrast to NetJapan, you're not an owner of NetJapan?

22       A.   No, I'm not.

23       Q.   You're just a consultant to NetJapan?

24       A.   That is correct.

25       MR. ENSOR:   Thank you.

1          THE COURT:  This witness can step down.  Your next

2     witness?

3          MS. SNEDDON:  Your Honor, we will call Scott Barnes.

4     We just have to go grab him.

5          THE COURT:  Okay.

6          THE CLERK:  Raise your right hand, please.

7                         **SCOTT BARNES,**

8        called as a witness at the request of the Plaintiff,

9             having been first duly sworn, was examined

10                    and testified as follows:

11          THE WITNESS:  Yes.

12          THE CLERK:  Thank you.  Please state your name and

13     spell it for the record.

14          THE WITNESS:  Scott Barnes, S-C-O-T-T B-A-R-N-E-S.

15          THE CLERK:  Thank you.  Please take a seat.

16                    **DIRECT EXAMINATION**

17     BY MS. SNEDDON:

18          Q.   Good morning, Mr. Barnes.

19          A.   Good morning.

20          Q.   Can you tell us what your current occupation is?

21          A.   I am the Chief Technology Officer for

22     StorageCraft.

23          Q.   Just pull the mike a little bit closer to you.

24     There you go.  Can you explain just generally to the jury

25     what your responsibilities are as the Chief Technology

1    Officer?

2         A.   I am responsible for engineering management.  I'm

3    responsible for facilities and for all of the IT systems.

4         Q.   So as a manager of engineering, what does that

5    involve in terms of your responsibilities?

6         A.   I am in charge of engineers and also any of the

7    source code and the source code repository where we keep

8    everything.

9         Q.   So that means that you oversee the security of

10   the source code?

11        A.   I do.

12        Q.   How long have you been the CTO or Chief

13   Technology Officer of STC?

14        A.   For eight years.

15        Q.   And you're also a founder of StorageCraft

16   Technology Corp?

17        A.   I am.

18        Q.   And you're also an officer of the company and a

19   member of the Board of Directors?

20        A.   Yes.

21        Q.   Can you please give the jury just an overview of

22   your education starting with high school and then proceeding

23   forward?

24        A.   Well, high school and then I studied computer and

25   electrical engineering at Brigham Young University from 1989

1    to 1995.  And then I had various courses in specific

2    software training over the years since then.

3         Q.   And have you also gained some experience in

4    software and development in your employment and in the

5    industry?

6         A.   Sure, yeah.

7         Q.   Why don't you just briefly describe for us your

8    employment history starting with your first job in the

9    software industry?

10        A.   First job in the software industry was Vinca.  We

11   created -- it was a high availability and disaster recovery

12   company.  I was a programmer for them.

13        Q.   And how long did you work for Vinca?

14        A.   For Vinca I worked for about four years and then

15   they were acquired by Legato.  At that time, I was director

16   of engineering in charge of 22 engineers.

17        Q.   And you're working on disaster recovery software

18   there?

19        A.   Yes.

20        Q.   And then what was your next job?

21        A.   My next job was with PowerQuest.  I was a chief

22   architect for them.

23        Q.   And what kind of software or what kind of

24   business is PowerQuest involved in?

25        A.   PowerQuest was a utilities company.  They built

1        utilities that you would run on your computer and I was

2        hired to start creating enterprise back-up products.

3              Q.   What were your responsibilities there as chief

4        architect?

5              A.   I was responsible for the product architecture.

6        Basically an architect is someone who designs the software

7        much like an architect for a house.  While I don't build it,

8        I design it and make many of the key decisions on what tools

9        and languages to use.

10             Q.   What was your next job?

11             A.   The next job was with --

12             Q.   Were you a founder of ShadowStor?

13             A.   I was.

14             Q.   When was that?

15             A.   That was December '03, 2003.

16             Q.   And what did you do at ShadowStor?

17             A.   I was a core programmer at ShadowStor.

18             Q.   What did your responsibilities include as a core

19       programmer?

20             A.   I built the first user interface and product for

21       our first product which was a ShadowUser or ShadowUser

22       product.

23             Q.   Can you describe that product just briefly?

24             A.   It was a product that ran on their computer that

25       allowed you to make changes.  But if you didn't like those

1      changes, you could quickly undo them.

2              Q.    And then in 2004 ShadowStor merged with

3      Mr. Kirby's company StorageCraft, Inc. to become

4      StorageCraft Technology Corporation, correct?

5              A.    Correct.

6              Q.    And then that is where you have been ever since

7      then?

8              A.    Ever since then, yes.

9              Q.    How many years of experience do you have in

10     developing, overseeing management and the development of

11     software and back-up software specifically?

12             A.    Over 16 years.

13             Q.    And you're intimately familiar with the making of

14     software products and back-up software products?

15             A.    Yes.

16             Q.    Now, I want to turn specifically to the source

17     code in this case, the VSnap source code in particular.

18     You're familiar with that code?

19             A.    I am.

20             Q.    How did you gain that familiarity?

21             A.    Well, I was -- I was responsible for part of the

22     architecture when I was at PowerQuest and then also at

23     StorageCraft because I am in charge of engineering.  Any of

24     the developers that make changes or check-ins, I'm

25     ultimately responsible for those.

1          Q.    Okay.  What products today does STC sell that

2     include the VSnap source code?

3          A.    We call it the ShadowProtect family.  There is

4     about 12 -- 12 products in that family.

5          Q.    And those are successful products?

6          A.    Yes, very.

7          Q.    Let's take a look at Plaintiff's Exhibit 129.  We

8     can use this.  Do you recognize that?

9          A.    I do.

10         Q.    And what does this represent?

11         A.    This is just kind of a rough outline of how

12    software becomes a product, how products are built.

13         Q.    And this one specifically deals with VSnap source

14    code and ShadowProtect, correct?

15         A.    Correct.

16         Q.    And now let's just start at the top here.  Can

17    you describe what these files are up here?  VSnap source

18    code file number one through number N here?

19         A.    Okay.  Well source code is basically human

20    readable instructions written in various languages such as C

21    or C++.  VSnap is written in C.  And if you -- the code file

22    number one through N there is about 70 files included in the

23    VSnap source code.

24         Q.    Do each of those files have kind of a little bit

25    of a different function?

1          A.    Yeah, each one has a -- has a limited set of

2     functions within them.

3          Q.    And then those go into the compiler here and then

4     you get these object code files, correct?

5          A.    Yeah.

6          Q.    What are these?

7          A.    Yeah.  The compiler basically takes the human

8     readable source code and converts it into machine readable

9     instructions.  And so the object code basically are ones and

10    zeros, something a computer can understand.

11         Q.    Okay.  And then going down, those object code

12    files go into a linker and then create VSnap.sys binary.

13    Can you see that?

14         A.    Yes.

15         Q.    Can you describe that?

16         A.    Linker basically gathers all of the object code

17    and puts it into a format that the computer can understand.

18    In this case that is the VSnap binary.

19         Q.    And how would you describe the VSnap binary?

20         A.    Well, the VSnap binary is the snapshot technology

21    with incremental tracking.  That is part of the product

22    ShadowProtect.

23         Q.    And then there are these other product binaries

24    that go into ShadowProtect.  What are those?

25         A.    ShadowProtect.xe is the UI for the product and

1       there are various other binaries that make up the product

2       that are all put into an install and that creates the

3       product application.

4              Q.   And the UI is the user interface, right?

5              A.   Correct.

6              Q.   So VSnap is not the only piece of source code in

7       ShadowProtect?

8              A.   No, it is just one, one key component.

9              Q.   Okay.  I want to go into your history a little

10      bit with Jamey Kirby.  When did you first meet him?

11             A.   While I was working as the chief architect at

12      PowerQuest.

13             Q.   And what was the nature of your meeting?

14             A.   Like I said, I was -- I was brought onto

15      PowerQuest to start creating back-up -- enterprise back-up

16      products and we were looking for a snapshot technology.

17             Q.   And did Kirby's company, StorageCraft, Inc. have

18      that technology?

19             A.   They did.

20             Q.   Were you involved in PowerQuest's decision on

21      what company they were going to license that technology

22      from?

23             A.   Yes, I was one of the key decision makers.

24             Q.   Did they decide to license that from

25      StorageCraft, Inc.?

1          A.    They did.

2          Q.    And at that time did the qualifications of the

3     engineers, including Mr. Kirby, play a role in that decision

4     in deciding to license the technology from StorageCraft,

5     Inc.?

6          A.    It did.  Jamey Kirby was a DDK MVP and so was his

7     lead engineer Maxim Shatskih both DDK MVPs.

8          Q.    Do you know of other engineers who were working

9     at StorageCraft, Inc. at that time?

10         A.    Yes, there were two others.

11         Q.    And who were they?

12         A.    Alexey Borisov and Denis Batrankov.

13         Q.    Did you have a sense of their qualifications?

14         A.    They worked for the military for some time in

15    security and security software.

16         Q.    Did you end up working with Kirby after

17    PowerQuest decided to license the snapshot technology?

18         A.    I did.

19         Q.    And at some point did StorageCraft, Inc. complete

20    VSnap for PowerQuest?

21         A.    It did.

22         Q.    When was that?

23         A.    That would have been in 2003.

24         Q.    Now, VSnap itself was not a software product,

25    correct?

1          A.   Correct.

2          Q.   Did you describe it as a technology that is built

3     from source code that then gets incorporated into products?

4          A.   Yes, it is a key component of a lot of products.

5          Q.   Is that what STC has done with it and with the

6     ShadowProtect product?

7          A.   Yes.

8          Q.   Now we talked about you being a founder of

9     ShadowStor.  At some point ShadowStor merges with

10    StorageCraft, Inc. to become StorageCraft Technologies.

11         What, in that merger or in discussing, you know, joint

12    efforts of those two companies, what was StorageCraft, Inc.

13    bringing to the table?

14         A.   Basically StorageCraft, Inc. brought VSnap or the

15    snapshot technology to the table.

16         Q.   Did they bring anything else?

17         A.   They brought some other various utilities and

18    source code.

19         Q.   What was your sense in terms of StorageCraft,

20    Inc.'s, you know, business savvy?

21         A.   Well, as we went through it, I know they had some

22    financial difficulty.  I personally gave $20,000 to

23    supporting them during that time.  And then as far as the

24    products, they weren't -- StorageCraft was not capable of

25    marketing a real end user product and so, you know, that is

1      that is the state that they were in.

2              Q.   And what did ShadowStor bring to the table?

3              A.   Well, we brought a lot of years of experience.  I

4      personally had created and productized several products at

5      both the previous companies Vinca and PowerQuest that made

6      millions of dollars, and then the co-founders brought vast

7      business experience and marketing experience.

8              Q.   And I'm going to talk a little bit about the disk

9      that we received from Rod Parker who is David Crocker's

10     counsel.  I want to refer you to Plaintiff's Exhibit 31.  I

11     don't know if the envelope is open, but you may need to open

12     that?

13             A.   Okay.

14             Q.   And that is a CD, right?

15             A.   That is.

16             Q.   Have you seen that before?

17             A.   I have.

18             Q.   Have you looked at its contents?

19             A.   I have.

20             Q.   What is on there?

21             A.   Over 77,000 e-mails and documents and those

22     documents are the attachments of those e-mails.

23             Q.   Okay.  How did you go about reviewing the

24     contents of that disk?

25             A.   We loaded them into a -- at our attorney's office

1    into a product called Summation, which is a document

2    management software.

3        Q.  Did you use any tools within Summation to kind of

4    get a sense of what was on that disk?

5        A.  Yeah, we used some of the search capabilities in

6    Summation.

7        Q.  What kinds of searches did you run?

8        A.  It ran several different searches.

9        Q.  Are there different kinds of searches that you

10   can run in Summation?

11       A.  Yeah, there is a quick search that basically

12   searches the to and from fields and the subject fields and

13   the name of any of the attachments.  It is a quick search

14   that returns very quickly.

15       Q.  And that is a search of the e-mails of that

16   information on the e-mails?

17       A.  Right.

18       Q.  Okay.  What other type of search can you do on

19   Summation?

20       A.  There is an index search that will actually

21   search the contents of any attachments of the actual

22   contents of a file contained in any of the attachments.

23       Q.  Does that search also include a search of the

24   body of the e-mail what the author and the recipients

25   actually have written back and forth?

1          A.   Yes, it does.

2          Q.   Okay.  What search terms did you decide to use?

3          A.   First I used the last names of the Russian

4     engineers.  So Shatskih, Borisov and Batrankov.

5          Q.   Those are hard, right?

6          A.   Yeah.

7          Q.   So you used those.  Did you use any others?

8          A.   And then I used VSnap.

9          Q.   Why did you choose those particular terms?

10          A.   Well, again, the three Russians were working on

11     the source code and then VSnap is the name of the product

12     and the source codes.

13          Q.   So those are the searches that you would do if

14     you were trying to locate the VSnap source code, right?

15          A.   Yes.

16          Q.   Do you recall the results of your searches?

17          A.   Yes, I do.

18          Q.   Do you remember the exact numbers that came up

19     when you ran those searches?

20          A.   No.  I just remember it was -- well, um, between

21     600 and 5,000 entries for each -- each search term.

22          Q.   Is there any document that would assist you in

23     refreshing your recollection of exactly what the results of

24     those searches were?

25          A.   Yes.  I took notes when I did those searches.

1        Q.   And what did you do with those notes?

2        A.   I typed them up.

3        Q.   Okay.  I'm going to hand you your typewritten

4   notes here.  Do you recognize those as your typewritten

5   notes?

6        A.   I do.

7        Q.   And do those notes refresh your memory as to the

8   exact number of hits that you got when you ran these

9   searches?

10       A.   They do.

11       Q.   How many documents came up when you searched the

12  term Shatskih?

13       A.   When I did a search for Shatskih, which was the

14  quick search, it returned 4,891 documents.

15       Q.   And what came up when you searched for Batrankov?

16       A.   1,168 documents.

17       Q.   And how about Borisov?

18       A.   606.

19       Q.   And when you searched the term VSnap?

20       A.   I did two different searches with VSnap.  I did

21  the quick search, it returned 2,318 documents.  And then I

22  did the more in-depth search that used both a simple search

23  and the attachment or document contents and e-mail search

24  and it returned 3,179 documents.

25       Q.   How long did those searches take you to do?

1          A.   Um, about 10 minutes.

2          Q.   Did you ultimately review the results of your

3     more comprehensive search for VSnap?

4          A.   I did.

5          Q.   What information did you find?

6          A.   I found lots of e-mails and lots of source code.

7          Q.   Was it all VSnap source code?

8          A.   It was.

9          Q.   Did you do anything with those search results for

10    VSnap?

11         A.   Yeah, I downloaded them to a CD and I gave them

12    to our document vendor to print them.

13         Q.   Did they ultimately do that?

14         A.   They did.

15         Q.   And are there printed results in these six boxes,

16    Plaintiff's Exhibit 33?

17         A.   They are.

18         Q.   Six full boxes like this?

19         A.   Yeah, over 19,000 documents.

20         Q.   19,000 --

21         A.   Or 19,000 pages.

22    MS. SNEDDON:  Your Honor, I move to admit Exhibit 33.

23    MR. ENSOR:  No objection, Your Honor.

24    THE COURT:  Exhibit 33 is admitted.

25         (Whereupon, Plaintiff's Exhibit 33 was received

1          into evidence.)

2          Q.   (By Ms. Sneddon)  Did you do any further review

3    of the VSnap search results?

4          A.   Yeah.  I went -- I thoroughly went through it to

5    find full copies of the VSnap source code.  I also took

6    several of those copies and compared them against the VSnap

7    source code that we used today.

8          Q.   How many full copies of VSnap source code did you

9    find?

10         A.   I found 11 full copies of the VSnap source code.

11         Q.   And those full copies are we're talking eight,

12   900 pages, thousand pages each, right?

13         A.   Yes.

14         Q.   And how are you able to make the determination

15   that each of those was a full copy of VSnap?

16         A.   Well, each of them contained a set of files and I

17   compared those first of all the names of the files with the

18   ones that we used in VSnap that are in our source repository

19   and found that they matched.  And then I went through many

20   of those files and compared the contents side by side with

21   what is in the source repository and they were identical.

22         Q.   Were there also a lot of partial copies of the

23   VSnap source code in there?

24         A.   Yes.  Many of the e-mails contained just one or

25   two files, but it was the VSnap source code.

1          Q.   Okay.  I want you to take a look at Plaintiff's

2     Exhibit 4 which I need to get for you.  Have you seen that

3     exhibit before?

4          A.   I have.

5          Q.   And what is it?

6          A.   It is an e-mail from Maxim Shatskih to Jamey

7     Kirby.

8          Q.   What is the date of it?

9          A.   December 9th, 2001.

10          Q.   And where have you seen that before?

11          A.   In the results of the VSnap search in Summation.

12     MS. SNEDDON:  Your Honor, I move to admit Exhibit 4.

13     MR. ENSOR:  No objection, Your Honor.

14     THE COURT:  It is received, 4.

15          (Whereupon, Plaintiff's Exhibit 4 was received

16           into evidence.)

17          Q.   (By Ms. Sneddon)  Can you take a look at the

18     attachments to that e-mail?

19          A.   Yes.

20          Q.   Do you recognize those?

21          A.   I do.

22          Q.   What are they?

23          A.   They are part of the VSnap source code.

24          Q.   Do you recognize those file names as part of the

25     VSnap source code?

1          A.   UB-Tree.h and UB-Tree.c.

2          Q.   Let's turn to, in that same Exhibit, 232185 Bates

3     number?

4          A.   Uh-huh.

5          Q.   We're there already, I'm sorry, Margaret.  Pull

6     up this top part, (indicating).  Can you tell me what you

7     see at the top there?

8          A.   It is a copyright notice.

9          Q.   And that is the StorageCraft copyright notice?

10          A.   Correct.

11          Q.   It says, this source code, including its

12     associated software, is owned by StorageCraft and is

13     protected by United States and International Intellectual

14     Property Law including copyright laws, patent laws and

15     treaty provisions, correct?

16          A.   Correct.

17          Q.   Let's go to Page 232188 of the same exhibit.

18     There is another one right there, right?

19          A.   Yes.

20          Q.   Basically the same that we just saw?

21          A.   Yes.

22          Q.   Now, I'm going to have you look at Plaintiff's

23     Exhibit Number 11.  Have you seen that before?

24          A.   I have.

25          Q.   And what is it?

1          A.   It is an e-mail from Maxim Shatskih to Jamey

2     Kirby.

3          Q.   Where have you seen it?

4          A.   Again, in the results of the VSnap search within

5     Summation.

6          MS. SNEDDON:  Move to admit this exhibit, Your Honor,

7     Exhibit 11.

8          MR. ENSOR:  No objection.

9          THE COURT:  11 is received.

10         (Whereupon, Plaintiff's Exhibit 11 was received

11          into evidence.)

12         Q.   (By Ms. Sneddon)  Do you recognize the attachment

13    to this e-mail?

14         A.   I do.  VSnap.zip.

15         Q.   Is this one of the full copies of the VSnap

16    source code?

17         A.   This one is a full copy of the VSnap source code.

18         Q.   Does this one also contain copyright notices

19    throughout?

20         A.   Yes, it does.

21         Q.   Did you notice in reviewing the full copies of

22    the VSnap source code that you found on the disk, was there

23    any sort of method to where they're located?

24         A.   I don't understand the question.

25         Q.   Okay.  Let me ask it this way.  Let's take a look

1    at 231534 in this Exhibit.  231534.  Pull up the top here

2    (indicating).

3        Is this piece of the code, the DCMP.C file in VSnap?

4        A.   Yes, it is.

5        Q.   This has got a copyright notice on it?

6        A.   Yes.

7        Q.   Have you seen copyright notices on each file that

8    is contained in the zip file for VSnap?

9        A.   Yeah, just about every file contained a copyright

10   notice at the top.

11       Q.   That is true for this whole exhibit, Plaintiff's

12   Exhibit 11?

13       A.   It is.

14       Q.   Now, I'm going to go to Plaintiff's Exhibit 13.

15   Is that in your same binder?

16       A.   It is.

17       Q.   Okay.  Have you seen this before?

18       A.   I have.

19       Q.   Where at?

20       A.   In the search results from VSnap from the

21   Summation.

22       MS. SNEDDON:  Okay.  Move to admit 13, Your Honor.

23       MR. ENSOR:  No objection.

24       THE COURT:  13 is received.

25       (Whereupon, Plaintiff's Exhibit 13 was received

1              into evidence.)

2         Q.   (By Ms. Sneddon)  And this is another e-mail from

3    Max Shatskih to Jamey Kirby?

4         A.   It is.

5         Q.   It says VSnap pretty prominently right there in

6    the subject?

7         A.   It does.

8         Q.   What are these attachments?

9         A.   UIOQ.H and UIOQ.C.

10        Q.   Are those part of the VSnap source code?

11        A.   They are.

12        Q.   Are those attached to this exhibit?

13        A.   Yes, they are.

14        Q.   Did they also have copyright notices on them?

15        A.   They do.

16        Q.   Now let's go to Plaintiff's Exhibit 16.

17        MR. ENSOR:  No objection, Your Honor.

18        THE COURT:  16 is received.

19        (Whereupon, Plaintiff's Exhibit 16 was received

20         into evidence.)

21        Q.   (By Ms. Sneddon)  Do you recognize that?

22        A.   Yes, I do.

23        Q.   And this e-mail you found on the disk from Rod

24    Parker?

25        A.   Yes.

1          Q.   It has VSnap.H file attached?

2          A.   VSnap.H.

3          Q.   That is part of the VSnap source code?

4          A.   Yes, it is.

5          Q.   It has a copyright notice?

6          A.   Yes, it does.

7          Q.   Let's go to Plaintiff's Exhibit 18.  What is this

8    exhibit?

9          A.   An e-mail from Maxim Shatskih to Jamey Kirby.

10         Q.   Also from the disk?

11         A.   Yes.

12         MS. SNEDDON:  Move to admit 18, Your Honor.

13         MR. ENSOR:  No objection, Your Honor.

14         THE COURT:  18 is received.

15         (Whereupon, Plaintiff's Exhibit 18 was received

16          into evidence.)

17         Q.   (By Ms. Sneddon)  Here is another one, it has the

18    VSnap.zip file attachment?

19         A.   Yes, it does.

20         Q.   Does this one also have a full copy of the VSnap

21    source code attached?

22         A.   Yes, it does.

23         Q.   It has many copyright notices?

24         A.   Yes, it does.

25         Q.   Let's go to Plaintiffs Exhibit Number 21, in the

```
 1      next -- do you need the next binder?

 2             A.   Yup.

 3             Q.   Have you seen this exhibit?

 4             A.   Yes, I have.

 5             Q.   This is also in the VSnap search results?

 6             A.   Yes.

 7             MS. SNEDDON:  Move to admit Plaintiff's Exhibit 21,

 8      Your Honor.

 9             MR. ENSOR:  I think it is already in, Your Honor.

10             MR. KARRENBERG:  It is already in.

11             MS. SNEDDON:  You're right.

12             Q.   (By Ms. Sneddon)  Here is another e-mail from Max

13      Shatskih to Roland Whatcott this time copying Jamey Kirby.

14      It says, subject next VSnap code drop, correct?

15             A.   Correct.

16             Q.   And the attachment is VSnap.zip?

17             A.   Yes.

18             Q.   Does this indicate in that attachment 1.02.05,

19      does that indicate anything to you?

20             A.   Yes, it is a particular version or label.

21             Q.   Okay.  And attached to this is a full copy of the

22      VSnap source code?

23             A.   Yes.

24             Q.   Again, it has a number of copyright notices

25      throughout?
```

1          A.   Yes, it does.

2          Q.   Let's go to Exhibit 24.  Have you seen this one

3     before?

4          A.   Yes, I have.

5          Q.   Is this another e-mail from the disk from David

6     Crocker's attorney?

7          A.   Yes, from Maxim to Jamey.

8          MS. SNEDDON:  Your Honor, I move to admit Exhibit 24.

9          MR. ENSOR:  No objection.

10         THE COURT:  24 is received.

11         (Whereupon, Plaintiff's Exhibit 24 was received

12          into evidence.)

13         Q.   (By Ms. Sneddon)  This is another e-mail with a

14    VSnap.zip attachment?

15         A.   Yes.

16         Q.   It is a full copy of the VSnap source code?

17         A.   Yes, it is.

18         Q.   Copyright notices throughout the code?

19         A.   Yes.

20         Q.   Now, we will go to Exhibit 26.  Is that in there?

21         A.   No.

22         Q.   These are getting kind of big.

23         A.   Which exhibit again?

24         Q.   Exhibit 26, sorry.

25         A.   Okay.

1          Q.   Have you seen this before?

2          A.   Yes, have I have.

3          Q.   Is this another e-mail that was on the Rod Parker

4    disk?

5          A.   It is.

6          Q.   Who is it from?

7          A.   It is from Maxim Shatskih.

8          Q.   And to Jamey Kirby?

9          A.   Jamey was one and to Nate Bushman.

10          MS. SNEDDON:  Okay.  Move to admit Exhibit 26, Your

11    Honor.

12          MR. ENSOR:  No objection.

13          THE COURT:  That was 26?

14          MS. SNEDDON:  26.

15          THE COURT:  It is received.

16          (Whereupon, Plaintiff's Exhibit 26 was received

17           into evidence.)

18          MS. SNEDDON:  Thank you.

19          Q.   (By Ms. Sneddon)  And do you recognize the

20    attachment named here?

21          A.   Yes, mfsbuff.c.

22          Q.   Is that part of the VSnap source code?

23          A.   It is.

24          Q.   Does that attachment have a copyright notice on

25    it?

1          A.   It does.

2          Q.   Now to Exhibit 28.  Have you seen this before?

3          A.   I have.

4          Q.   This is also on the disk?

5          A.   Yes, it is.

6          MS. SNEDDON:  I move to admit Exhibit 28.

7          MR. ENSOR:  No objection.

8          THE COURT:  28 is received.

9          (Whereupon, Plaintiff's Exhibit 28 was received

10          into evidence.)

11          Q.   (By Ms. Sneddon)  Do you recognize these

12    attachments?

13          A.   Yes, I do.

14          Q.   And what are they?

15          A.   They are two of the source code files for VSnap.

16          Q.   And in the exhibit they also have copyright

17    notices?

18          A.   Yes, they do.

19          Q.   And let's pull up Plaintiff's Exhibit 30.  Have

20    you seen that exhibit before?

21          A.   Yes, I have.

22          Q.   Also on the disk?

23          A.   Yes.

24          MS. SNEDDON:  Move to admit Exhibit 30, Your Honor.

25          MR. ENSOR:  No objection, Your Honor.

1          THE COURT:  30 is received.

2          (Whereupon, Plaintiff's Exhibit 30 was received

3           into evidence.)

4          Q.   (By Ms. Sneddon)  And you recognize these

5     attachments to the e-mail?

6          A.   Yes.

7          Q.   Are those also part of VSnap?

8          A.   They are.

9          Q.   And they also have copyright notices on them?

10         A.   Yes, they do.

11         Q.   Okay.  And the last one, Plaintiff's Exhibit 164.

12    And this one is already admitted.  Have you seen this

13    exhibit before?

14         A.   I have.

15         Q.   Is this one also on the disk that we got from

16    David Crocker's attorney?

17         A.   It is.

18         Q.   What is it attached to?

19         A.   VSnap.zip.

20         Q.   What is that?

21         A.   An archive of all of the VSnap source code.

22         Q.   And again with copyright notices?

23         A.   Yes.

24         Q.   Okay.  And I'm finished with that one for now so

25    we'll move on.  You're familiar with Microsoft Outlook,

1      correct?

2           A.   I am.

3           Q.   An e-mail program among other things?

4           A.   Yes.

5           Q.   Are the searches that you did on the disk for Rod

6      Parker using the Summation program, are they similar to the

7      searches you can perform on Microsoft Outlook?

8           A.   Yes, very similar.

9           Q.   Would you expect basically the same results from

10     the searches you did on the disk than if you did them on

11     Microsoft Outlook?

12          A.   Yes, I would.

13          Q.   Okay.  I want to talk to you a little bit about

14     how StorageCraft Technology protects the confidentiality of

15     its source code.  In your position as CTO, are you

16     responsible for that?

17          A.   I am.

18          Q.   And how long have you been in charge of that?

19          A.   For eight years.

20          Q.   Since that time, has STC ever experienced a

21     breach in the confidentiality or security of its source

22     code?

23          A.   No, except for Jamey Kirby retaining copies of

24     the source code.

25          Q.   This lawsuit?

1          A.   This lawsuit.

2          Q.   Okay.  Tell me the steps generally that STC

3     undertakes to maintain the security of its source code?

4          A.   First of all we require all employees to sign an

5     employee and confidentiality agreement.  We have network

6     security.  You cannot get on our network without being --

7     having a user name and password, a complex password.  And

8     um, we have building security.  We have key card entry that

9     is certainly logged and also video surveillance.  Our source

10    repository also requires a user name and password.  And that

11    is pretty much it.

12         Q.   Okay.  I want to go through each of those just

13    briefly with you.  The first one you mentioned was

14    confidentiality agreements that STC requires from each of

15    its employees.  Have you pull up Plaintiff's Exhibit 45.

16    Have you seen this before?

17         A.   I have.

18         Q.   Is the agreements that STC requires of each of

19    its employees and its contractors similar to this agreement?

20         A.   Yes, they are.

21         Q.   And generally what does it provide?

22         A.   It provides basically that the employees will

23    keep all confidential information confidential during and

24    when they leave.

25         Q.   And you have signed an agreement like this?

1          A.   I have.

2          Q.   And every employee at StorageCraft has signed an

3     agreement like this?

4          A.   Yes, they have.

5          Q.   How do you know that?

6          A.   Well, first of all we require that they do before

7     we grant them any access to the building or network.  And

8     also we did an audit in October of last year and indeed all

9     employees had signed this agreement.

10         Q.   Okay.  Now, please describe for me -- you

11    mentioned the source code repository that STC has.  Can you

12    describe what that is for the jury and how it works?

13         A.   The source repository we have used two different

14    versions, SourceSafe and another one called Subversion.  But

15    basically it organizes the source code into projects, but

16    more importantly it grants access to those projects on a

17    user -- per user basis.

18         Q.   Is there any sort of policy that STC has with

19    respect to access to the source code repository?

20         A.   Yup.  First of all you have to be a developer to

21    even get access to it.  And then even those developers gain

22    access to the parts that they need on a need to know basis.

23         Q.   And so as soon as they no longer need to know,

24    their access is taken away?

25         A.   That is correct.

1          Q.   And has that always been STC's policy?

2          A.   Yes, it has.

3          Q.   Is the source code repository audited?

4          A.   It is.

5          Q.   And describe what that means?

6          A.   Basically any time anybody accesses it, accesses

7     it, in other words downloads or uploads files to it, those

8     accesses are logged.

9          Q.   So if you want to go back and check what anybody

10    has ever done to the source code, you can find out who it

11    was and exactly what they did?

12         A.   Yes.

13         Q.   Who currently has full access to the source code

14    repository?

15         A.   No one has full access to the source code

16    repository.

17         Q.   So people only have limited pieces of access?

18         A.   Correct.

19         Q.   Okay.  And you currently don't have full access

20    to it?

21         A.   Correct.

22         Q.   And officers of the company don't get full access

23    to it?

24         A.   I am the only officer that even has any access to

25    it.

1          Q.   Okay.  And shareholders certainly don't get

2     automatic access to it, right?

3          A.   No, only developers.

4          Q.   Now, let's discuss the security measures on STC's

5     network that you mentioned.  Can you describe what those are

6     for us?

7          A.   On our network again you have to have a user name

8     and password.  Our passwords are ten digit complex

9     passwords.

10         Q.   How often are those passwords changed?

11         A.   We require that all users change them every 90

12    days.

13         Q.   And you mentioned some security measures with

14    respect to the building.  What were those?

15         A.   Key card access.  So you have to have a key card

16    or a badge to get in and those accesses are also logged.

17         Q.   And there is also video surveillance?

18         A.   Yeah.  We have over 25 internal cameras and

19    another 12 or 15 external cameras.

20         Q.   And has STC ever licensed the VSnap source code

21    to anyone?

22         A.   No.

23         Q.   It has never freely given it to anyone?

24         A.   No.

25         Q.   And Mr. Barnes, you understand that you have been

1    designated by STC as an expert in this case on a few

2    different topics, correct?

3         A.   Yes.

4         Q.   I want to talk to you about your opinions.  Do

5    you have an opinion as to the similarity between the copies

6    of the VSnap source code that were on the disk that are in

7    these boxes, and the VSnap source code that STC uses today

8    in its products?

9         A.   Yes.

10        Q.   And what is that opinion?

11        A.   That opinion is that what is contained on the

12   Crocker CD and what we use today is very similar.

13        Q.   And how did you arrive at that opinion?

14        A.   I downloaded the latest version of the VSnap

15   software.  Actually, I couldn't download it, I got it from

16   our director of engineering, downloaded it to a directory,

17   and put the latest copy, in fact, it was this one, Exhibit

18   164, in another directory and I used a program called Beyond

19   Compare that does a side-by-side comparison of all of the

20   files, file names and the file contents.

21        Q.   And what was the result of that comparison?

22        A.   That they were substantially similar.

23        Q.   Did you see anything in there that was different?

24        A.   Yeah, there were -- there were changes.

25        Q.   And can you describe the nature of what those

1    changes were?

2         A.   Some of the changes were bug fixes so any

3    deficiencies or errors in the product were fixed.  And then

4    there -- there were additions to account for the newer

5    faster hardware, so 32-bit to 64-bit support, and then also

6    for the newer operating systems that had been released

7    since this time.

8         Q.   So did you take a look at what those bug fixes

9    were, for example?

10        A.   Yes.

11        Q.   Did you consider them to be pretty minor?

12        A.   They were very minor.

13        Q.   And then the other two pieces that are different

14   that you mentioned are just basically update the code so

15   that it works on operating systems and hardware that didn't

16   exist when this was originally written?

17        A.   Correct.

18        Q.   But the core technology did not change, right?

19        A.   The core technology and core functionality has

20   not changed.

21        Q.   And Mr. Barnes, do you also have an opinion with

22   respect to the similarities between STC's ShadowProtect

23   product which contains VSnap source code, and the

24   ActiveImage Protector product released by NetJapan and

25   Rectiphy?

1          A.    Yes.

2          Q.    And what is that opinion?

3          A.    That the two products are very similar.

4          Q.    And how did you arrive at that opinion?

5          A.    We purchased a version of ActiveImage Protector,

6     installed it on a system, and then on a system next to it

7     installed our product and went through the -- went through

8     both products thoroughly and compared basically what they do

9     and their end results.

10         Q.    And did the version that you purchased of

11    ActiveImage Protector that was in 2010, correct?

12         A.    Yes.

13         Q.    Okay.  Did you conclude that they had similar

14    ultimate goals?

15         A.    Well, the ultimate goals of both products are to

16    take full back-ups in incremental back-ups and then also to

17    recover those, yes.

18         Q.    Okay.  Did they have a similarity with respect to

19    incremental sector tracking?

20         A.    Yeah.  The incremental sector tracking was very

21    similar.  Basically when you would make back-ups, you would

22    first take a full back-up and then after that you take

23    incrementals.  And the output of both products were very,

24    very close to the same.

25         Q.    So why is it important if both pieces of software

1    create virtually the same output, how does that affect your

2    opinion?

3        A.   It means that the technology -- tracking those

4    sectors is very similar.

5        Q.   Okay.  Before ActiveImage was -- ActiveImage

6    Protector was originally released by NetJapan, which we know

7    was in March of 2009, do you know if there were any other

8    products on the market besides ShadowProtect that had

9    incremental sector tracking?

10       A.   There were two others that I know of.  One from

11   Symantec and then one from Acronis.

12       Q.   And tell me what you know about the Symantec

13   product and its incremental sector tracking feature?

14       A.   Well, Symantec purchased PowerQuest and so it was

15   actually using the same driver or VSnap that was licensed to

16   them from StorageCraft.  So it is basically the same

17   technology.

18       Q.   So StorageCraft's technology in that product?

19       A.   Yes.

20       Q.   Okay.  And the other product you mentioned was

21   Acronis True Image?

22       A.   Yes.

23       Q.   And do you know anything about how Acronis True

24   Image accomplishes incremental sector tracking?

25       A.   Yeah, it is a little different.  Actually, many

1    of our users are actually former True Image users.  First of

2    all, their product had serious issues with incrementals.

3    Often times they were corrupt.  And then in comparing the

4    outputs, they were different sizes.  So it seemed to be

5    using very different technology.  Probably it was using file

6    system intelligence to figure out what had changed and not

7    tracking sectors directly.

8        Q.    And did you learn that through testing that True

9    Image product?

10       A.    Yes.

11       Q.    Now, I want to talk to you about Microsoft's

12   Volsnap snapshot technology.  When you tested the 2010

13   version of ActiveImage Protector, did you test it on some

14   different operating systems?

15       A.    Yes.

16       Q.    Which ones?

17       A.    We tested it on Windows 2000XP, Windows 2003 and

18   Windows 2008.

19       Q.    Okay.  And did it work on Windows 2000?

20       A.    It did.

21       Q.    So is there still a market for people who use

22   Windows 2000?

23       A.    Absolutely, yes.

24       Q.    And does ShadowProtect work on Windows 2000?

25       A.    Yes, it does.

1          Q.   Are you familiar with the snapshot technology

2     that Microsoft calls Volsnap or VSS as I mentioned?

3          A.   Yes, I am.

4          Q.   How are you familiar with that?

5          A.   Since I have been working in this industry for

6     many years, I have been familiar with it since it came out

7     in around 2002, 2003.

8          Q.   Is it the same snapshot technology that

9     StorageCraft uses?

10         A.   No, it is not.

11         Q.   Do you know what operating systems it works on?

12         A.   It works on WindowsXP on up and Windows 2003 on

13    up.

14         Q.   Okay.  So it does not work on Windows 2000,

15    right?  It wasn't available then?

16         A.   No, it does not work on Windows 2000.

17         Q.   So if it doesn't work on Windows 2000 and

18    ActiveImage Protector from 2010 does, that means it has got

19    to have a different snapshot technology, right?

20         A.   Correct.

21         Q.   Now, when you were comparing ActiveImage

22    Protector and ShadowProtect, were you able to compare the

23    source code of each of those products?

24         A.   No.

25         Q.   And why not?

1              A.   We didn't have the source code we requested

2    that -- that an independent expert compare source code but

3    Rectiphy refused.

4              Q.   Could you have obtained the code from anywhere

5    else?

6              A.   No.

7              Q.   Would it be possible to reverse engineer that

8    code, for example, if you had purchased ActiveImage

9    Protector?

10             A.   You could reverse engineer it, but the user

11   agreement specifically says you are not allowed to reverse

12   engineer the product.

13             Q.   And so you didn't do that?

14             A.   No.

15             Q.   Because had you done that, you would have

16   breached that user agreement, right?

17             A.   Correct.

18             Q.   And now finally I want to talk to you a little

19   bit about NetJapan.  You understand that Mr. Kirby suggested

20   in this case that NetJapan was somehow given access to

21   portions of the VSnap source code, correct?

22             A.   Correct.

23             Q.   Is that true?

24             A.   No, it is not true.

25             Q.   What did NetJapan have access to?

1          A.   NetJapan was helping localize so they had access

2     to a -- to very limited files specific to user interface

3     type work.

4          Q.   Describe for me just briefly what localization

5     means?

6          A.   Basically you're translating English to Japanese.

7     So anything that may be displayed on a button, a menu, or on

8     the screen is translated from English to Japanese.

9          Q.   So they were only given the limited user

10    interface files needed to do that?

11         A.   Correct.

12         Q.   And are those user interface files secret?

13         A.   No.

14         Q.   Were they under a confidential agreement any ways

15    at the time that they received those?

16         A.   Yes, they were.

17         Q.   Is that code that those user interface pieces of

18    code, is that contained in the VSnap source code?

19         A.   No, that is not.

20         Q.   So NetJapan never had access to the VSnap source

21    code?

22         A.   NetJapan never had access to the VSnap source

23    code.

24         MS. SNEDDON:  That is all I have for now.

25         THE COURT:  Cross-examination?

**CROSS-EXAMINATION**

BY MR. ENSOR:

     Q.   Mr. Barnes, you're the Chief Technology Officer of StorageCraft?

     A.   Yes.

     Q.   You're also an owner of StorageCraft?

     A.   Yes, I am.

     Q.   And what is your ownership interest?

     A.   Somewhere around 14 and a half percent.

     Q.   And last year what was your salary as CTO?

     A.   Last year $200,000.00 a year.

     Q.   Did you receive a bonus?

     A.   I did.

     Q.   How much was your bonus?

     A.   $50,000.00.

     Q.   Did Thomas Jeffrey Shreeve receive a bonus last year?

     A.   Yes, he did.

     Q.   He didn't mention that to us.  How much was it?

     A.   I believe he made $200,000.00 a year plus a $50,000.00 bonus.

     Q.   Now, you had a -- you had no hand in developing the trade secrets that we're here about; is that correct?

     A.   I had no hand --

     Q.   Yeah.

1          A.   -- of the VSnap trade secrets?

2          Q.   Yes.  Let me just back up.  You understand we're

3    here to talk about the VSnap code?

4          A.   Yes.

5          Q.   And there is really two parts to that code.  It

6    is the snapshot driver and then the incremental sector

7    tracking, right?

8          A.   Yes.

9          Q.   And you had nothing to do with the snapshot

10   driver and developing it or writing the code for it, did

11   you?

12         A.   I could probably take credit for some of the

13   architecture of the sector tracking.

14         Q.   Of the sector but not the actual snapshot driver?

15         A.   No.

16         Q.   Okay.  And I just want to -- I'm trying to be

17   clear because this doesn't come naturally to me, but there

18   are two parts to the trade secret.  The snapshot driver, you

19   didn't have anything to do with the development of that?

20         A.   Correct.

21         Q.   The second part of the trade secret, the

22   incremental sector tracking, you feel you can take some

23   ownership for?

24         A.   I can take some credit for the architecture, yes.

25         Q.   And how can you take credit for the architecture

1    of that?

2        A.    Like I said, I was the chief architect at

3    PowerQuest.  When we hired StorageCraft to do development,

4    they didn't have the sector tracking technology at that time

5    and I had many conversations with Jamey Kirby about sector

6    tracking.

7        Q.    So a lot of the earlier versions of the source

8    code that you went through with your counsel don't have

9    sector tracking?

10        A.    Correct.

11        Q.    That came later?

12        A.    That came in 2002, later in 2002.

13        Q.    So a lot of the 11 source codes in there don't

14    have the second half of the trade secret; is that right?

15        A.    No most -- most probably over half have the

16    sector tracking.

17        Q.    Now, you were in charge of the technology back in

18    2004 when Jamey Kirby left STC?

19        A.    Yes.

20        Q.    And he did, in fact, pack up the source server

21    from his office in California and send it to you guys in

22    Utah, did he not?

23        A.    Yes, he did.

24        Q.    And, in fact, as the lawsuit went on and got

25    settled, Mr. Gross, his attorney, gave you guys a bunch of

1    stuff, CDs, other hard copies of stuff that Jamey had packed

2    up, sent to his lawyer and said give this to STC, isn't that

3    right?

4         A.   I believe so, yes.

5         Q.   Now, we have talked about the two parts of the

6    trade secrets so let's talk about the first part and that is

7    a snapshot driver, right?

8         A.   Uh-huh (affirmative), yes.

9         Q.   And Microsoft, as we know, offers a snapshot

10   driver?

11        A.   Yes.

12        Q.   And it is called the VSS?

13        A.   Well, that is the framework.  The driver is

14   actually called Volsnap.

15        Q.   Fair enough.  So it is called Volsnap.  And that

16   has been free with every Microsoft product for the last 10

17   years, correct?

18        A.   It has been free with anything after Windows

19   2000.  So XP and 2003.

20        Q.   So Volsnap was in XP.  When did that come out?

21        A.   Around 2002, 2000 --

22        Q.   Volsnap was in Windows 2003?

23        A.   Yes.

24        Q.   I can guess when that came out.  What else was

25   the Volsnap in?

1        A.    And in Windows 2008.

2        Q.    And what else was the Volsnap in?

3        A.    Windows 7.

4        Q.    What else was the Volsnap in?

5        A.    Windows -- the one before Windows 7, whatever

6    that was.  I forgot already.

7        Q.    And, in fact, your products recognize that, you

8    know, Microsoft has the snapshot driver and some people are

9    going to want to use it instead of your snapshot driver?

10       A.    No, that is not correct.  We have one product

11   called ShadowProtect IP does that use Volsnap.  The other

12   product uses our snapshot.

13       Q.    Okay.  So ShadowProtect IP, your product uses

14   Volsnap?

15       A.    Yes.

16       Q.    But your other products give the user the

17   opportunity to use Volsnap if they want, right?

18       A.    Yes, but without the sector tracking capability.

19       Q.    I understand that.  But you sell your product and

20   it boots up and essentially they can say we don't want to

21   use STC's snapshot, we want to use Volsnap?

22       A.    Actually at install time, they can choose not to

23   use our snapshot driver.

24       Q.    Instead go with the Microsoft driver?

25       A.    Yes, but with limited functionality.

1         Q.    That is in all your products?

2         A.    I think it is still is, yes.

3         Q.    Now, other products based on the snapshot driver

4    you have Acronis -- strike that.  That was not a very good

5    question.  Other products that use snapshot technology but

6    do not use STC's snapshot driver.  We have Acronis?

7         A.    Yes.

8         Q.    Correct?

9         A.    Yes.

10        Q.    We have Computer Associates?

11        A.    Now, yes.  Are you talking about current or back

12   then?

13        Q.    I'm talking about now.

14        A.    Okay, yes.

15        Q.    When did Computer Associates start?

16        A.    A couple of years ago.

17        Q.    And we have Symantec also offers a program that

18   doesn't use your snapshot driver but uses a different

19   snapshot driver, correct?

20        A.    I believe so, yes.

21        Q.    And you think there are likely other companies --

22   strike that.  Are there other companies as well that use

23   snapshot driver different than the STC snapshot driver?

24        A.    I think so.

25        Q.    Can you name those for the jury?

1          A.   I can't.

2          Q.   So we have three that you can name and you think

3     there are others but you don't know what they are?

4          A.   No.

5          Q.   Now, incremental sector tracking, you are not

6     able to tell if the ActiveImage Protector product uses STC

7     source code, correct?

8          A.   Correct.

9          Q.   In fact, without looking at the code, and without

10    reverse engineering, it would be very difficult to know,

11    wouldn't it?

12         A.   If it used the source code?  Yes.

13         Q.   Right.  I mean you would have to compare the

14    source code or reverse engineer otherwise you can't really

15    know; isn't that right?

16         A.   Correct.

17         Q.   And it is also certainly possible for someone to

18    write incremental tracking software, right?

19         A.   Yes.

20         Q.   And you don't know whether in this case or not,

21    Bob Campbell at LeapFrog Development did that, do you?

22         A.   Correct.

23         Q.   You know he testified he did?

24         A.   Yes.

25         Q.   And you don't have any idea whether or not his

1 source code is still being used or not?

2   A. I don't.

3   Q. Other products with incremental sector tracking,

4 it is just not your technology, right?

5   A. Correct.

6   Q. And you do it a certain way, other people do it

7 too though, right?

8   A. Correct.

9   Q. So competitors with incremental sector tracking,

10 we talked about Acronis; is that right?

11   A. Yes.

12   Q. And VMWare has a product that uses incremental

13 sector tracking, correct?

14   A. They have several products, yeah.

15   Q. They use incremental sector tracking?

16   A. I don't know.

17   Q. And Oracle9i uses incremental sector tracking,

18 does it not?

19   A. Oracle9i is a database program.

20   Q. There are other products as well that use

21 incremental sector tracking, correct?

22   A. Probably so.

23   Q. In fact, you know of a couple that came out

24 recently, don't you?

25   A. I don't recall.

1          Q.   Mr. Barnes, could you turn to Exhibit 218.  It is

2     in the blue binder which you don't have.  Would you turn to

3     page -- it is actually Exhibit 214, I'm sorry.

4          Mr. Barnes, do you recognize that as your declaration

5     that you filed in this case?

6          A.   Yes.

7          Q.   And it is signed by you under oath?

8          A.   Yes.

9          Q.   In Paragraph 18 you state, although two other

10    competitors have more recently released products that

11    include some form of incremental tracking without a license

12    from STC, those products did not exist in March of 2009, and

13    likewise do not appear to accomplish sector tracking in the

14    same way.  Do you see that?

15         A.   Yes, I do.

16         Q.   Does that refresh your recollection on what those

17    other two companies were that would have developed

18    incremental sector tracking?

19         A.   I remember one, I think it was CA from Computer

20    Associates.  I don't remember the other.

21         Q.   Okay.  So we have Acronis has incremental sector

22    tracking, we have Computer Associates with incremental

23    sector tracking, and we have another one that you can't

24    recall with incremental sector tracking; is that right?

25         A.   Correct.

1          Q.   Now you don't -- strike that.  Mr. Barnes, you

2     have filed for patents before, haven't you?

3          A.   Yes, I have.

4          Q.   In fact, you have done it recently, haven't you?

5          A.   Yes.

6          Q.   And you don't -- strike that.  Well, I'll ask it

7     this way.  You or STC does not have a patent on incremental

8     sector tracking; is that correct?

9          A.   Correct.

10         Q.   Are you aware if a patent exists for incremental

11    sector tracking?

12         A.   I would assume there is something out there.

13    There is a lot of patents.

14         Q.   So your assumption is incremental sector tracking

15    has been patented by somebody besides you guys?

16         A.   We don't have a patent on incremental tracking.

17         Q.   My question was, do you know if a patent on

18    incremental sector tracking exists?

19         A.   Not specifically, no.

20         MR. ENSOR:  Okay.  Your Honor, I have marked as

21    Exhibit 222, a document that I would like to hand to the

22    witness and have admitted.

23         THE COURT:  You may approach.

24         Q.   (By Mr. Ensor)  Can I have that back, Mr. Barnes.

25    Thank you.  Good idea.  Mr. Barnes, I'm going to hand you

1       what has been marked as 223.  Your Honor, I move Exhibit 223

2       into evidence.

3              MS. SNEDDON:  Your Honor, we object.

4              THE COURT:  Can I see a copy, please.

5              MR. ENSOR:  Yes, Your Honor.

6              THE COURT:  Then I want to hear from counsel.  Is this

7       available for me or is this one that you need back?

8              MR. ENSOR:  That is your copy, Your Honor.

9              THE COURT:  Okay.  Just a minute.  Have you asked the

10      witness any questions regarding this exhibit yet?  I don't

11      think so.

12             MR. ENSOR:  I have not, Your Honor.

13             THE COURT:  All right.  Your offer into evidence now

14      is declined.  Please proceed.

15             Q.  (By Mr. Ensor) Mr. Barnes, Exhibit 223 is a U.S.

16      patent, is it not?

17             A.  It is.

18             Q.  And have you seen this document before?

19             A.  I have.

20             Q.  And when did you see it?

21             A.  I saw it yesterday.

22             Q.  And do you have any reason to doubt the validity

23      of this patent?

24             A.  No.

25             Q.  In fact, it appears to have a website address

1       from the United States Patent Office on the bottom line,

2       does it not?

3               A.   Yes, it does.

4               MR. ENSOR:  I move to admit Exhibit 223, Your Honor.

5               MS. SNEDDON:  Your Honor, we object.  This appears to

6       be an IBM patent that has nothing to do with our company.

7       It has nothing to do with the VSnap source code.  It is

8       irrelevant.

9               THE COURT:  Overruled.  The exhibit is received.

10              (Whereupon, Plaintiff's Exhibit 223 was received

11               into evidence.)

12              Q.   (By Mr. Ensor)  Now Mr. Barnes, um -- Mr. Barnes,

13      as we talked, about as your lawyer mentioned, this is a

14      patent held by IBM, correct?

15              A.   Correct.

16              Q.   It is a patent that was issued, it looks like it

17      was filed on June 2nd, 2003.  Do you see that?

18              A.   I do.

19              Q.   And this patent, and you're welcome -- I assume

20      you flipped through it yesterday.

21              A.   I read the abstract.

22              Q.   Did you?

23              A.   Yes.

24              Q.   This patent talks about making incremental

25      back-ups, correct?

1          A.    It does.

2          Q.    And it talks about, generally speaking, doing it

3     the way you guys do it, correct?

4          A.    No, it is a lot more than what we do.

5          Q.    It talks about you take the big back-up and then

6     you just take -- you just take out what has been changed and

7     you just -- you make the back-ups of that; is that correct?

8          A.    Not this patent.  This patent is actually making

9     the back-up as part of the process.  What we just track the

10    sector tracking just tracks the sectors, and then the

11    product actually comes in and backs it up.  This one

12    actually is backing the sectors up at the time that it is

13    doing the tracking.

14         Q.    So for this back-up you take the full picture and

15    you take the incrementals and then you're actually copying

16    the incrementals at well?

17         A.    Right.  So this patent is actually doing the

18    back-up as part of its patent.

19         Q.    And this back-up, the abstract, talks about how

20    incremental sector tracking is done, does it not?

21         A.    It uses sector tracking, yes.

22         Q.    And it provides how -- I'm going to get a little

23    lost in the technology here, but the whole idea is you

24    identify which data is, I think you guys sometimes call it

25    dirty, right?  I mean if there is a change somewhere in the

1    system, it marks the block as dirty or used or whatever, and

2    then you just you copy that, right?

3         A.    Yeah.

4         Q.    And that is part of the idea that this patent

5    addresses, does it not?

6         A.    Part of it, yeah.

7         Q.    When you see that right here, where it talks

8    about block level operations are tracked within a storage

9    subsystem, metadata corresponding to the block level

10   operations are collected in the storage subsystem between

11   snapshot, i.e., back-up instances, correct?

12        A.    Correct.

13        Q.    That is talking about taking the used parts and

14   just making a back-up of that, right?

15        A.    Yeah, basically just talking about back-up.

16        Q.    And that is the idea behind your incremental

17   sector tracking?

18        A.    Yeah, tracking what has changed.

19        Q.    What do you -- you know Bob Campbell works for

20   LeapFrog, right?

21        A.    Yes.

22        Q.    And you know that he states he developed the

23   incremental sector tracking himself for the ActiveImage

24   Protector product, correct?

25        A.    Correct.

1          Q.   What else do you -- do you know how he was

2     trained other than what you have read in his deposition?

3          A.   No.

4          Q.   Do you know who he worked for other than what you

5     have read in his deposition?

6          A.   No.

7          Q.   Do you know anything about Bob Campbell other

8     than what you read in his deposition?

9          A.   No.

10          Q.   Did you even bother to go to his deposition so

11     you could have your counsel ask questions that you thought

12     might be relevant?

13          A.   I didn't go to his deposition, no.

14          Q.   You didn't go?

15          A.   No.

16          Q.   Now, you would agree that the compression driver

17     to the extent that Mr. Kirby worked on that for AIP, that

18     had nothing to do with the snapshot driver or the

19     incremental sector tracking, correct?

20          A.   Can you be more specific on compression driver?

21          Q.   The part of the code that pushes the data all

22     down into something like a zip file?

23          A.   Well, there is -- there is -- if you can be more

24     specific because there is the compression within VSnap that

25     manages the bitmaps and then there is compression within the

1    product that actually does the back-up.

2        Q.   The compression within the product that actually

3    does the back-up?

4        A.   Yes.

5        Q.   That is called a compression engine frequently,

6    right?

7        A.   Yes.

8        Q.   And that has nothing to do with the snapshot

9    driver?

10        A.   No, it does not.

11        Q.   Mr. Kirby is free to work on that, right?

12        A.   Correct.

13        Q.   And the mount driver, the mount driver has

14    nothing to with either the snapshot driver or the

15    incremental sector tracking, correct?

16        A.   Correct.

17        Q.   So Mr. Kirby is free to work on that?

18        A.   Yes.

19        Q.   In fact, Mr. Kirby is free to work on the

20    snapshot or on incremental sector tracking as long as he

21    doesn't use your technology, right?

22        A.   Right.

23        Q.   Did you review -- your review of the ActiveImage

24    Protector product, now we know you didn't reverse engineer

25    it, right?

```
1              A.   Right.

2              Q.   And you don't know if it uses your source code,

3        right?

4              A.   Right.

5              Q.   Did you look at version 1.0 of the ActiveImage

6        Protector?

7              A.   I did not.

8              Q.   What version did you look at?

9              A.   The version -- it was from 2010.

10             Q.   Do you remember what version it was?

11             A.   I don't remember.

12             Q.   That was an English version, right?

13             A.   Yes.

14             Q.   Now you actually have a version earlier than that

15       that was released from Japan, don't you?

16             A.   We may.

17             Q.   You just don't remember buying a copy of the

18       ActiveImage Protector when it first came out?

19             A.   I don't recall.

20             Q.   So you didn't run a search on that, you didn't do

21       your comparison in regards to ActiveImage Protector 1.0?

22             A.   No.

23             Q.   And that would tell you, wouldn't it, I mean if

24       the evidence shows that Mr. Kirby didn't have much to do

25       with that, and the sector tracking still looks in your view
```

1      similar, well then, you know, the ActiveImage Protector

2      isn't using your product; isn't that right?

3            A.   Um, yeah.

4            Q.   You talked with your counsel about Exhibit 33

5      here?

6            A.   Yes.

7            Q.   And that comes directly from the Crocker disk

8      that your counsel showed you, right?

9            A.   Yes.

10           Q.   And the Crocker disk contained 80 -- close to

11     80,000 documents?

12           A.   Yes.

13           Q.   And you're aware that the Crocker disk isn't even

14     the entirety of Mr. Kirby's PST file that he gave

15     Mr. Crocker, right?  Mr. Kirby's PST file, the entire file,

16     is not on the Crocker disk, right?

17           A.   Um, I don't know.

18           Q.   Your understanding is that Mr. Crocker deleted a

19     bunch of e-mails before he sent that PST file to his

20     counsel, right?

21           A.   That is what he says, yes.

22           Q.   So originally there were more than 80,000

23     e-mails, that would be your understanding, wouldn't it?

24           A.   If Crocker is right, yes.

25           Q.   And out of the 80,000 e-mails you found 11 copies

1  of the VSnap code?

2          A.   Yes.

3          Q.   And each code is close to a thousand pages?

4          A.   Yes.

5          Q.   So 11,000 pages of these boxes are just the 11

6  source codes; is that correct?

7          A.   No, I believe that contains all of the -- all of

8  the results from all of them.  So there are partial copies

9  as well as e-mails.

10         Q.   Okay.  Let me be a little more specific.

11         A.   Okay.

12         Q.   So 11,000 pages of that, more or less, is just

13  the 11 full copies of the source code?

14         A.   Yes, correct.

15         Q.   Okay.  And when you were at PowerQuest, the

16  source code was e-mailed back and forth frequently, was it

17  not?

18         A.   That is how it was delivered.

19         Q.   Right.  And we saw some of those e-mails your

20  counsel walked you through Jamey Kirby's e-mailing it to I

21  guess one of your colleagues named Nate Bushman?

22         A.   Yes.

23         Q.   At PowerQuest?

24         A.   Yes.

25         Q.   And so it would go back and forth that way,

1    right?

2         A.    Correct.

3         Q.    Presumably hundreds of times?

4         A.    Probably not hundreds, but yeah a lot of times.

5         Q.    And of the -- you only found 11 on the Crocker

6    disk, right?

7         A.    I only found 11.  But keep in mind that most of

8    Jamey's sent e-mails were not included in that.  I did not

9    find very many e-mails that Jamey was actually the sender.

10   So most of those were missing.

11        Q.    Possibly deleted?

12        A.    Possibly deleted.

13        Q.    Okay.  And you would have -- so many times the

14   source code would have gone back and forth between

15   PowerQuest and Mr. Kirby and I call him Max because I'm

16   going to mess up his last name.

17        A.    Yes.

18        Q.    And you would also expect that many times

19   Mr. Kirby and Max would send the e-mails back and forth to

20   each other?

21        A.    Yes.

22        Q.    And so we know 11,000 pages of that is just those

23   11 copies of the source code.  So that leaves about 8,000

24   pages.  And your counsel said every single copy dealt with

25   the VSnap code.  That is not every single document in there

1    relates to the VSnap code, does it?

2        A.   Every single document had the VSnap search term

3    related in it somehow.  So I assume VSnap is either in the

4    attachment or the e-mail or the subject.  It probably has to

5    do with the VSnap source code.

6        Q.   But some of them are pretty innocuous, right?

7    They don't really say anything?

8        A.   Yeah.

9        Q.   For example, let me show you a page from

10   Exhibit 33.  Sure enough this uses the word VSnap, right?

11       A.   Yes.

12       Q.   Doesn't attach any source code, does it?

13       A.   No.

14       Q.   Do you have any idea how many of those remaining

15   8,000 pages are e-mails like this that don't attach the

16   source code?

17       A.   I don't.

18       Q.   Now, going back to your analysis on ActiveImage

19   Protector, we know you can't know if the source code is

20   being used without doing a comparison.  But tell me what you

21   did do?

22       A.   We put -- again, I saw the product side-by-side.

23       Q.   Let me just shorten it.  I'm really focused on

24   your expert opinion about the incremental sector tracking.

25       A.   Okay.

1          Q.    I just want to hear what you did to back-up your

2     conclusion that it does it in a similar way?

3          A.    When you set up to create a back-up, and you

4     create a full back-up, and then you make changes and then

5     you tell it to make another back-up or an incremental

6     back-up, the time to prepare to make that back-up and then

7     the output of the file of those back-ups were very similar.

8     So both the time that it takes and contrast that with the

9     Acronis, Acronis takes a lot longer, where ActiveImage

10    Protector and ShadowProtect take just about the same amount

11    of time to prepare and then back-up the incremental data.

12         Q.    So mainly the similarity is in the time that it

13    takes to back-up the product?

14         A.    To prepare to back-up and then to back-up, yes.

15         Q.    So that is the basis for your opinion that the

16    products are similar?

17         A.    That is one basis, yes.

18         Q.    Okay.  What is -- and you have a second basis it

19    sounds like?

20         A.    Basically that the way they're used as well.

21         Q.    So I'm sticking on the incremental sector

22    tracking, so I don't want to get off track.  No pun

23    intended.

24         A.    Okay.

25         Q.    So for incremental sector tracking, it is the

1    time?

2        A.    It is the time and the output.

3        Q.    And when you say output, what do you mean by

4    that?

5        A.    The file that is created.  In other words, the

6    data that is tracked by both technologies appears to be

7    very -- the same, the same data or very close to the same

8    data.

9        Q.    And how do you -- how do you know that?

10       A.    You can see the file.

11       Q.    So --

12       A.    You can compare the file sizes.

13       Q.    So your two basis for the belief that it is

14   possible the source code is being used is one they back-up

15   about the same amount of time; and two, that the file, the

16   back-up file, is about the same size?

17       A.    They prepare the data to be backed up in the same

18   amount of time so they can quickly figure out what is

19   changed so that they're tracking it definitely and in a

20   smart way, and the time it takes to back-up and then the --

21   the output, the file that is created.

22       Q.    The output, it is just the size, right?

23       A.    Yes.

24       Q.    You know, your back-up, STC's back-up on an

25   incremental basis may be I'm going to get this wrong, but a

1     millobyte?

2         A.   A megabyte.

3         Q.   A megabyte?

4         A.   Yes.

5         Q.   And ActiveImage Protector, when they run their

6     back-up, it is somewhere around the same size?

7         A.   Very close to the same exact size.

8         Q.   And I mean you would expect that though it is

9     similar, right, because if you're reviewing incremental

10    tracking, you're only taking the used or the dirty parts of

11    the -- of the operating system or --

12        A.   File system.

13        Q.   -- file system, sorry.  And if you're only taking

14    those in, you're only copying those, right?

15        A.   Yes.

16        Q.   So at some level, you know, incremental sector

17    tracking is going to pick out these four things that have

18    been used, smush them down and back it up, and that is going

19    to be the size?

20        A.   Yes.

21        Q.   And another incremental sector tracking program

22    might figure out also these four things have been used and

23    smush them down and it would be about the same size?

24        A.   Yes.

25        Q.   So that doesn't really surprise you, does it?

1        A.    Not that they're the same size, but the fact that

2        those three factors that the preparation time is the same,

3        and the length of time it takes to back-up and then the

4        size.

5            Q.    The length of time it takes to back-up, that is

6        -- that is also done by the compression engine, right?

7            A.    No, it is not.  You actually have to read in an

8        intelligent way the sectors that have changed.

9            Q.    Those three things, we have talked about them

10       now, but those all relate to incremental sector tracking?

11           A.    Yes.

12           Q.    And that is the basis for your entire belief that

13       they're similar?

14           A.    Yes.

15           Q.    But you don't have any idea whether or not

16       NetJapan or LeapFrog used any STC source code in producing

17       that product?

18           A.    I don't.

19           Q.    It is a little bit off topic, the ColdSnap

20       product, you helped develop that, right?

21           A.    Yes.

22           Q.    And you did that while you were at STC?

23           A.    It was a collaboration with Jamey, talking about

24       different possibilities, yes.

25           Q.    You did that when, in 2004?

1          A.   2000 -- it would be 2000 is when I think it first

2     came up.

3          Q.   The year 2000?

4          A.   2002.

5          Q.   2002.  And when was it ready to go?

6          A.   2004.  2003, 2004.

7          Q.   Your counsel talked to you about -- your lawyers

8     that your lawyer had mentioned to you he sent me a letter

9     saying hey, have Rectiphy get the source code and we'll

10    compare it against our source code.  You talked about that

11    with Ms. Sneddon, didn't you?

12         A.   Yes.

13         Q.   And now I mean, you know, obviously Jamey Kirby

14    is not NetJapan, right?

15         A.   I'm not sure what the relationship is.  It is

16    pretty complex, I think.

17         Q.   Well, as far as you know, he is not an owner or

18    officer of NetJapan.  That is right, isn't it?

19         A.   I think he has been paid by NetJapan so I think

20    there is a relationship there.

21         Q.   Fair enough.  That really wasn't my question.  I

22    mean STC pays a lot of people, right?

23         A.   Yes.

24         Q.   They pay Mr. Karrenberg, don't they?

25         A.   Yes.

1        Q.    Does that make him an officer or director?

2        A.    No.

3        Q.    Okay.  Now, so you don't have any reason to

4    believe Jamey Kirby has ever been an officer or director in

5    NetJapan, right?

6        A.    I don't know.

7        Q.    Okay.  Now, what you didn't tell the jury was

8    your counsel's letter and I'll give it to you.  May I

9    approach Your Honor?

10        THE COURT:  You may.

11        Q.    (By Mr. Ensor)  Take a minute to read that,

12    Mr. Barnes.

13        A.    Okay.

14        Q.    Now you have seen that before?

15        A.    I haven't.

16        Q.    It appears to be from your lawyer,

17    Mr. Karrenberg?

18        A.    Yes.

19        Q.    It appears to be to me?

20        A.    Yes.

21        Q.    And it essentially says hey, let's compare source

22    code, Rectiphy and STC, right?

23        A.    Yes.

24        Q.    It doesn't say anywhere in that that this case

25    would go away if we did that and the source codes were

1    different, did it?

2         A.   No.

3         Q.   It doesn't say that, right?

4         A.   No.

5         Q.   He just wants to see the source code?

6         A.   I think he wants a third-party to see to compare

7    the source code.

8         Q.   But if they're different, he doesn't make an

9    offer that this case would go away, does he?

10        A.   I don't think he got that far.

11        Q.   Last question, Mr. Barnes, two more questions,

12   the Crocker disk you looked at, it is just a disk that can

13   be fed into a litigation program, right?

14        A.   Yes.

15        Q.   So it is not the actual -- you can't see

16   Mr. Kirby's e-mail files.  I mean you can't see what his

17   Microsoft Outlook looked like?

18        A.   Correct.

19        Q.   So you don't know whether those e-mails were in a

20   folder entitled deleted, correct?

21        A.   No, I don't know.

22        Q.   You don't know if they were in an archived file,

23   right?

24        A.   I don't know.

25        Q.   I mean all you know is that this was a copy of

1    the PST file and I mean you're not looking at Mr. Kirby's

2    e-mail, you're looking at everything that might have been on

3    the PST file?

4        A.   Right, I don't know.

5        Q.   And finally, your e-mail searches you mentioned

6    again I'm going to use their first names for the Russian

7    engineers?

8        A.   Okay.

9        Q.   You found a lot more e-mails from Max than you

10   did from Alexey and more e-mails from Alexey than you did

11   from Denis; is that right?

12       A.   I think -- yeah.  I don't remember.  Max yes, a

13   lot more, and then somebody was 606.  So --

14       Q.   That was Denis?

15       A.   Denis, yeah.

16       Q.   Isn't that consistent with your recollection that

17   Max was more involved in the software development of VSnap

18   than the other two Russian engineers?

19       A.   I'm not sure what it means.  Certainly Max speaks

20   English better so he generally interfaced with anybody that

21   spoke English.  The other two didn't speak English as well.

22       MR. ENSOR:  Thank you.

23       THE COURT:  Do you have very long on redirect?

24       MS. SNEDDON:  Your Honor, I would say maybe 10 or

25   15 minutes.

1          THE COURT:  I would really like to finish this witness

2     before we break for lunch, so let's go ahead.

3          MS. SNEDDON:  Sure.  I'll try to be quick here.

**REDIRECT EXAMINATION**

5     BY MS SNEDDON:

6          Q.   Mr. Barnes, do you remember Mr. Ensor asking you

7     about several different products that also have incremental

8     sector tracking?

9          A.   Yes.

10          Q.   I think he identified one from Computer

11     Associates, one from Symantec that does not use the licensed

12     copy of VSnap, one from Acronis, and then one other one that

13     you weren't able to recall.  So I think that is four?

14          A.   Well, the one from Symantec that does not use our

15     technology does not have incremental tracking.

16          Q.   Okay.  So really we're talking about three?

17          A.   Yes.

18          Q.   Is that right?

19          A.   Okay.

20          Q.   So of those three, which one had a product that

21     was out in March of 2009 with incremental sector tracking

22     when ActiveImage Protector came out?

23          A.   CA and Acronis.

24          Q.   And do you know anything about CA's incremental

25     sector tracking?

1          A.   I don't.

2          Q.   I want to also bring your attention to the patent

3     that Mr. Ensor had you take a look at.  It was Exhibit 223.

4          A.   Yes.

5          Q.   This is the IBM patent.  Patents are something

6     that give you protection over an idea, right?

7          A.   Right.

8          Q.   They don't patent source code, right?  This isn't

9     a patent over source code?

10         A.   No, it is not.

11         Q.   And STC actually has a copyright over the VSnap

12    source code, correct?

13         A.   Correct.

14         Q.   Margaret, can you pull up Exhibit 44.  And you

15    know that VSnap was written and developed by StorageCraft,

16    Inc. and you had some role in that in 2000, 2001, 2002,

17    right?

18         A.   Yes.

19         Q.   And if you will take a look at this, the

20    copyright, you go to the second page, it is shown right

21    there in the corner it has a date of April 12, 2005, right?

22         A.   Yes.

23         Q.   And that was when STC obtained the copyright in

24    the VSnap source code?

25         A.   Yes.

1          Q.   Do you know what prior art is?

2          A.   Yes, I do.

3          Q.   What is it?

4          A.   It is work that has been done before you have

5     done your work.  So prior art in the patents means somebody

6     had the idea before you did, or similar ideas before you

7     did.

8          Q.   Would VSnap qualify as prior art?

9          A.   Yes, it would.

10         Q.   If you take a look at the patent that Mr. Ensor

11    handed you, this is a patent dated June 27, 2006, right?

12         A.   Yes.

13         Q.   So that is a patent that was after you got a

14    copyright in VSnap source code, right?

15         A.   That is correct.

16         Q.   Now, Mr. Ensor asked you some questions about

17    whether or not you know for sure that the VSnap source code

18    is in ActiveImage Protector source code?

19         A.   Yes.

20         Q.   And you haven't been able to do a code comparison

21    as we have discussed, right?

22         A.   Correct.

23         Q.   The request that was made to Rectiphy and to

24    Mr. Ensor was ignored, we did not get a copy of their source

25    code to compare through a third-party expert, correct?

1          A.    Correct.

2          Q.    But nevertheless, you still did your comparison

3    between the two products and you believe that ActiveImage

4    Protector contains VSnap or used it to at least improve its

5    technology?

6          A.    I do.

7          Q.    And what is the basis for that?

8          A.    Speed to market.  VSnap, the snapshot and the

9    incremental technology, really took quite a few engineers

10   over a year to develop.  So basically four engineers working

11   over a year to develop.  So speed to market was one of them.

12   And then the similarities were -- it was very similar.

13         Q.    And he also talked to you about running searches

14   on Microsoft Outlook.  And you mentioned that you can't do

15   the same or you couldn't view the contents of the Crocker

16   disk in Microsoft Outlook because of the way in which they

17   were produced to us by Mr. Crocker's counsel, correct?

18         A.    Correct.

19         Q.    But if I recall your testimony correctly, you do

20   -- can you do basically the same searches in that software

21   that you do in Microsoft Outlook, correct?

22         A.    Correct.

23         Q.    In fact, doing a search for just the term VSnap

24   turns up 19,000 pages of material from that disk, right?

25         A.    Right.

1      Q.   And can you perform that same search in Microsoft

2    Outlook?

3      A.   Yes.

4      Q.   Mr. Ensor also mentioned that you didn't know if

5    any of the VSnap e-mails were contained maybe in a deleted

6    items folder or archive folder, do you remember that?

7      A.   Yes.

8      Q.   And you know that Mr. Kirby is a talented

9    software developer and architect, correct?

10     A.   Yes.

11     Q.   And you weren't here for it, but he testified

12   extensively about his experience.  Would you expect that he

13   knows how to use Microsoft Outlook pretty well?

14     A.   I know he knows how to use it very well.

15     Q.   How do you know that?

16     A.   Well, I recall a meeting in 2003 in his offices

17   in Palomar Mountain where we talked specifically about him

18   using Outlook as basically his life's organizer, his

19   calendar, his e-mail.  Anything that he wanted to keep he

20   would actually e-mail himself and he actually talked about

21   the PST file, his PST file being over a gigabyte at that

22   time.

23     Q.   So if you have that much e-mail, and you use it

24   to calendar your life and organize your life, you know that

25   if you delete an e-mail, it ends up in your deleted items

1    folder, right?

2        A.   Yes.

3        Q.   It is not permanently deleted.  Is that correct?

4        A.   Correct.

5        Q.   And if you put it in an archive file, you're

6    obviously putting it there to save it, right?

7        A.   Yes.

8        Q.   And so if you do a search, and you find 19,000

9    documents with the term VSnap on them, it suggests he did

10   not permanently delete those, correct?

11       A.   Correct.

12       MR. ENSOR:  Your Honor, this is a very leading line of

13   testimony.

14       MS. SNEDDON:  Trying to be quick here.

15       THE COURT:  Let's finish up.  And for the record

16   sustained.  That answer can stand.

17       Q.   (By Ms. Sneddon)  When you're doing a search in

18   Outlook, does it matter if there are 80,000 e-mails in your

19   e-mail folder or a thousand e-mails in your e-mail folder?

20       A.   No.

21       Q.   Can you run the same search?

22       A.   Yes.

23       Q.   Does it take about the same amount of time?

24       A.   The more e-mails the longer, but it is still

25   under a minute usually.

1          MS. SNEDDON:  And just the last thing, Your Honor, we

2     would like to offer the letter from Mr. Karrenberg to

3     Mr. Ensor into evidence.

4          MR. ENSOR:  No objection, Your Honor.

5          THE COURT:  Is it marked yet?

6          MS. SNEDDON:  It is not marked.

7          THE COURT:  What number will it have?

8          MR. KARRENBERG:  It will be the next number 224.

9          THE COURT:  224.  Did you make an original, Mr. Ensor,

10    of 223?

11         MR. ENSOR:  The witness has it, Your Honor.

12         THE COURT:  Okay.  224 is received.

13         (Whereupon, Plaintiff's Exhibit 224 was received

14          into evidence.)

15         MS. SNEDDON:  That is all I have, Your Honor.

16         THE COURT:  Any re-cross?

17         MR. ENSOR:  Real brief, Your Honor.

18                        **RECROSS-EXAMINATION**

19    BY MR. ENSOR:

20         Q.   Mr. Barnes, the reason I brought the patent up is

21    not so much that you do or don't have a copyright, it is the

22    idea of incremental sector tracking was public domain by

23    2003, correct?

24         A.   The idea, yes.

25         Q.   And IBM sets out that idea in 11 pages?

1          A.   In 11 pages.

2          Q.   You added a new reason why you think maybe the

3     STC source code is being used.  That is speed to market,

4     right?

5          A.   Yes.

6          Q.   Now, we know that LeapFrog didn't have to develop

7     the Volsnap because Microsoft had already done that, right?

8          A.   Well, the product I tested it had some form of

9     VSnap, some form of snapshot to support Windows 2000.

10         Q.   Right.  Let's put Windows 2000 aside.  That was

11    12 years ago and we can talk about that with your counsel on

12    redirect.  But with the exception of Windows 2000, and all

13    of the other versions we went through, it was using Volsnap,

14    right?

15         A.   The product I tested worked on Windows 2000, it

16    did not use Volsnap.

17         Q.   Correct.  But for the other versions of Windows?

18         A.   Yes.  For the other versions of Windows it used

19    Volsnap.

20         Q.   That doesn't surprise you, does it?

21         A.   No.

22         Q.   I mean it is a publicly free snapshot driver from

23    Microsoft, right?

24         A.   Well, it is not free.  It is part of the

25    operating system.

1          Q.   Fair enough.  When you buy Windows, you get it?

2          A.   Yes.

3          Q.   And so LeapFrog didn't have to develop that?

4          A.   For those.  But again, I said it worked on

5     Windows 2000.

6          Q.   I understand there is an old operating system

7     that it works on that they had to develop one for.  I get

8     it.  But for all of the other more current, the five or six

9     more current versions of Windows, there was no development

10    time, it was already done by Microsoft in regard to the

11    snapshot driver, right?

12         A.   Yes.

13         Q.   And you're aware Mr. Campbell testified it took

14    18 months to get everything done, right?

15         A.   Yes.

16         Q.   You consider that too fast?

17         A.   I do.

18         Q.   Well, when we talked about how a lot of the early

19    versions of the VSnap there didn't have incremental sector

20    tracking, right?

21         A.   Correct.

22         Q.   And incremental sector tracking wasn't added

23    until 2002, right?

24         A.   It was being worked on, but it wasn't added to

25    the product until 2002.

1          Q.   Well, it didn't take 18 months to develop the

2     incremental sector tracking, did it?

3          A.   Well, in development terms we talk about

4     man-hours.  So Robert Campbell was one developer, and we had

5     four developers.  In fact, two of which were Microsoft MVP

6     -- DDK MVPs.

7          Q.   Well, the incremental tracking was requested by

8     PowerQuest, right?

9          A.   Yes.

10         Q.   And the PowerQuest license wasn't even until June

11    of 2002, right?

12         A.   Yes.

13         Q.   And I can show you Exhibit 164, if you want, but

14    that is the latest copy of the Volsnap in there?

15         A.   Yes.

16         Q.   Sorry, of the VSnap in there.  It says it is

17    almost done.

18         A.   Yes.

19         Q.   So it certainly took less than a year from the

20    beginning of the PowerQuest license to get the incremental

21    sector tracking in there, didn't it?

22         A.   Four engineers, yes, less than a year.  But in

23    terms of man years, and that is how we measure software

24    development.

25         Q.   Four engineers, okay.  How much was Alexey

1    working on it?  Tell me what you know?

2         A.   I know that he was working at least half -- half

3    of his time on it.

4         Q.   And did you talk to him?

5         A.   No, I talked to Jamey and to Max.

6         Q.   Okay.  And how much was Denis working on it?

7         A.   My guess is half time as well.

8         Q.   Denis didn't interact with you, right?

9         A.   No, he did not.

10        Q.   And Alexey didn't interact with you?

11        A.   No, he did not.

12        Q.   Okay.  And you had some communications with Max

13   and that is it and Jamey?

14        A.   Correct.

15        MR. ENSOR:  Thank you.

16        MS. SNEDDON:  Your Honor, just one question actually.

17        THE COURT:  Okay.

18        MS. SNEDDON:  Will you hold me to it?

19        THE COURT:  No, 12 people will.

20        MS. SNEDDON:  Okay, I will try to meet that promise.

21                   **FURTHER DIRECT EXAMINATION**

22   BY MS. SNEDDON:

23        Q.   The patent that Mr. Ensor brought up, and I think

24   your testimony has covered everything else and I want to

25   just cover this, does that patent make the VSnap source code

1    part of the public domain?

2         A.   It does not.

3         MS. SNEDDON:  That is all I have.

4         THE COURT:  Any follow up on that, Mr. Ensor?

5         MR. ENSOR:  No, Your Honor.

6         THE COURT:  We'll be in recess until 20 'til one.  All

7    rise.

8         (Whereupon, the jury left the courtroom.)

9         THE COURT:  We're going to print two copies of the

10   exhibit list, one for each side, so that you can look at it

11   and see what we have marked as received.  And then if you

12   check that before we come back in half an hour I would

13   appreciate it.  You have your expert?

14        MR. KARRENBERG:  Yes, sir.

15        THE COURT:  And you have a witness?

16        MR. ENSOR:  I do, Your Honor.

17        THE COURT:  And is there anything we need to talk

18   about before we break?

19        MR. KARRENBERG:  I believe so, sir.

20        MR. ENSOR:  Just the briefs we filed last night about

21   whether or not Mr. Kilbourne's testimony is --

22        THE COURT:  I have read the briefs.  I have read cases

23   from both briefs.  I am going to permit Mr. Kilbourne's

24   testimony.  I recognize you'll have other motions based on

25   these principles, but I am going to permit -- this case is

1        going to the jury full throttle.  And I may be reserving

2        some decisions about what is justified and not, but I think

3        given particularly the language in the trade secret act, in

4        1324(4), royalty damages are authorized if there is

5        disclosure or use.  And I'm going to live by that.  So

6        Kilbourne's testimony is going to come in and it will go to

7        the jury.

8            MR. ENSOR:  Your Honor, I'm going to move on the

9        contract claim as STC has not presented any damages on that.

10       I don't know if you want to excuse the jury when he rests

11       his case.

12           THE COURT:  We only have the expert left.  I think you

13       can make your motion right now.  We can deal with it in two

14       minutes from each side.

15           MR. ENSOR:  Your Honor, I would be glad to do that.

16       My motion is very simple.  The court is very well aware

17       there is four elements to any breach of contract to any

18       breach of contract claim.  One of the mandatory elements is

19       damages.  STC has not even attempted to prove damages caused

20       from the breach of contract.  Their next witness is only

21       going to talk about a reasonable royalty under the trade

22       secret act, Your Honor.  For that reason, the claim fails

23       and it should be dismissed.

24           THE COURT:  Any response from plaintiff?

25           MR. KARRENBERG:  Yes, Your Honor, actual damages and

1    for consequential damages and we have some cases that

2    Ms. Heather --

3        THE COURT:  I don't need cases.

4        MR. KARRENBERG:  -- that says a reasonable royalty can

5    be paid for a breach of contract.  He had a contract not to

6    use it, and he ended up using it.  If he would have had it

7    legally, he would have got it through having to pay it.  And

8    there would have been at least minimal reasonable royalty.

9        THE COURT:  I am going to permit the issue of the

10   contract damages to go to the jury.  So that motion will be

11   treated as if made at the close of plaintiff's case and has

12   been made now.

13       MR. ENSOR:  Thank you, Your Honor.

14       MR. KARRENBERG:  And Judge, just a quick proffer on

15   the issue we talked about when the jury went out.  We would

16   have, based on Mr. Kirby opening up the area of comparing

17   screenshots, we would have had Mr. Barnes say that the

18   screenshots for the user interface from the AIP product and

19   the ShadowProtect product are exactly the same.

20       THE COURT:  And the --

21       MR. KARRENBERG:  That is just a proffer.

22       THE COURT:  The proffer is now on the record for your

23   appeal to the much smarter judges.  We're in recess.

24       MR. KARRENBERG:  I'm not going to comment on that,

25   Judge.  Thank you, sir.

```
1    STATE OF UTAH              )

2                              )ss

3    COUNTY OF SALT LAKE        )

4

5            I, Laura W. Robinson, Certified Shorthand

6    Reporter, Registered Professional Reporter and Notary Public

7    within and for the County of Salt Lake, State of Utah, do

8    hereby certify:

9            That the foregoing proceedings were taken before

10   me at the time and place set forth herein and were taken

11   down by me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13           That the foregoing pages contain a true and

14   correct transcription of my said shorthand notes so taken.

15           In witness whereof I have subscribed my name and

16   affixed my seal this 14th day of September, 2012.

17

18                    _____

19                    Laura W. Robinson, CSR, RPR, CP

20                    and Notary Public

21

22   MY COMMISSION EXPIRES:

23   February 19, 2013

24

25
```