1              (Recess.)

2              THE COURT:  I had a question about a document that

3    we found on the witness stand.  I was having Exhibits 223 and

4    224 scanned.

5              MR. KARRENBERG:  That one was the one that

6    refreshed Mr. Barnes' recollection of exactly the numbers.  So

7    he didn't memorize them.  It wasn't offered.  If counsel wants

8    it in, you're welcome.

9              THE COURT:  It's yours.  Okay.

10             MR. KARRENBERG:  As soon as my witness gets back,

11   I'm ready to go.

12             THE COURT:  Where is your witness?

13             MR. SNEDDON:  I think he's out there.

14             MR. KARRENBERG:  We're ready, Your Honor.

15             THE COURT:  Okay.  They're here.

16             (Whereupon, the jury returned to the court

17        proceedings.)

18             THE COURT:  We're convened again in StorageCraft

19   vs. Kirby.  We're ready for the next witness.  It might be a

20   good idea to clean up some of those binders before we do that.

21             MR. KARRENBERG:  I'm going to do that, Your Honor.

22             And I call Mr. Patrick Kilbourne.

23             THE COURT:  Mr. Kilbourne, if you'll come up and

24   just pause here in front of the clerk to take an oath.

25             THE CLERK:  Raise your right hand, please.

PATRICK KILBOURNE,

1

2          called as a witness at the request of Plaintiff,

3              having been first duly sworn, was examined

4                      and testified as follows:

5              THE WITNESS:  Yes.

6              THE CLERK:  Thank you.  If you'll, please, state

7    your name and spell it for the record, please.

8              THE WITNESS:  Patrick Kilbourne.  P-A-T-R-I-C-K.

9    Kilbourne, K-I-L-B-O-U-R-N-E.

10             THE CLERK:  Thank you.

11                      DIRECT EXAMINATION

12   BY MR. KARRENBERG:

13        Q.   Good afternoon, Mr. Kilbourne.

14        A.   Good afternoon.

15        Q.   You've been hired by my law firm to be an expert

16   witness in this case; correct?

17        A.   Yes.

18        Q.   Okay.  Would you, please, describe your educational

19   background?

20        A.   I have a bachelor's degree in accounting from

21   Brigham Young University.  I also have a master's degree in

22   accounting from Brigham Young University.  And I have an MBA

23   from the Wharton School from the University of Pennsylvania.

24        Q.   And the Wharton School is a business school;

25   correct?

1        A.    That's right, yes.

2        Q.    And have you taken any continuing education in the

3    area of intellectual valuations?

4        A.    Yes.  I have a number of professional

5    certifications, all of which require anywhere from three to

6    five days per year of continuing education.  So that goes on

7    every year.

8        Q.    Have you ever testified before concerning -- in a

9    lawsuit concerning intellectual property valuations?

10        A.    Yes.

11        Q.    Could you tell the jury which ones those were?

12        A.    Well, I've been involved with a number of cases

13    over my career.  Some of them go to the trial at this point

14    where I testify.  Some do not where I prepare a report but

15    they settle or work things out beforehand.

16            And I've been involved in cases dealing with

17    intellectual property of patents, copyrights, trade secrets.

18    I've dealt with reasonable royalty issues, with royalty

19    audits, with accounting investigations, lost profit analyses.

20    All those areas.

21        Q.    And on the cases that you've worked with, what were

22    some of the clients that hired you?

23        A.    Some of the more recognizable clients would be IBM

24    in which I worked with them in a software case dealing with

25    source code.  I've done several, a couple of cases with

1    Novell, Shell Oil, InVideo, which is a chip maker.  Motorola.

2    Those are maybe a few that would be more recognizable.

3         Q.   Thank you.  Where do you currently work?

4         A.   Berkeley Research Group.

5         Q.   How long have you been with Berkeley Research

6    Group?

7         A.   About a year and a half.

8         Q.   And where did you work prior to that?

9         A.   Law and Economic Consulting Group.

10        Q.   How long were you with LECG?

11        A.   About nine years.

12        Q.   Tell us how it ended up going from LECG to BRG.

13        A.   I moved my practice from LECG to BRG.  It was just

14   a transition of taking myself and my staff and moving my

15   clients from one company to the other.

16        Q.   And what's the business of LECG and BRG?

17        A.   Both companies provide expert services in

18   litigation and in litigation support and other areas like

19   that.  We provide independent expert analysis.  We have

20   accountants, economists, statisticians, finance types.

21        Q.   And have you received any professional credentials?

22        A.   Yes.

23        Q.   What would those be?

24        A.   I'm a CPA, which is a certified public accountant.

25   I'm an ABV, which is accredited in business valuation.  I'm a

1    CMA, which is certified management accountant; a CFF, which is

2    certified in financial forensics; and a CFE, which is a

3    certified fraud examiner.

4         Q.    Are you accredited in business valuations?

5         A.    Yes, I am.

6         Q.    And who accredits you in that?

7         A.    That accreditation is from the AICPA, which is the

8    American Institute of Certified Public Accountants.

9         Q.    And you've provided testimony as you've indicated

10   in other litigation matters; right?

11        A.    Yes.  Many.

12        Q.    And those include intellectual property issues?

13        A.    Yes.

14        Q.    Royalty issues?

15        A.    Yes.

16        Q.    Royalty audits?

17        A.    Yes.

18        Q.    Lost profits?

19        A.    Yes.

20        Q.    And, of course, forensic accounting?

21        A.    Yes.

22        Q.    Did any of those cases involve reviewing license

23   agreements?

24        A.    Yes.  Many of them.

25        Q.    You already gave me some examples of those, I

 1    think, so we can move on.

 2              Let me move to admit Exhibit 165, Your Honor, which

 3    is just Mr. Kilbourne's CV.

 4              MR. ENSOR:  No objection, Your Honor.

 5              THE COURT:  165 is received.

 6         (Whereupon, Plaintiff's Exhibit 165 was received.)

 7              MR. KARRENBERG:  Thank you, Your Honor.

 8         Q.   BY MR. KARRENBERG:  What was your assignment in

 9    this matter?

10         A.   I was asked to determine a reasonable license fee

11    for the VSnap source code that Mr. Kirby misappropriated from

12    StorageCraft.

13         Q.   Let's make it clear.  You are not here to give any

14    expert opinion on any liability issues; is that correct?

15         A.   That's correct.  The liability is separate from the

16    damages, and I am just dealing with the damages.

17         Q.   Thank you.  What did you do to actually execute

18    your assignment for me?

19         A.   I reviewed a number of documents.  Part of my

20    report is, I think it's a three-page list of documents that I

21    reviewed that includes license agreements, correspondence

22    between StorageCraft and other parties.  We did independent

23    research of licenses that are in the public domain.  I

24    reviewed a number of depositions.  Other documents.  It's

25    quite an extensive list.

1          Q.    And did you speak to any of the StorageCraft

2    employees?

3          A.    Yes, I did.  I spoke to a number of StorageCraft

4    people, both including here in the US and Russia.

5          Q.    In fact, in Russia you spoke to Mr. Shatskih;

6    right?

7          A.    That's correct.

8          Q.    Let's get this out.  You have worked with me and

9    Ms. Sneddon before in a number of cases; isn't that true?

10         A.    Yes, that's correct.

11         Q.    Did you do any independent research regarding

12   software licenses?

13         A.    Yes.  We looked at a number of licenses that are

14   publicly available.  And we actually used a third-party

15   research firm called Royalty Source to go and find software

16   licenses that could be considered comparable to what

17   StorageCraft would have licensed with the VSnap.

18         Q.    And after doing your work, what was the opinion you

19   reached?

20         A.    My opinion is that the reasonable license fee for

21   the VSnap software or source code would be at least

22   $4.5 million.

23         Q.    Okay.

24               Can we put up the first of Exhibit 131, which is a

25   demonstrative exhibit?

1          Could you explain to the jury what is the basis for

2     your conclusion?

3          A.   Yes.  So in my analysis, I went through five

4     factors that led me to this conclusion of a $4.5 million

5     reasonable license fee.  And those five are listed here on

6     this page.

7          Number one is the cost of developing the source

8     code and bringing the software to market.  Number two is the

9     comparity of the VMware license, which I'm sure we'll discuss,

10    but it's a license that is contemporaneous or around the same

11    time when Mr. Kirby misappropriated the software.  Also STC's

12    unwillingness to license the source code.  And Number four,

13    their revenue growth.  And finally a comparison to software

14    and source code license rates that are in the public.

15         Q.   All right.  Could we begin by going through the

16    first area.  What did you do concerning the cost of developing

17    the source code and bringing the software to market?

18         A.   Sure.  This encompasses several things.  And if

19    you're a company that wants some source code or software, your

20    first decision is, do you build it or do you buy it?  And if

21    you're going to buy, that means you're going to license it

22    from someone else.  If you build it you're going to have to

23    build it and build the code yourself, and you've got to take

24    it to market and that takes both time and money.

25         So one of the ways you look at these types of

1    issues, you say, if a company choses to build it themselves,

2    what would it take them?

3              So in this issue, we first have the actual cost of

4    development.  And perhaps if we can go to the --

5         Q.   Next slide?

6         A.   -- next slide, yeah.

7         Q.   It's in the same exhibit.

8         A.   So there's a couple of components to this, and one

9    is just the actual time and energy it takes to build it.

10             And Mr. Kirby testified in his deposition that it

11   took he and three other developers, the three Russian

12   developers that we've talked about, between 15 and 20 months

13   to develop the software.  So when you take that time, multiply

14   by 250 an hour, and 250 an hour is the rate that StorageCraft

15   charges its software developers out to people, to customers

16   for doing develop work at around that time, if you just do

17   that math you get to between 2 1/2 to $3 1/2 million.

18             So that's just the first part of the actual time

19   that somebody would spend.  And it's not so much how much time

20   or money -- how much money was actually spent, but how much

21   the next person would have to spend to do it.

22             So what we're looking at here is a new party comes

23   in and says, I want to build the software.  How long will it

24   take them, and what will I have to pay for that?

25        Q.   Now, you sat here both yesterday and today

1    listening to Mr. Kirby's testimony; is that correct?

2         A.   Yes.

3         Q.   Was there anything in that testimony that made you

4    question this first line item on here?

5         A.   Well, Mr. Kirby's testimony in his deposition and

6    what he gave today was inconsistent.  In his deposition he

7    testified that it took 15 to 20 months.  Today he said that it

8    was being developed in 2000, 2001, 2002, 2003 and 2004, so

9    upwards of five years when the development was going on.  So I

10   don't know if those two reconcile by perhaps he's -- in his

11   deposition he was talking about the total time all squished

12   together as opposed to being spread out over five years.  But

13   one way or the other, I'm comfortable with what he said.

14        Also as I mentioned I spoke to Max Shatskih, the

15   Russian engineer, and confirmed that with him.  And he

16   corroborated the fact that they spent about that much time

17   developing the software.

18        Q.   And how did you satisfy yourself that the $250 an

19   hour was a reasonable rate?

20        A.   Well, again, that's the rate that StorageCraft

21   charges its clients for software development work.  And, you

22   know, that's a pretty reasonable rate for that kind of work.

23   You have to remember that that folds in, it's not just --

24   that's not -- that's not just you grab somebody and say, we're

25   going to pay you 250 an hour.  That what's goes to a company.

1    So if you have a group of people, they have overhead.  They

2    have all the costs that are in there.  They're trying to make

3    a profit, as well.  And so that number incorporates cost of

4    the labor, the profit, overhead, everything.

5           And not only that, but as we've heard the testimony

6    about the expertise of Mr. Kirby and of Mr. Shatskih that

7    they're both Microsoft DDK MVPs, that's a very specialized

8    skill.  And so I know that in my discussions with StorageCraft

9    they discussed one other person who was also a Microsoft

10   DDK MVP, and he has his own consulting company.  He was

11   billing out at $500 an hour.  So the 250 is a pretty good

12   number.

13        Q.   Now, you heard the testimony yesterday and today

14   about how much, which was granted a little bit all over the

15   place, but generally about how much was being paid to the

16   Russian engineers?

17        A.   Yes, I did.

18        Q.   Did that make you change your evaluation at any

19   time?

20        A.   No, for two reasons.  First of all, again, we're

21   not looking at what the Russian engineers were paid, but we're

22   looking at what you have to pay to go out in the marketplace

23   and do it now.  So if they were below market, that's fine.

24   But also the second thing is that what Mr. Kirby talked about

25   was their actual salary, their compensation, which was

1    somewhere in the 30- to $60,000 range.  But also those

2    engineers received 16 percent of StorageCraft.  And that

3    16 percent would be valued at about $2 million.

4            So whether you look at what they received, which

5    was, you know, around 2-, $3 million because that doesn't

6    include Mr. Kirby, and actually probably more than that

7    figure.  If you took in what Mr. Kirby received it probably

8    would be well above the $3.5 million figure.  So not only did

9    they receive around this level of compensation, but it is also

10   consistent if you went out and have to pay if you went and did

11   it yourself with a new consulting company.

12       Q.   And that 16 percent of the $12 million, that was

13   based on the value that was put on the company by everybody

14   including Mr. and Mrs. Kirby in 2004; is that correct?

15       A.   Everybody agreed to that valuation.  And not only

16   did they agree, but importantly to people like me, NetJapan

17   put their money where their mouth was.  They bought

18   10 percent, and they paid $1.2 million.  So that says the

19   market has valued this at $12 million.  So when you take the

20   share that the three Russian engineers received, which was

21   16 percent, that's about $2 million.

22       Q.   Okay.  You're aware that both Mr. Kirby and

23   Max Shatskih were DDK MVPs; correct?

24       A.   Yes.

25       Q.   Did you research when you were doing this in 2010

1  and '11 how many of those such individuals existed in the

2  world?

3       A.   Yes.

4       Q.   How many?

5       A.   When I was doing my analysis, there were 15.  I

6  think we've heard testimony at the time there were 12.  So

7  it's a select group.

8       Q.   Can you explain to the jury how you came up with

9  this value of immediate usability and software hardening and

10  what all that means, please?

11      A.   This is really important, as well, because when

12  you're thinking about this build or buy decision, if you buy

13  you pay the fee and you've got it right then.  You're done.

14  If you build, not only do you have to incur the cost of the

15  development, but you also have time, and time is expensive.

16  If you have to wait two, three, four years to develop a

17  product and get it into your product and be able to start

18  generating revenue, there's a cost to that.  We refer to that

19  as an opportunity cost.

20           And so if you're going this long period of time

21  without being able to use the technology that you want, there

22  is a real cost to that.  So when you license it, the licensee

23  is going to be willing to pay for that immediate usability.

24  They're going to say, I can pay you more than the cost of

25  development so I can use it now, and I don't have to wait for

1    two or three or four years while we build it.

2            Also combined in that is the concept of being first

3    to market, and this is also important, because if you're the

4    first party to the marketplace with a new product, the market

5    recognizes that.  It's new, and you're rewarded for it.

6            In this case, what happened is that, you know, we

7    heard testimony about how they licensed it to Dantz and

8    PowerQuest while they were still in development.  And those

9    two companies and others, as well, they took that early

10   license when the product was only partially finished, and it

11   was new to them.  They wanted the technology.  So they were

12   willing to invest time and energy and resources of their own

13   to debug it, to test it, to harden it is what the term is.

14   And while that didn't cost StorageCraft anything, it was very

15   valuable to them.

16           If you're second to market -- so that all happens.

17   These companies have tested it, know that it works in a

18   variety of platforms and a variety of settings.  If you come

19   in later and say, hey, I've got some great software, it does

20   the same stuff that StorageCraft's software does, will you

21   test, debug it and harden it, the market place is going to be

22   less receptive of that because they'll say, well, we've

23   already got a product.  It's going to be more difficult to get

24   that process done.  It doesn't mean it won't happen, but it's

25   more difficult.

1          So there's this benefit of being, one, to use

2     immediately and another to be able to be the first one that's

3     there.

4          Q.   Do you consider this an aggressive valuation or a

5     conservative valuation?

6          A.   I consider it to be a conservative valuation,

7     meaning that it's at least that.

8          MR. KARRENBERG:  Your Honor, I'm going to move on

9     to a topic on a license that was issued after Mr. Kirby left

10    StorageCraft, and we designated that as highly confident.

11    That was the areas where we talked about earlier that you

12    agreed that Mr. Kirby would had to leave the room.

13          THE COURT:  Are you aware of this, Mr. Ensor?

14          MR. ENSOR:  I am, Your Honor.

15          THE COURT:  So I'll invoke the exclusion again and

16    again admonish the jury that this is highly sensitive and

17    confidential information, that your oath as jurors requires

18    you to keep confidential regardless of the termination of this

19    case.

20          How long do you think you'll be with this

21    examination with that topic?

22          MR. KARRENBERG:  Like the last one, Your Honor,

23    10 minutes, 12 minutes.

24          THE COURT:  Okay.  Mr. Kirby, we have to excuse you

25    again.

1          Are there others in the courtroom that need to be

2     excused, Mr. Karrenberg?

3          MR. KARRENBERG:  These are StorageCraft employees.

4     One is somebody who is working with you, Your Honor, and I

5     think we can trust that person to follow your directions.

6          THE COURT:  Yeah.  She'll stay.

7          MR. KARRENBERG:  And the others are StorageCraft

8     employees, who is not on anybody's witness list.

9          THE COURT:  Thank you.

10         MR. KARRENBERG:  Thank you for asking, sir.

11         (Whereupon, Mr. Kirby left the courtroom.)

12         PAGES 192-197 IS UNDER SEAL UNDER SEPARATE COVER

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

1  //

2  //

3  //

4  //

5  //

6  //

7  //

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20            (Whereupon, Mr. Kirby returned to the court

21        proceedings.)

22        Q.   BY MR. KARRENBERG:  The third factor you considered

23    was STC's unwillingness to license the source code.  Would you

24    explain to the jury how that factored into your analysis?

25        A.   Sure.  This is another important consideration.

1    When you're dealing with something like this, you want to say,

2    how willing are they to offer a license for this?  And if it

3    would have been a situation where StorageCraft was licensing

4    the source code willingly to many parties, then that would

5    give you an indication of how they value it.  But as we've

6    heard, StorageCraft keeps it under guarded lock and key, and

7    they haven't been willing to license it to anyone.  That tells

8    you that if they were to license it, you probably would have

9    to pay them a lot of money to pry it out of their hands.  So

10   it doesn't give you a number, but it tells you it's valuable

11   and it tells you that it's something that's highly prized by

12   StorageCraft.

13        Q.   And the next factor you looked at was STC's revenue

14   growth.  How did that factor into your analysis?

15        A.   This is also very important because StorageCraft is

16   based, the company is built around the VSnap source code, and

17   they generate revenue.  If they were unsuccessful and had no

18   revenue, it might say, well, this source code really isn't

19   worth all that much.  But that's not the case.  Their revenue

20   has been growing, and they've been very, very successful with

21   it, which says there is value to this code.

22        Q.   Now, what's the final factor you looked at?

23        A.   So the final one was I looked at similar software

24   and source code license rate in the market.  So these are

25   other, other license agreements that are publicly available.

 1    And again, I mentioned before, we had a third party go out and

 2    do a search for us, and we asked them to gather other licenses

 3    for source code.  And we looked at -- I think we got about 13

 4    that were pretty similar.

 5              Now, the tricky part with this is that whenever you

 6    look at other licenses, it's for a different product.  And so

 7    some software product, not all software is created equal.

 8    Some is more valuable than others.  So it ended up being

 9    difficult to kind of take that and assign a value from those

10    market rates.

11              But what did emerge, and I already knew this from

12    my previous experience in dealing with software and source

13    code, is that a source code license is more valuable than just

14    a license for the software, for the object code.  That's

15    pretty well commonly understood, and certainly these license

16    agreements that I reviewed corroborate that.

17         Q.   In fact, you reviewed 13 different licenses, didn't

18    you?

19         A.   Yes.  Yes.

20         Q.   Okay.  And did you identify one that you believe

21    was the best candidate for comparison?

22         A.   Well, this third party that we asked to pull these

23    up, they came back and said, we think this one is most

24    comparable.  And that one has had a one-time license rate of I

25    believe it was $17 million.  I looked at it and also thought

1    it was comparable, as well.  But again, it's a little bit

2    tricky to try to overlay two different software technologies.

3        Q.   Did you look at any others that did have payments

4    for source code?

5        A.   Yes.  There was one agreement in particular that

6    actually memorialized the difference between a license for the

7    software and the source code, and that was an agreement

8    between ESPS and Adobe.  And Adobe was the licensee in this

9    case.  And they agreed to pay that if they -- let me back up.

10            Sometimes when you license the software the

11   licensee will actually require the licensor to put the source

12   code in escrow, is what they call it, and to kind of put a

13   copy somewhere so if they were to go bankrupt or have problems

14   that the licensee could get access to it.

15            So this agreement had a provision for that.  And it

16   said that, you know, if something happens to you, ESPS, then

17   we, Adobe, we can get to the source code.  And if that

18   happens, we'll pay you between 3 and 30 times the normal

19   royalty rate that we're paying.

20            And I realize that 3 to 30 is a big difference, but

21   there were some different terms in the agreement, so there was

22   this wide range.  But regardless, what they said is that the

23   source code is worth 3 to 30 times more than the software

24   itself.

25        Q.   And what was the ongoing annual royalty payments,

1  do you recall?

2      A.    In that particular agreement?

3      Q.    Right.

4      A.    I think the ongoing was 700,000, maybe $1 million a

5  year, somewhere in that range.

6      Q.    And what did looking at these comparable licenses

7  tell you?

8      A.    Well, again, the big takeaway for me was that a

9  source code license is more valuable than just a license for

10 the software.  That was really the important takeaway.

11     Q.    Before we wrap this up, you're being paid for your

12 services; right?

13     A.    Yes, I am.

14     Q.    And what's the rate you charge me?

15     A.    415 per hour.

16     Q.    And how does that compare in this community with

17 others doing the type of work that you do?

18     A.    Very comparable.

19     Q.    Is that your standard rate?

20     A.    That is less than my standard rate.

21     Q.    Okay.  Now, were any of these factors, any one of

22 them really more important than the others?

23     A.    You know, you really have to look at all of them as

24 a whole, and they all inform you on what the answer should be.

25 And so it's not really fair to break one apart or to classify

1    one as more important than the other.

2         Q.   And your conclusion again is?

3         A.   My conclusion was that a reasonable license fee for

4    the source code, the VSnap source code that Mr. Kirby

5    misappropriated from StorageCraft would be at least

6    $4.5 million.

7              MR. KARRENBERG:  Your Honor, I have no further

8    questions at this time.

9              THE COURT:  Re -- sorry.  Cross-examination,

10   Mr. Ensor?

11                         CROSS-EXAMINATION

12   BY MR. ENSOR:

13        Q.   Mr. Kilbourne, you and I have spent some time

14   together in a deposition in this matter, did we not?

15        A.   Yes.

16        Q.   In that deposition, we talked about your

17   qualifications at length, did we not?

18        A.   Yes.

19        Q.   And I asked you -- well, let me take a step back.

20   You're here to testify about intellectual property; right?

21        A.   Yes.  About the value of VSnap source code.

22        Q.   And that's intellectual property, the VSnap source

23   code?

24        A.   Yes.

25        Q.   So you're valuing intellectual property?

1          A.    Yes.

2          Q.    And in your deposition, I asked you when you got

3     your bachelor's from BYU if you could tell me a single class

4     that you took about intellectual property, and you couldn't

5     name a specific class.  Do you remember that?

6          A.    Yes.

7          Q.    And in your deposition I asked you when you got

8     your MBA from Wharton, I asked you, hey, can you remember a

9     specific class about intellectual property?  And you couldn't

10    name a single class.  Do you remember that?

11         A.    I remember saying that there wasn't a single class.

12         Q.    And when we talked about some of your

13    qualifications, the CMA, do you remember that?  What does that

14    stand for?

15         A.    Certified management accountants.

16         Q.    And I asked you if you could tell me a single class

17    that you ever took on intellectual property to become a

18    certified management accountant, and you couldn't name one;

19    right?

20         A.    That's true; because a CMA doesn't really have to

21    deal with intellectual property.

22         Q.    And the CFE, what does that stand for?

23         A.    Certified fraud examiner.

24         Q.    And again I asked you, can you -- name a class you

25    took as part of your CFE training, and you couldn't name one;

1    correct?

2        A.    That's probably generally true.  I mean, CFE where

3    there is some relation to intellectual property issues, but I

4    may very well have said there is not a class because, again,

5    that would be part of the training but not a class.

6        Q.    I went through all of your qualifications, and I

7    said, name a class for me, and the best you could do is say, I

8    know I took some continued education a couple years ago.  Do

9    you remember that testimony?

10       A.    I don't remember the testimony being that way, no.

11       Q.    Now, let's move on to when was the date of

12   misappropriation that forms the basis for your analysis?

13       A.    So it was, I think I would say around 2006, which

14   if I remember correctly, that's when Mr. Kirby entered into

15   the settlement agreement and said he had cleared all of the

16   intellectual property from his computers and his files.

17       Q.    And, Mr. Kilbourne, let's talk about factor

18   Number One.  You'd agree with me that the cost of developing

19   the VSnap source code and bringing it to market provides a

20   benchmark for the reasonable license fee for the VSnap source

21   code retained by Mr. Kirby?

22       A.    Yes.

23       Q.    And that's from your report, is it not?

24       A.    Yes.

25       Q.    And, in fact, your report also concludes that the

1    cost to create the VSnap source code and take it to market is

2    estimated to be $4.5 million.  I believe this establishes a

3    minimum reasonable license fee for the VSnap source code

4    retained by Mr. Kirby.  Does that sound about right?

5         A.   Yes.

6         Q.   And then you go on to say, the other four factors

7    support that number?

8         A.   Well, they all support each other.

9         Q.   So let's talk about Number One.  Now, we're talking

10   about the actual cost to develop the source code; correct?

11        A.   We're talking about the costs that somebody else

12   would have to incur to develop the software plus the value of

13   being first to market and the opportunity cost of bringing the

14   software to market.  So it's more than just the cost.

15        Q.   You're not talking about money actually spent by

16   STC in developing the source code?

17        A.   No.

18        Q.   So if your report says STC's actual cost to develop

19   VSnap combined with its value of immediate usability was

20   estimated to be over 4.5 million, that would be an incorrect

21   statement?

22        A.   No.  You just said -- no.  That's a correct

23   statement.  Their cost plus the value of bringing to market,

24   that's a correct statement.  It's $4.5 million.

25        Q.   Right.  So part one requires you to look at STC's

 1    actual costs, what dollars went out the door.

 2         A.   Well, again, you can look at STC's costs or you

 3    could look and see what it would cost to build it by the next

 4    person that comes along.

 5         Q.   I just want to know if when you said STC's actual

 6    cost to develop the VSnap, you meant STC's actual cost.  I'm

 7    just trying to figure that out.

 8         A.   So again, you can look at either the actual cost or

 9    the cost for the next person to do it.  And the most relevant

10    is you can look at the actual cost as a surrogate, but the

11    most relevant is what would it cost you to do it again.  What

12    would it cost the next person to build it?

13         Q.   Your analysis actually relates on STC's actual

14    cost; right?

15         A.   Well, my analysis looked at the time that the

16    engineers spent and incorporates an estimate of what they

17    spent as a surrogate to what you would have to spend if you

18    built it again.

19         Q.   So your goal was to figure out how long it took STC

20    to build the code and figure out how much they spent on it;

21    right?

22         A.   More or less, yes.  Yes.

23         Q.   And Mr. Kirby testified back in 2007, which is a

24    long time ago, much closer to when the code developed it took

25    15 to 20 months to get it done; right?

1              A.    Yes.

2              Q.    So that's where your 15- to 20-month number comes

3      from.

4              A.    That's correct.

5              Q.    And you actually got on the phone as part of your

6      assignment, and you called Max, the Russian engineer, and you

7      talked to him once; right?

8              A.    That's correct.

9              Q.    And during that one phone call, you really were

10     just curious if it took 15 to 20 months.

11             A.    Yes.

12             Q.    And you asked him that question, and my

13     recollection is he told you lots of other things, but he also

14     told you it took 15 to 20 months to pretty much get it done.

15             A.    Yes.

16             Q.    So that's where that number comes from.

17             A.    Yes.

18             Q.    And what you did, if I heard you correct, is you

19     assumed that all, that Mr. Kirby and all three Russian

20     developers, were working on it full-time for those two years,

21     for those 20 months.

22             A.    Yes.

23             Q.    You assumed that Mr. Kirby -- strike that.  You

24     assumed that the Russian engineers were costing $250 an hour

25     each?

1      A.   No.  Again, that number is taken from what

2   StorageCraft currently charges to its customers for software

3   development time.  So I was not assuming that the Russian

4   engineers were being paid 250 per hour.

5      Q.   Well, you're trying to figure out how much it cost

6   STC; right?

7      A.   Again, as I think I've explained, you can look at

8   what they spent, and you can look at what you would need to

9   spend to do it over again.  And the 250 per hour figure is

10   what it would cost in the marketplace to do it over again.

11           MR. ENSOR:  Your Honor, may I approach the witness?

12           THE COURT:  You may.

13      Q.   BY MR. ENSOR:  Let me have you read a line from

14   your report.  You can read the whole paragraph if you want,

15   but I'd like you to start there.

16      A.   STC's actual cost to develop VSnap combined with

17   its value of immediate usability was estimated to be over

18   $4.5 million.

19      Q.   Actual costs apparently don't mean actual costs?

20      A.   Well, perhaps you're getting hung up on the fact

21   that I used the word actual cost.  And perhaps I would have

22   better -- been better if I would have stated, you know, their

23   time plus current market rates.  But really again, when we go

24   back and look at their actual cost of what they were paid plus

25   the value of the stock they received, which was for the three

1    engineers was $2 million, you know, it very easily could be

2    that the actual cost was much higher than that.

3         Q.   Let me tell you what else I'm getting caught up on.

4    You're using $250 an hour.  You just said that's what

5    StorageCraft charges for their current engineers; right?

6         A.   Right.

7         Q.   And we all know this is 2012 and that development

8    was done over a decade ago; correct?

9         A.   Well --

10        Q.   Yes or no?

11        A.   Yes.

12        Q.   And not only was it done over a decade ago, a lot

13   of it was done in Russia; correct?

14        A.   Yes.

15        Q.   And obviously, I think you were here when we went

16   through the business plan, but part of STC's business plan

17   recognized that Russian engineers are well below market level,

18   doesn't it?

19        A.   Yes.

20        Q.   So even though you know all of that is true, you're

21   still using $250 an hour?  Yes or no?

22        A.   Yes.  I need to make a correction to what you said.

23   $250 is not the current rate.  That was the rate that was in

24   the VMware license which is contemporaneous to when Mr. Kirby

25   misappropriated the software.

1          Q.    Actually current rate is what you said.  Let's talk

2     about the VMware license without getting into any confidential

3     information.  We just looked at it.  It was 2006, wasn't it?

4          A.    Yes.

5          Q.    And the primary software development was done in

6     this case in 2001-2002; correct?

7          A.    Mr. Kirby says 2001, 2002, 2003 and 2004.

8          Q.    Well, software development never really ends, does

9     it?

10         A.    I'm not a software developer.

11         Q.    STC would tell you that, wouldn't they?  They're

12    always tinkering with it.

13         A.    Tinkering I think is different than developing.

14         Q.    In 2007 Mr. Kirby testified that it took 15 to

15    20 months; right?

16         A.    Yes.

17         Q.    And you called Max and said, hey, Max, it took 15

18    to 20 months; isn't that right?

19         A.    Yes.

20         Q.    So not only are you using a $250 number from four

21    years later, you're using a number that the Russians were

22    never paid; right?

23         A.    No, I'm not using a number from four years later.

24         Q.    Let me back it out.  What were -- what was Max paid

25    in 2001?

```
 1          A.   I don't know.

 2          Q.   You didn't ask him?

 3          A.   No.

 4          Q.   Is that because you thought it might result in a

 5     lower damages number?

 6          A.   No.

 7          Q.   Did Max work full-time on the VSnap project in

 8     2001.

 9          A.   Max told me he was working full-time on it for 15

10     to 20 months.

11          Q.   Okay.  Did you talk to Denis?

12          A.   I did not.

13          Q.   You never talked to Denis at all?

14          A.   No.

15          Q.   Did you ask Denis what he was paid in 2001?

16          A.   No.

17          Q.   Did you ever find out what Denis was paid in 2002?

18          A.   No.

19          Q.   Is that because you were worried that it might

20     reduce your damage analysis?

21          A.   No.

22          Q.   Now did you ever call Alexey?

23          A.   No.

24          Q.   Now Alexey and Denis, they're still part of

25     StorageCraft, aren't they?
```

1          A.    Yes.

2          Q.    So you could have called them.  I mean, you had

3     access.

4          A.    I spoke to Max, and I got the information from Max

5     about all of them.

6          Q.    Did you ask Alexey what he was paid in 2000 and

7     2001?

8          A.    No.

9          Q.    Did you ask Alexey if he was working full-time on

10    the VSnap?

11         A.    No.  I asked Max.

12         Q.    And Max said Max was?

13         A.    Max said all of them were pretty much working

14    full-time.

15         Q.    Mr. Kilbourne, let me direct you to Page 41 of your

16    deposition.

17               Can I approach, Your Honor?

18               THE COURT:  You may.

19         Q.    BY MR. ENSOR:  I asked you -- well, you remember

20    this deposition; right?

21         A.    Well, I remember it occurred, but I'll need to read

22    what we discussed.

23         Q.    I'm not memorable, is that what you're telling me?

24               Line 1, Page 41.

25         A.    Line what?

1          Q.    I'm sorry.  Line 1, Page 41.

2          A.    Okay.

3          Q.    Did he tell you -- I asked you:

4                Did Max, did he tell you who else helped with the

5     development?

6                And your answer was?

7          A.    Yes.

8          Q.    Did he tell you what their roles were?

9          A.    I don't recall that.

10               I'm reading what I said then.

11         Q.    Fair enough.  And I asked:

12               During that conversation he told you it took

13    somewhere around 15 to 20 months, and he explained to you who

14    else helped on the project; correct?

15         A.    I said:  Yes.

16         Q.    Can you remember anything else he told you during

17    that conversation?

18         A.    I said:  No.

19         Q.    Now, you didn't tell me during your deposition that

20    Max told you that Denis and Alexey or Denis and Alex were

21    working full-time on the project, did you?

22         A.    Is this the extent of my testimony in this topic?

23         Q.    I'm sure your counsel will point out somewhere if

24    I'm in error.

25               MR. KARRENBERG:  No, Your Honor.  If he's going to

1    refer to the deposition, I think then we're going to have to

2    go through the whole darn thing.  I mean --

3                MR. ENSOR:  Your Honor, I'm cross-examining him.

4                THE COURT:  On direct you can bring this back up.

5         Q.    BY MR. ENSOR:  So you didn't mention anything in

6    your deposition how Max told you Denis and Alex were working

7    on it full-time; is that right?  At least that testimony?

8         A.    Well, we've read nine lines of my testimony, and I

9    don't see that there.  But I do say he told me who else was

10   working on it.  And so clearly I was referring to the other

11   developers.

12        Q.    Now, did you ask STC for any financial records from

13   2000 to see how much money went to the Russian engineers?

14        A.    No.  I didn't need that.

15        Q.    Did you ask STC for financial information from

16   2001-2002 about how much money went to the Russian engineers?

17        A.    No.  Again, I didn't need that.

18        Q.    Did you ask STC for financial documents identifying

19   what other projects those three Russian engineers might be

20   working on?

21        A.    No.  I already had testimony from two people

22   telling me what they worked on.

23        Q.    But you didn't talk to either of those people

24   directly; right?  Strike that.  You didn't talk to Alex, and

25   you didn't talk to Denis directly?

1          A.    No.  But I spoke to Max Shatskih, and I had

2     Mr. Kirby's testimony.

3          Q.    Mr. Kirby's testimony doesn't say anything about

4     Denis and Alex working on that full-time, does it?

5          A.    I don't recall.

6          Q.    So you take four Russian engineers who are getting

7     paid substantially less than $250 an hour and who might not

8     have been working on the project full-time, and you

9     extrapolate that to $2.6 million; is that right?

10         A.    No, that's wrong.  We have three Russian engineers

11    that were paid and then received $2 million in stock plus

12    Mr. Kirby and whatever he was paid and whatever he received in

13    stock.  It's -- the number of 2.6 to $3.5 million is

14    definitely reasonable.

15         Q.    Thanks for reminding me about the stock.  Now, that

16    stock occurred in 2004; right?

17         A.    I don't recall the exact time.  But --

18         Q.    It didn't happen in 2001, did it?

19         A.    Again, I think 2004 sounds about right.  I just

20    don't know off the top of my head.

21         Q.    So they weren't getting paid in stock while the

22    development was going on; is that right?

23         A.    No.

24         Q.    And the other thing is your expert report doesn't

25    mention anything about that, does it, the stock being part of

1    the value that goes into that 2.6?  And I can hand it to you.

2        A.   No.  No, it doesn't.  But not everything I did is

3    it in my expert report.  And again, this calculation is based

4    on the market rate for software developers around that time.

5    So that's why I didn't include either the cost of the

6    developers, whether it was through normal compensation or

7    through stock-based compensation.

8        Q.   My question was much similar.  The stock being the

9    part of the 2.6, that wasn't included in your report; right?

10       A.   No.

11       Q.   And we didn't talk about that at your deposition,

12   did we?

13       A.   You didn't ask me anything about that.

14       Q.   It's not in your report, is it?  In fact, your

15   report makes it pretty clear that the 2.6 million comes from

16   more engineers times $250 an hour for 50 weeks a year for up

17   to 20 months; isn't that right?

18       A.   Exactly that's on the board here, yes.

19       Q.   And the reason this stock that came in later after

20   all the development was done is now part of your analysis is

21   because you realized, oh, no, the Russians weren't getting

22   paid $250 an hour a year; isn't that right?

23       A.   No, that's not correct.  The 250 has always been

24   based on the market rate that StorageCraft billed out its

25   software developers around the time of the misappropriation.

1    That's always been the case.

2        Q.    So when you say STC's actual costs are important

3    really wasn't STC's actual cost.  That was just a misstatement

4    by you?

5        A.    Again, perhaps I could have worded that a little

6    bit differently to talk about the actual time that someone who

7    was going to build it would spend and the time and cost they

8    would spend, and I was using STC's actual times as surrogate

9    for that.

10       Q.    So you're telling me when you wrote, the cost of

11   developing the VSnap source code and bringing it to market

12   provides a benchmark for the reasonable license fee for the

13   VSnap source code retained by Mr. Kirby and subsequently

14   transferred to NetJapan's consultant Mr. Crocker, you weren't

15   talking about STC's actual costs.  You were talking about a

16   hypothetical model of what it would cost to build?

17       A.    Again, if you look at my report, it clearly states

18   what the 250 per hour comes from.  And that was never based on

19   STC's actual cost for the engineers.  That's very clear.

20       Q.    So when you write STC's actual cost to develop

21   VSnap, you didn't mean that; right?  I understand.

22            MR. KARRENBERG:  Your Honor, I object.  It's

23   already been answered.

24            MR. ENSOR:  Your Honor, I'm moving on.

25            THE COURT:  Sorry?

1          MR. ENSOR:  I'm moving on, Your Honor.

2          THE COURT:  Thank you.

3      Q.   BY MR. ENSOR:  And, in fact, you have no idea what

4  it actually costs STC to develop the VSnap code, do you?

5      A.   I don't know what the actual compensation paid to

6  the engineers were besides the stock compensation.  That's

7  pretty clear and easy to get to.  I don't know the rest of it.

8      Q.   Moving on to the second factor, it probably will

9  require Mr. Kirby to leave the room for a minute.

10         THE COURT:  It will again, Mr. Kirby.  The

11 comparison with the VMware license?

12         MR. ENSOR:  Correct, Your Honor.

13         (Whereupon, Mr. Kirby left the courtroom.)

14      PAGES 218-234 ARE UNDER SEAL UNDER SEPARATE COVER

15 //

16 //

17 //

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1     //

2     //

3     //

4     //

5     //

6     //

7     //

8     //

9     //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1  //

2  //

3  //

4  //

5  //

6  //

7  //

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

1   //

2   //

3   //

4   //

5   //

6   //

7   //

8   //

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1     //

2     //

3     //

4     //

5     //

6     //

7     //

8     //

9     //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    //

2    //

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

```
 1    //

 2    //

 3    //

 4    //

 5    //

 6    //

 7    //

 8    //

 9    //

10    //

11              (Whereupon, Mr. Kirby returned to the

12         court proceedings.)

13              THE COURT:  Let's go ahead and be seated.

14              The significance of the point that we just reached

15    was that the plaintiff is finished presenting evidence.  And

16    if you've noticed, the parties have cooperated in presenting

17    all the evidence from any witness at the same time even though

18    it was technically during the plaintiff's case.

19              The defendant has a witness to call.  It will be a

20    brief witness.  Then we need to instruct the jury, which I

21    think will take about half an hour, and have argument from

22    each side which will take another hour.  That would mean we

23    could be submitting the case to you somewhere around 3:00 or

24    4 o'clock and you could have it for decision.

25              That's much later than I said that I would keep
```

1    you.  But with the prospect of having the case submitted to

2    you today, I think I would strongly recommend that we proceed

3    so that it can be submitted to you today, and then you can

4    decide how long you want to deliberate today and whether you

5    want to come back and deliberate tomorrow.  The alternative

6    would be to leave more substantial parts of the proceedings

7    for tomorrow and begin deliberation later tomorrow.

8              Do any of you have a significant problem if we

9    press forward today and attempt to submit the case to you this

10   afternoon?  If you have a significant problem, please raise

11   your hand.

12             Okay.  Then I'd like to proceed, counsel.  Does it

13   present a problem for plaintiff?

14             MR. KARRENBERG:  No, Your Honor.  I'm surprised we

15   even get to vote.

16             THE COURT:  I'm not saying it's a vote.  I'm asking

17   for a comment.

18             MR. KARRENBERG:  I'm even surprised that we have

19   any input.  But I think speaking for both of us, we would like

20   to press on, too.

21             THE COURT:  Mr. Ensor?

22             MR. ENSOR:  Likewise, Your Honor.

23             THE COURT:  All right.  Then, please, call your

24   witness.

25             MR. ENSOR:  Brett Johnson.

1               Mr. Johnson, if you'll stop there and take an oath.

2                              BRETT JOHNSON,

3          called as a witness at the request of Defendant,

4              having been first duly sworn, was examined

5                       and testified as follows:

6              THE WITNESS:  I do.

7              THE CLERK:  Thank you.  Please state your name and

8     spell it for the record, please.

9              THE WITNESS:  Brett Johnson.  B-R-E-T-T,

10    J-O-H-N-S-O-N.

11             THE CLERK:  Thank you, please take a seat.

12                        DIRECT EXAMINATION

13    BY MR. ENSOR:

14        Q.   Mr. Johnson, you are STC's in-house counsel?

15        A.   I am.

16        Q.   How long have you held that position?

17        A.   Since January of 2009.

18        Q.   Prior to that, you worked for a law firm?

19        A.   I did.

20        Q.   And what law firm was that?

21        A.   Immediately prior Snell and Wilmer.

22        Q.   And you represented STC as their outside lawyer

23    while you were at Snell and Wilmer; correct?

24        A.   Yes.

25        Q.   In fact, some of the deposition testimony we've

1    gotten to read you were there?

2         A.    I was there, yeah.

3         Q.    Now, STC's been in litigation with Symantec and

4    NetJapan, as well; right?

5         A.    Yes.

6         Q.    And in those cases, both of those cases, an expert

7    was identified to pull the source codes from both sides and

8    compare them; is that correct?

9         A.    Experts were identified, yes.

10        Q.    And in this case, STC never asked the Court to --

11   well, strike that.  In this case, STC never asked the Court to

12   establish an expert to try to identify the source codes; is

13   that correct?

14        A.    That is correct.

15        Q.    In this case, STC did not try to subpoena NetJapan

16   and get the source code for the ActiveImage Protector product;

17   is that correct?

18        A.    That's correct.

19        Q.    In this case, even though LeapFrog owns part of the

20   source code for the ActiveImage Protector product, STC did not

21   issue a subpoena to obtain that source code from LeapFrog, did

22   they?

23        A.    I don't recall on that one.

24        Q.    And STC could have called any of the Russian

25   engineers to come testify, but they chose not to do so;

1    correct?

2           A.   It wasn't necessary.

3           Q.   And STC as you know has entered into a settlement

4    agreement with NetJapan dated March 2009, approximately?

5           A.   That's correct.

6           Q.   And if you, STC, thinks NetJapan is using any of

7    its confidential information it can file a demand for

8    arbitration against NetJapan; correct?

9           A.   That's true.

10          Q.   And that demand for arbitration -- well, the actual

11   arbitration would take place in Hawaii; right?

12          A.   I don't recall.  That sounds good to me, though.

13          Q.   It sounds good to me, too.

14               Do you see that?

15          A.   I do.

16          Q.   Does that refresh your recollection that if STC

17   feels NetJapan is using any of its confidential information it

18   can file a demand for arbitration and the arbitration will be

19   heard in Hawaii?

20               MS. SNEDDON:  What exhibit is this?  55?

21               MR. ENSOR:  55.

22               THE WITNESS:  Yes.  Assuming that this is the

23   NetJapan-StorageCraft settlement agreement from 2009 that

24   appears to be correct.

25          Q.   BY MR. ENSOR:  So this is the agreement; right?

1          A.    It looks to be, yes.

2          Q.    And back to that page, STC has dispute resolution

3     procedure inside the United States.  It can use it if it feels

4     NetJapan is doing anything wrong with its confidential

5     information that it got over the years from STC?

6          A.    That I don't know.  I know that this would apply to

7     a breach of the settlement agreement.  I don't recall the

8     scope of the arbitration provision itself and whether it would

9     apply to any dispute.

10          Q.    Well, the breach of a -- the settlement agreement

11     would require NetJapan to return all confidential information

12     that STC gave them; correct?

13          A.    It has provisions relating to the confidentiality,

14     yeah, the return of confidential information.

15          Q.    I can go through it, but Page 9.  This is the kind

16     of information that NetJapan was required to return; is that

17     right?

18          A.    Yes.

19          Q.    Has StorageCraft, STC, filed an arbitration against

20     NetJapan?

21          A.    Not yet.

22          Q.    Thank you.

23                THE COURT:  Cross?

24                MR. KARRENBERG:  Yes, sir.

25     //

1                      CROSS-EXAMINATION

2     BY MR. KARRENBERG:

3          Q.   Mr. Johnson, the settlement agreement said they had

4     to return any confidential information they got from us;

5     correct?

6          A.   That's right.

7          Q.   And that would be the subject for an arbitration;

8     correct?

9          A.   That's right.

10         Q.   If they got information from Mr. Kirby after the

11    settlement agreement, is that covered by the settlement

12    agreement?

13         A.   I would assume it would not be.  I would have to

14    review the agreement itself, but that would surprise me.

15         Q.   And have -- you said we haven't sued NetJapan.  Has

16    the company made that decision finally or not yet?

17         A.   No.

18         Q.   Is it under consideration?

19         A.   Yes.

20         Q.   Okay.  Now, we didn't learn that Mr. Kirby had even

21    been hired by NetJapan until way into this litigation; isn't

22    that correct?

23         A.   Mr. Crocker?

24         Q.   No.  Mr. Kirby, that he had been hired by NetJapan

25    to work on the AIP product until after actually the original

1    discovery was completed?

2         A.   Oh, yes, that is absolutely true.  We had learned

3    that Mr. Kirby was hired by NetJapan as I recall on the eve of

4    his first deposition in the case, which was -- we were

5    probably well over a year into the lawsuit by then.

6         Q.   And then we did -- we had asked in motions to

7    compel to be allowed to get to LeapFrog software; isn't that

8    correct?

9         A.   Yes.

10        Q.   And those motions were heard by a certain

11   magistrate in here?

12        A.   Yes.

13        Q.   And were they granted?

14        A.   No.

15        Q.   And, in fact, let's look at my letter to Mr. Ensor,

16   which is Exhibit 224.  Would you read that to the jury since I

17   don't have that on our system?

18        A.   Sure.  A letter from Tom Karrenberg to

19   Richard F. Ensor, dated September 13th, 2010.

20             As the individual depositions of both Russ -- at

21   the individual depositions of both Russ and Tom Shreeve you

22   asked about what information StorageCraft possessed concerning

23   the possible use by Rectify of the StorageCraft VSnap source

24   code.  You also listed that as a topic in the 30(b)6, and you

25   also asked about it in the 30(b)6 deposition of Russ Shreeve

1     this morning.  As you know, because of the rulings you

2     obtained from the Magistrate Nuffer and -- because of the

3     rulings you obtained from Magistrate Nuffer and were upheld by

4     Judge Benson we are precluded in this case from pursuing

5     discovery along those lines.  However, since you continue to

6     raise that issue I suggested to you at the deposition this

7     morning a very simple way to resolve those questions which you

8     keep asking, simply I suggested that since Rectify is also a

9     client to your law firm that you arrange to obtain that source

10    code and I will arrange to obtain the VSnap source code at

11    StorageCraft.  We can then agree on a special master who can

12    examine the source codes to determine if there has been any

13    copying.  We can split the cost between us.

14              I believe this would get you the exact answers to

15    the questions that you continue to raise and would resolve the

16    issue once and for all and in the most efficient way possible.

17    Please let me know if you agree with this proposal.  Very

18    truly yours, Tom.

19         Q.   Thank you.  Did Mr. Ensor take us up on that?

20         A.   To my recollection, he never responded.

21         Q.   That was even more efficient than asking the Court

22    for a special master, isn't it?

23         A.   My bill was smaller, yes.

24         Q.   And one final thing.  Area.  Where's NetJapan

25    located?

242

1          A.    NetJapan is located in Japan.

2          Q.    And you were here when Mr. Kirby testified that

3     that's where the source code is located?

4          A.    Yes.

5          Q.    Is NetJapan signature to the Geneva Convention for

6     the provisions of doing international discovery?

7          A.    They are not.

8          Q.    Do you know how easy it is to get discovery in

9     Japan?

10         A.    It's virtually impossible.  In the

11    NetJapan-StorageCraft lawsuit, that was one of the continuous

12    battles we fought for, you know, well over two years.  They

13    had the benefit of our legal system and could get really any

14    discovery from us, but it was virtually impossible to get

15    discovery from them in Japan.  It would have been a losing

16    proposition to try to subpoena NetJapan.

17         Q.    Thank you.

18               THE COURT:  Redirect?

19                         REDIRECT EXAMINATION

20    BY MR. ENSOR:

21         Q.    September 10th, 2009, that's when you took the

22    first Jamey Kirby deposition in this case, and that's when you

23    learned he was working for NetJapan; right?

24         A.    To the best of my recollection, yeah.

25         Q.    So it's been over two-and-a-half years since you've

1    known that, and you still haven't filed for arbitration in

2    Hawaii, have you?

3         A.   I'm not aware of the basis under the settlement

4    agreement to arbitrate against NetJapan over that.

5         Q.   You think the settlement agreement says they can

6    use your confidential information?

7         A.   I think the settlement agreement has provisions

8    relating to the return of confidential information they

9    received from us and certain representations about their

10   destruction of that confidential information.  To my

11   recollection, it doesn't address their misappropriation -- or

12   their obtaining our source code from a third party.

13        Q.   Have you filed suit against NetJapan here in the

14   United States?

15        A.   Not yet.

16        Q.   And, in fact, you actually -- you got discovery

17   from Rectify in this case, and you got discovery from LeapFrog

18   in this case; right?

19        A.   We got some.  I know in discussions with LeapFrog's

20   counsel LeapFrog was reluctant to produce some of what we

21   asked for because NetJapan had threatened to sue them.

22        Q.   Well, they ended up producing 3- or 400 pages of

23   e-mails, didn't they?

24        A.   They did produce in documents.

25        Q.   And Rectify also ended up producing I think close

1    to 500 pages of e-mails.  Does that sound about right?

2           A.    I don't recall the exact count.

3           Q.    But Rectify did produce the e-mails.  You recall

4    that?

5           A.    They did produce documents.

6           Q.    And if any of those implicated any sort of use of

7    STC's confidential information, we've seen them by now; right?

8           A.    I'm sorry.  I don't follow the question.

9           Q.    Well, I haven't seen very many of those documents

10   as trial exhibits, so my assumption is they weren't real

11   relevant.

12          A.    Is that a question?

13                MR. ENSOR:  No more questions.

14                MR. KARRENBERG:  Just quickly.

15                          RECROSS-EXAMINATION

16   BY MR. KARRENBERG:

17          Q.    When we took, served the subpoena on LeapFrog, we

18   had to get an order from the Court to do so, didn't we?

19          A.    We did.  We had to fly to California and file it.

20          Q.    And we were actually precluded from asking for the

21   source code in the leave of court.  We got to serve that

22   subpoena, weren't we?

23          A.    We were, due to the intervention of NetJapan.

24                MR KARRENBERG:  That's all I have.

25                THE COURT:  Follow-up?

1           MR. ENSOR:  We rest, Your Honor.

2           THE COURT:  All right.  Any case in rebuttal?

3           MR. KARRENBERG:  No, sir.

4           THE COURT:  You can step down, sir.

5           Ladies and gentlemen of the jury, we'll take a

6    recess until 25 till.  Then I will instruct you on the law,

7    and we will hear argument from counsel.  And the case will be

8    submitted to you for your decision.  All rise.

9           (Whereupon, the jury left the court proceedings.)

10           THE COURT:  Counsel, I'm guessing it's going to

11    take 20 to 30 minutes for me to read these instructions.  And

12    then can we keep you each to a half an hour?

13           MR. KARRENBERG:  Yes, sir.  I think that's the

14    outset.  We got through this, got it presented I think both of

15    us pretty well.  The facts came out.  So I think we can be

16    pretty efficient.

17           THE COURT:  Okay.  I would like you to appoint --

18    how do you want me to keep time, because I don't know what to

19    do to you when you go over your half hour.

20           MR. KARRENBERG:  Well, Judge, feel free to ask me

21    to hit Rick.

22           MR. ENSOR:  Your Honor, I was going to suggest you

23    put Tom in jail.

24           THE COURT:  Well --

25           MR. KARRENBERG:  Judge, he's delightful.  And like

1    I told you before, we fight like heck on the merits.

2             THE COURT:  How long?

3             MR. KARRENBERG:  You know, Judge, I'll watch it,

4    too.  I'm going to reserve five minutes of rebuttal.

5             THE COURT:  25 and 5.

6             MR. KARRENBERG:  Maybe when I'm getting to about

7    five minutes left, if you'll holler at me.  But I'll be at

8    side glancing at the clock.

9             THE COURT:  Would you have -- well, you'll be doing

10   exhibits, won't you?

11            The other issue I want to discuss, I'll signal you

12   at 25 and I'll signal you at 30.

13            MR. JOHNSON:  Margaret said she would be happy to

14   watch the clock.

15            THE COURT:  How do you get the people's attention

16   when they're faced away from you.

17            MARGARET:  We can just let them know, speak up.

18            THE COURT:  Okay.  I'll give you that

19   responsibility.

20            Is this our original set of exhibits?

21            MR. KARRENBERG:  Yes, sir.  We're going to have to

22   remove the ones that have not been in.

23            THE COURT:  I'll ask the clerk to do that while we

24   instruct and argue.  And then we'll send the jury into the

25   juryroom, and you can check the exhibits while they're

1    assembling in the juryroom, they always take some time,

2    anyway, and verify that we have segregated them correctly.

3    Does that sounds all right?

4            MR. KARRENBERG:  I believe so, sir.

5            THE COURT:  So let's make sure we have everything

6    on the cart because we'll wheel it in the clerk's office now.

7    So we're in recess.

8            (Recess.)

9            MR. ENSOR:  Judge, can they stay as long as they

10   can?

11           THE COURT:  They can.  We accommodate that.  The AC

12   shuts off here between 6:00 and 6:15, but we keep it on as

13   longs as they want to continue.

14           MR. KARRENBERG:  I've gone as late as 1 o'clock in

15   the morning for the jury trial.

16           THE COURT:  That doesn't say much for your advocacy

17   skills.

18           MR. KARRENBERG:  Both times I won.

19           THE COURT:  They didn't want to come back and see

20   you another day.

21           MR KARRENBERG:  That is probably true.  Between the

22   two things, they really have great judgment.

23           THE COURT:  There's no telling.  We finished our

24   trial last week at 6 o'clock and deliberations on Friday.

25               (Whereupon, the jury returned to the court

```
 1            proceedings.)

 2            THE COURT:  Members of the jury, we have copies of

 3   these final instructions for you, and those will remain with

 4   you.  There is one set of official instructions and one

 5   official verdict form.  Those are your personal copies, so you

 6   can mark on those.  I ask you not to mark on the official jury

 7   instructions and not to mark on the verdict except as

 8   directed, and you'll have instructions about that.

 9            Did you distribute the verdict form to the jury?

10            THE CLERK:  I have not.

11            THE COURT:  Could you, please?

12            (Whereupon, more instructions were given.)

13            THE COURT:  We will now proceed with the arguments

14   of counsel, and then you will retire as a group to deliberate

15   and reach your verdict.

16            Mr. Karrenberg, I understand that you want to

17   allocate 25 minutes to your principal argument and five for

18   reply?

19            MR. KARRENBERG:  That's correct, Your Honor.

20            THE COURT:  All right.  Thank you.  You may

21   proceed.

22            MR. KARRENBERG:  If it please the Court, counsel,

23   ladies and gentlemen, first of all, sincerely on behalf of

24   myself, my co-counsel and even on behalf of my colleague and

25   friend Mr. Ensor, we want to thank you for your participation
```

1    in this.  We know it's inconvenient for you to come to listen

2    to us for four days.  But you want to know something?  This is

3    the pinnacle of the American justice system.  Jurors, 12

4    regular people just like the rest of us get to decide.  Not

5    somebody in Washington, not somebody up on the hill here, but

6    people.  It really is.  It's a system that I'm really proud

7    of.

8           As you know, as the Judge has instructed you, you

9    are to decide this on the evidence, so I'm going to try to

10   review some of the evidence that has been presented.  First of

11   all, I'd like to remind you what I said in the beginning.

12   First of all, I warned you that I was coming back, and I'm

13   impressed that you hung around long enough to see me again.

14          But seriously, it's already been determined that

15   Mr. Kirby breached the contract and that he infringed our

16   copyright.  The real issues we have to decide here today are,

17   do we have a trade secret?  And did he misappropriate it in

18   connection with the copyright claim, the trade secret claim?

19   Was that willful?  And if so, that has some damage

20   consequences.  And also, what are the damages for all three

21   claims?  And I'm going to look at that evidence.  And I think

22   it's important to look at the history a little bit.

23          As I think we've established pretty clear and

24   there's not much in dispute, Mr. Kirby was the architect and

25   the developer of the VSnap source code.  He's assisted by the

1    Russian engineers, as you've heard quite a bit, and that

2    product is used in virtually every one of STC's products.  It

3    is the central core of my client's business.

4            Now, Kirby knowingly and understandably transferred

5    to STC by the assignment.  It's Exhibit 41.  Don't have to go

6    through it again.  But this is what you saw.  This was the

7    assignment which included the VSnap source code.  And as you

8    see, he received considerable consideration which we covered

9    during the trial and did end up with 35 percent of the company

10   between him and his wife, which at the time it was valued at

11   at least $12 million, which in other words, is a $4.2 million

12   receipt value.

13           Also I think we've established without a doubt that

14   Mr. Kirby knows the value of the source code and its

15   importance.  Prior to the merger in developing this -- and he

16   did a darn good job developing it.  You even heard him say

17   that he wanted to make sure this was very good software.

18   That's why he got this consideration.  But he always made

19   sure, him and the Russians in Moscow, made sure all copies of

20   it even electronically had the copyright notice and, just as

21   he said, for the purpose of protecting it.  Mr. Kirby was an

22   extremely experienced software engineer, in fact, a DDK MVP as

23   designated by Microsoft.  At the time, only 12 in the world.

24           Now, right after the merger, he resigns.  And we'll

25   put up Exhibit 60.  This is his resignation.  It's

1    November 12, 2004.  And I know he says he called somebody.

2    But even here, this is what he actually said.  Effective

3    immediately, November 12th.

4            And he claims he did that, kind of an odd

5    explanation, but he says they stole his company.  He didn't

6    mean they stole it.  He meant they just took it over.  But he

7    entered into these agreements willingly.  And he didn't like

8    the fact that there was going to be a nondisclosure agreement,

9    confidentiality agreement, he didn't like the at will

10   employment agreement.  But remember something, as Mr. Jeff

11   Shreeve said in the beginning, everybody was signing those.

12   This wasn't directed at him personally.  This is what they

13   were responsible for.  And at this time between the Russian

14   engineers who he had the relationship with and he and his

15   wife, they controlled 51 percent of the company.

16           There was no reason to be that upset.  Nonetheless,

17   he did.  And as he said, he bailed.  He admitted it right

18   here.  And when did he bail?  Just as his company is being

19   formed, just as he actually got a million-two from an overseas

20   investor, just as it's about to get out, and he's the chief

21   developer of our code, the chief architect.  It was the most

22   critical time in a company's existence, and for whatever

23   reasons, he decides to bail.

24           But let's look at some of the things he did

25   beforehand.  Let's look at Exhibit 57.  Exhibit 57 is when we

1   learned nothing, not too long at that time, that he had

2   downloaded the software in various places.  And, of course,

3   STC was concerned.  It wants to protect its core business.  It

4   knows Kirby is working for competitors.  Remember we called

5   him up after he resigned and called him back.  And Mr. Jeff

6   Shreeve called him and he asked for Kirby.  Kirby is there,

7   and he wouldn't even talk to him.

8           We know he has at least one copy of the source

9   code, if not more.  And if we look at Exhibit 46, he says

10  we'll get it back in here.  But he also tells us -- doesn't

11  say anything about the DVD and CD he loaded it to.  And he

12  also says that any further contact by any employee, board

13  member or any legal representative of StorageCraft would be

14  considered harassment, so he won't talk to us.  So the lawsuit

15  ensues.  We don't need to go through that.

16          But he signed that settlement agreement,

17  Exhibit 48.  This is the contract that the Court has found

18  that he already breached.  And we went through it, so I don't

19  think I really need to highlight all the terms.  But basically

20  as you see, he promised that he didn't have anything, or would

21  return it, doesn't have it.  In fact, he claims he had done it

22  before he even signed this, remember?  He scrubbed everything

23  before.  That's what his story was.

24          If you go to the second page, he went on further in

25  this paragraph to warrant, and the Court has instructed you

1     what a warranty is, that he doesn't have it.  And if we go

2     down the last paragraph on this page, he was also going to

3     cooperate in protecting it.  That was his deal.  And then he

4     said he also checked again, okay?

5              Turns out all the reps and warranties are false.

6     The trouble begins then with NetJapan.  They appoint Crocker

7     to the board, who resigns five days later.  Immediately

8     becomes a consultant with Burbidge and Mitchell, Kirby's

9     former lawyers now representing NetJapan.  Quite acrimonious

10    litigation.  No doubt about it.  That's been resolved.  But

11    Kirby is all too willing to help NetJapan.  Despite saying he

12    won't talk to anybody from StorageCraft, he immediately is

13    willing to talk to Crocker.  In fact, let's look at

14    Exhibit 63.

15             Exhibit 63 was when they said they need his help,

16    and he immediately said, I will help if I can.  And, of

17    course, they didn't take him up on the idea to drink Cocaine,

18    but they did want a glass of wine with him.  And they said

19    Crocker's going to contact him.

20             What else has he previously done?  And I think this

21    is important for some of the questions you've got to answer on

22    the verdict form.  Let's look at Exhibit 59.  This is where

23    he's talking to his friend, wants to set up a company.  He's

24    going to go -- this is November 4th.  Now he says it's after

25    he verbally resigned.  But there's no doubt it's before he

1    submitted his resignation effective immediately.  He's trying

2    to set up competing products.

3          And let's go to the second page.  More importantly,

4    he's also wanting to get the Russian engineers to go with them

5    if they bail.  That's how loyal he was to this company.

6          And what else did he do?  Let's look at Exhibit 61.

7    61 is the e-mail he sent, here there's no doubt it was after

8    he resigned, two days after his letter to Symantec.  And what

9    does he tell Symantec?  Let's go to the second page.  That

10   he's recommending that they begin litigation against some of

11   the StorageCraft personnel, and he even admits it's for a

12   little revenge.  And he claims, he claims that it's because

13   they violated the nondisclosure agreements with StorageCraft.

14         Yet, you heard me read his testimony from 2007

15   where he admitted under oath in questioning from his former

16   lawyer that that didn't happen.  And you've had an instruction

17   from the Court, if you believe any witness has intentionally

18   testified falsely about any important matter, you may

19   disregard the entire testimony of the witness.

20         Ladies and gentlemen, I think it's appropriate

21   here, because there was no doubt of what he testified to in

22   2007.  He didn't even know what the agreement said.  He said

23   they were real careful to make sure they didn't do that.  And

24   they didn't talk about any of the products.  And then what did

25   he do?  Because he's annoyed, he's mad, he makes up a lie and

1    tells it to PowerQuest to try to get a lawsuit going, which

2    never happened, by the way.  And then he lies to you, as well,

3    despite his sworn testimony.

4            And what else does he say why he didn't get

5    everything off the disk?  Well, he said he couldn't run his

6    Outlook searches in a heartbeat.  And with respect to his

7    searches, he said, there's a quote, I could have been more

8    diligent.  I concede that.  And what else did he say?  I was

9    not inclined to go to that much effort.

10           This is a guy who made a contract.  That's why I

11    asked him that question.  Do you think you're supposed to live

12    up to your contracts?  A contract to make sure that didn't

13    happen.  And just because he wasn't inclined to give it the

14    effort, he doesn't have to follow his contracts.

15           The only thing that kind of attitude does in this

16    country is make lawyers like all of us here rich because you

17    end up with lawsuits over the thing instead of just people

18    living up to their word.  If people lived up to their word

19    half the time we wouldn't be over here.

20           Okay.  And he claims -- what does he also claim?

21    Oh, I did look.  I checked the names of the software

22    engineers.  Max Shatskih's name, you're going to have these

23    boxes back there, is on every one of these e-mails that has

24    the source code on it.  And don't forget, he knew and admitted

25    that they had sent thousands of e-mails with the source code

1    on it.  He knew it was out there.  How he can miss

2    Max Shatskih's name is impossible.

3             He admitted he could check VSnap.  If you find

4    VSnap, you'd find all the attachments.  And then you know all

5    he had to do?  Is delete, delete, delete to the delete file.

6    Delete, delete to the delete file.  We all do it.  It's easy.

7    It wouldn't have been there.  And what else did he do?  If you

8    remember, afterward he even tried to recruit Max to the

9    NetJapan lawsuit.

10            You know, something else that I think is very

11   interesting is to the credibility of the witnesses.  Neither

12   he nor Crocker could remember a darn thing about anything they

13   said in any of the meetings; right?  It's also interesting

14   that every computer Kirby, who's a longstanding computer

15   expert as he admitted, either crashes or has been cleaned or

16   doesn't know or thrown out or is now in a garbage can.  I'm

17   telling you if that many computers crashed we wouldn't have a

18   computer industry in this country.  It wouldn't make any

19   sense.

20            The rest of the story also doesn't make any sense.

21   Kirby says Crocker told me he was on the board.  What does

22   Crocker say?  I never told him that by the time I went there.

23   And one thing we do know Kirby has only been introduced from

24   NetJapan who he already knows is planning a lawsuit doesn't

25   even check if he's really on the board.  It just takes an

1    e-mail.  Find out.  He would have found out no.

2              Then he says, what does Kirby say?  He just wanted

3    the settlement agreement.  Well, if he's on the board the

4    settlement agreement was in our files.  Why would he have to

5    go all the way to California to get that?

6              What did Crocker say?  Kirby actually wanted to

7    give me a lot of documents.  And that's why we didn't have

8    time enough to get it done before we actually got to lunch.

9    And what else was on there?  All of his confidential

10   information with his lawyers over the lawsuit he had done with

11   my client.  And what does he say?  Oh, I gave it to him

12   because he was going to give it to StorageCraft.  Absolutely

13   unbelievable.  You don't give your confidential privileged

14   communications with your lawyer to the other side of a

15   lawsuit.  But what do we do know?  He gave the disk to

16   StorageCraft -- I mean to NetJapan.

17             And can you imagine in the middle of that

18   acrimonious discovery we get documents from NetJapan, and my

19   clients are going through them, and guess what?  They're

20   seeing their business, the core of their business right on the

21   screen in front of them as they're going through the

22   documents, and despite the fact that they've got a written

23   agreement from them.  What do we try to do?  We try to get

24   Dickson Burton down here to talk to them to find out what

25   happened with this stuff.  Wouldn't even talk to us.

1          So what else do we do?  Well, we're back here now.

2     Okay.  And what happened to those?  Well, Crocker's memory is

3     faulty on that as it is with the conversations between him and

4     Kirby.  But let's look at what he does say in his deposition.

5          Can we go I think it's 99 first?  This is Crocker,

6     Page 99.

7          Besides Rod Parker at Snow Christensen, did you

8     provide the CD or any part of the PST file to anyone else?

9          Yeah.  I believe I gave it to Burbidge and

10    Mitchell.

11         Of course, we're going to run out of time.  I'm not

12    going to go through more, but that's in there.  You heard him.

13    Twice he said he gave it to Burbidge and Mitchell.  He also

14    said he probably also gave it to NetJapan because when he sent

15    something to Burbidge and Mitchell he gave them both.  And he

16    sent it in e-mails.  And all of this is attached to e-mails.

17         Now, where does that lead to?  After the settlement

18    he immediately ends up getting a $15,000 a month job.  Now,

19    Campbell who they rely on from LeapFrog says he didn't do a

20    darn thing.  He was useless.  So why is NetJapan paying him

21    $15,000 from March '09 all the way through to today if he

22    didn't do anything?  Campbell doesn't know what he did with

23    the -- on the NetJapan e-mails, and that's also interesting.

24    Why?  Because the NetJapan e-mails are the ones he can't get

25    supposedly, but, of course, all he had to do is ask these very

1    people that he talked to every day and that's where the

2    information would have been.  Oh, but I can't get that.

3    That's over in Japan.  But I can get my 15 grand a month out

4    of Japan.  I can use my Rectify e-mail which started later

5    which is on the NetJapan server and give that to us, and he

6    doesn't even have a reason why not.

7         Let's get to the claims.  Copyright infringement

8    has already been found.  We're asking for statutory damages.

9    You can go up to 30,000 if you don't find he did it willful.

10   That's what the law of the United States says.  If you find he

11   was willful, you can go up to $150,000.  What's willful?  It

12   includes reckless disregard.  Can you think of anything more

13   reckless than somebody saying, well, I should have been more

14   diligent.  I really wasn't inclined to put that much effort

15   into it.  That's from his own words the definition of reckless

16   disregard for my client's rights.  I think without a doubt

17   we've proved it's willful.

18        What else do we have to prove?  It's a trade

19   secret.  I think that's beyond peradventure.  You heard the

20   Shreeves tell how important it is.  You heard what we go

21   through to protect this code, what it means to us, how

22   important it is.  There's no doubt it's a trade secret.  And

23   again, you're going to have to find there is a question

24   because it has some consequences with what the Judge does on

25   whether or not it is willful and malicious.  I think you all

1    should find that, as well.

2              And then finally the contract, well, we already

3    found he breached the contract.  So what are the damages?  The

4    Judge said consequential is all out.  These are the

5    consequential damages, the minimum royalty.  And the minimum

6    royalty is what Patrick Kilbourne testified to.  You haven't

7    heard anybody here testify to anything different.  Okay?  They

8    all -- and you've seen instructions that say you can create

9    that hypothetical in order to prove these kind of damages.

10             And what choice do we have?  This is our only

11    remedy, ladies and gentlemen.  We can sue in a lawsuit.  We

12    don't have Sharia law where you cut the hands of a thief off.

13    All we can do is come to court and ask for relief.  And one

14    thing that is a limitation in our system, good, bad or

15    indifferent, it is what we have, the only thing we can get in

16    court is monetary damages.  Same with any other lawsuit.  You

17    lose your arm, no one can give you back your arm.  But if it

18    was a negligent act that caused that harm, you can get

19    monetary relief.  That's all the Court is really empowered to

20    do to give us a remedy.

21             And the fact that we have been successful since

22    then is not a license for him to be allowed to steal.  And he

23    knew what he was doing.

24             Ladies and gentlemen, here's the verdict form.  You

25    have it as well as I do.  First question is, what amount of

1    damages, if any, was caused by Kirby's breach?  I suggest you

2    put the $4.5 million in.  You heard Mr. Kilbourne's analysis.

3    It's been uncontested.  There is no other witness.  That is a

4    minimum reasonable royalty.  And the fact what he used it for

5    we don't know it.  But to get it that's what he would have had

6    to pay.

7         MARGARET:  Five minutes, Mr. Karrenberg.

8         MS. KARRENBERG:  Thank you.

9         The Court has previously determined that he is

10   liable for having alleged the copyright.  Was it willful?

11   Yes.  Statutory damages?  I suggest $150,000.  Did he

12   misappropriate our trade secret?  I don't think that's even an

13   issue at this point.  That's yes.  And what amount of damages,

14   if any?  4.5 million.

15        It's lot of numbers, but that's what it is.  That's

16   what it would have cost for him to get that and use it and

17   disclose it the way he did.  And was it willful?  Was it

18   reckless?  Was it malicious?  Did he know what he was doing?

19   Should he have known better?  Absolutely.  The answer to that

20   is yes.

21        I'll have a few more moments in a little bit to

22   come back.  But I want to thank you for your time and for your

23   service.  Thank you.

24        THE COURT:  Mr. Ensor?

25        MR. ENSOR:  Opposing counsel and I certainly agree

1    on one thing, and that's the value of your service.  He is

2    correct.  It is the foundation of our legal system, and it's

3    an incredibly important duty.  And on behalf of my client and

4    the Court we thank you.

5            I started off by telling you there would be seven

6    facts in this case that would be established, and they have

7    been.  Jamey Kirby is an extremely talented software

8    developer.  Now, there's very little dispute about that.  It

9    turns out on the two parts of the trade secret, the Snapshot

10   driver and the incremental sector tracking, which

11   Mr. Karrenberg I don't think mentioned once in his closing,

12   Mr. Kirby didn't write those for NetJapan.  Bob Campbell wrote

13   the incremental sector tracking.  You saw his testimony.  It

14   was clear as day.  And NetJapan used the Volsnap from

15   Microsoft because it's free, and it's been on every single

16   version on the Windows program for the last 10 years.  So that

17   fact is established.

18           NetJapan was a partner, not an adversary in STC.

19   That was fact Number 2.  NetJapan owned 41 percent of STC.

20   You saw the internal correspondence from Mr. Shreeve to

21   NetJapan calling them a committed partner, how they're honored

22   in the partnership, how they're looking forward to doing

23   things together, how -- and he testified eventually after he

24   moved away from his testimony that he didn't really mean

25   partner and it was just a Christmas card word, that, yes, they

1      were close.  Yeah, they depended on each other.

2            The third fact was that Kirby didn't know he had

3      the e-mails.  Now, it's easy to point to 18,000 pages, but the

4      fact of the matter is there's 11 copies of the VSnap in there,

5      spanning 2001, 2002 and halfway through 2003.  Each copy of

6      the VSnap is 1,000 pages, so that's 11,000 pages right there.

7      I wouldn't get caught up on volume.  I think the point you

8      ought to take away from that is Mr. Kirby testified and

9      Mr. Barnes testified that this code is sent around a lot by

10     e-mail.  It was sent between Mr. Kirby and Max over in Russia

11     all the time as they were developing it, and it was sent to

12     clients who had licenses.  It was sent.  Mr. Barnes sent it a

13     lot.  Mr. Kirby testified hundreds, if not thousands of times.

14     There's 11 in there, and that's bad that he missed it.  And he

15     shouldn't have missed it.  He should have caught those.  But

16     11 out of 4- or 500 is not reckless.  It's not intentional.

17     It's an accident.

18            Now, I told you that the deposition transcripts

19     wouldn't be fun, and I think that was true.  But they did

20     establish that Crocker worked for NetJapan.  He was their

21     representative on the board.  He was the person that they

22     hired to try to protect their involvement.  He didn't see STC

23     and NetJapan as adversaries in the sense that these guys do

24     now five years later when they're fighting for market share.

25     NetJapan owned 41 percent of the company.  Mr. Crocker was

1    just trying to find out how he could protect that, how he

2    could make sure that all the money they put into STC would be

3    preserved.

4         The testimony not -- you heard much from

5    Mr. Crocker.  Mr. Crocker's recollection over the years is not

6    100-percent clear.  But he testified very clearly that, one,

7    he never gave that disk to anyone other than his lawyers.  And

8    when Mr. Karrenberg says NetJapan produced that disk in

9    discovery, he's wrong.  Mr. Crocker produced it in discovery.

10    And he went through that disk.  He found some e-mails that was

11    relevant, and he may have shared those with Burbidge and

12    Mitchell.  But if you remember right at the end of his

13    examination I put every single source code in front of him,

14    and I said, is this the kind of stuff you find relevant?  And

15    he said, of course not.  I don't know even know what that is.

16    And, of course, there was no evidence that it was sent to

17    Burbidge and Mitchell, either.  It's just more speculation.

18    That was the fifth fact.  Crocker got the disk.  He put it on

19    his e-mail, and he destroyed his copy.  And he sent it to his

20    lawyer, and his lawyer completed the loop by giving it back to

21    STC.  That was fact Number 5.

22         Fact Number 6 was that LeapFrog Development worked

23    on this hard for 18 months.  18 months' time.  Robert

24    Campbell, a guy who doesn't have any incentive to lie, says

25    18 months working more than full-time.  And, of course, by the

1    way, I wrote the incremental tracking driver.  I had to take a

2    class to do it.  It was hard work, but I did it.  And he says,

3    naturally we used the Volsnap from Microsoft.  It's free.

4    It's reliable.  I didn't have to write it.  There's no dispute

5    about that.  Even STC admits that for every version of AIP

6    going except for the one that works on Windows 2000 uses the

7    Volsnap by Microsoft.

8              Finally, I said they're not going to show actual

9    damages.  They're not going to show loss sales.  They're not

10    going to show any harm.  And you saw the financials.  I can't

11    go into detail because Mr. Kirby is here.  But you saw them.

12    You know why they can't do that.  So instead they hire a guy

13    to go out and to a hypothetical reasonable analysis and come

14    up with 4.2 for a reasonable license fee, 4.2 million.  And

15    I'm going to get into more detail in a minute.  But that

16    testimony is just not credible, and his methodology is not,

17    either.

18              And I'll pull the testimony out from Russ Shreeve a

19    little bit where, STC's COO, he testified clearly, you've got

20    to know how it's going to be used if you're going to negotiate

21    a license agreement.  It only makes sense.  Hey, I want to

22    license your software.  Great.  How are you going to use it?

23    It's the first question you ask.

24              Mr. Kilbourne didn't care.  That wasn't part of his

25    concern.  His concern was developing some hypothetical number

1    that would be very, very large and hope that you guys found it

2    persuasive.

3          Now, those were the seven facts that we talked

4    about up front.  And I want to talk about the law a little

5    bit.  The first two claims are the breach of contract claim --

6    or I think it's, excuse me -- it's the breach of contract

7    claim and the copyright claim.  Now both of those claims as

8    far as liability had been established, damages are not.

9    That's your job.  And the reason liability is established on

10   those claims is because there's no intent in those claims.  It

11   doesn't matter if you intended to copyright something that you

12   shouldn't have.  It doesn't matter if you meant to.  It

13   doesn't matter if you didn't mean to.  All that matters is you

14   did.

15         And that's -- and that's really where you come in.

16   The owner of the copyright has the opportunity to prove actual

17   damages.  Hey, I can show they've sold $1 million using my

18   copyright.  They took my novel.  I had a copyright on it, and

19   they sold it.  I was going to say it might be similar to the

20   stuff with Naptser and the music back about ten years ago, but

21   I'm not really sure.  But that's the idea.  You can show

22   actual damages.

23         STC doesn't try to do that, and again, we know why.

24   STC has elected to recover what's called statutory damages.

25   And the Judge explained that to you in a jury instruction and

1     in pretty good detail.

2           Now, this is actually one part of the law that

3     really made sense.  You have -- under statutory damages the

4     jury gets to decide a broad range, $750 up to 30,000.  And if

5     they think it was with some kind of intent to hurt or wrongful

6     or reckless disregard, then you can go up to $150,000.  But

7     the standard statutory damages analysis is 750 to 30,000.  And

8     that makes sense.  It was a copy was made, and the law says

9     you can't do that.  And the law says you get to evaluate the

10    factors relating to how that copy was made, and it should fall

11    somewhere between this.  If you think, you know, gee whiz, he

12    made a mistake, but, you know, no one's perfect and people

13    make mistakes, then it ought to fall closer to the $750 scale.

14    If you think, well, Mr. Kirby should have spent more time

15    going through that but I don't think it's in bad faith, then

16    it's higher.  But that's the law on copyright, and it makes

17    sense.

18          Here the award should be on the low side.

19    Mr. Kirby didn't know he was violating the copyright.  He

20    didn't have any idea the source code was on there, and he

21    certainly wasn't trying to violate STC's copyright.  But he

22    did.  And you're going to have to decide on that $750 scale up

23    to 30,000 what he has to pay for doing that.

24          Now, STC's second claim is for breach of contract.

25    And again, like copyright, there's no intent there.  You don't

1    need to mean to breach a contract.  You just do.  Even if you

2    try not to breach a contract and you breach it, it's breached.

3    Even if you don't know you're breaching the contract, it's

4    breached.  So there's no intent there, which is why the

5    Court's already established liability.  It's established, but

6    damages is in your hands.

7          The Court instructed you on damages for breach of

8    contract.  The idea is that the parties are supposed to

9    recover actual losses that they suffered.  Here there has been

10   none.  Mr. Karrenberg is going to make an argument that it

11   should be a reasonable license fee, but the jury instructions

12   don't say that.  The reasonable license fee comes into play on

13   STC's third and final claim of trade secret.

14         The Judge did tell you that in regard to breach of

15   contract, you do have the option to award what the law

16   recognizes.  It's called nominal damages.  And nominal damages

17   is what we're talking about theoretically here, I mean, and

18   what I was talking about.  Breaches of contracts happen, and

19   sometimes the party that is bearing the breach doesn't lose a

20   sale.  It doesn't lose money.  There's no actual harm.  So in

21   that case, the law says, and the Judge instructed you on this,

22   you can award nominal damages.  It can be as low as $1.  It

23   can be a little more.  But the idea is there was a breach, but

24   there was no real damages.  And as the Judge told you, damages

25   have to be proven with some sort of particularity, some sort

1    of specificity.  They can't be guesses.  They can't be

2    speculation.  And there's no -- STC didn't even try to put in

3    damages here on their breach of contract claim.

4          Which gets me to the remaining claim, the trade

5    secret claim.  And unlike the first two claims, the trade

6    secret claim has not been established.  And the reason it

7    doesn't -- excuse me -- the reason it hasn't been established

8    is because it requires intent.  It requires an actual intent

9    that I'm going to take this guy's trade secret, and I'm going

10   to use it against him.  And that's what you have to decide if

11   there was an intent.

12         The evidence demonstrates why there is no intent

13   here.  Mr. Thomas Shreeve, the elderly, the father of Russ

14   Shreeve and the CEO of the company stated under oath in

15   deposition and to you that he never considered NetJapan to be

16   his partner.  Now, he went through document after document

17   after document demonstrating that wasn't the case.  2004,

18   2005, STC considered NetJapan part of the team.  And it only

19   makes sense.  They were the only ones that put in money.  They

20   owned 41 percent.  STC was worried about getting sued by a

21   competitor.  They wanted money from NetJapan to fund the suit.

22   These guys worked closely together.  That's why on top of

23   those letters that Mr. Shreeve would send NetJapan, it would

24   say, highly confidential.  That's why he would share their

25   attorney-client information with NetJapan.  That's why he gave

1    them STC's product information prior to investment.  That's

2    why he gave them their business plan.  That's why they gave it

3    the financial information.  And again, it's not surprising.

4    They were in this together.

5           Now, I'm not arguing that to mean what I think

6    Mr. Shreeve thinks I was arguing.  I'm not saying because

7    they're partners NetJapan ought to get access to the source

8    code.  There is evidence that they did have access to source

9    code, and there's also testimony from STC that they didn't.

10   That's not my argument.  But my point is that's the atmosphere

11   that existed in 2004 and 2005.  So they weren't -- STC and

12   NetJapan were adversaries when NetJapan asked Mr. Crocker to

13   call on Mr. Kirby.  They were in the same company together.

14   They were trying to, you know, develop a product and make

15   money together.

16          Now, had a dispute arisen between NetJapan and STC

17   by the time Mr. Crocker came around?  Yeah, it had.  But it

18   wasn't to the extent that it's grown later in 2007, 2008,

19   2009.  When Mr. Crocker showed up, he was a fellow who

20   represented NetJapan.  Mr. Kirby knew that.  Mr. Kirby knew

21   that NetJapan owned 41 percent.  Mr. Kirby knew all the

22   confidential information had been shared with NetJapan before.

23   So when Mr. Crocker asked for certain information, he didn't

24   think about it.

25          Now, that doesn't mean that Kirby should have

1    burned that disk.  You know, maybe he should have been more

2    careful.  But it certainly doesn't show an intent that, oh, I

3    know NetJapan is out to get StorageCraft and to take away

4    their source code.  Just like Mr. Crocker said over and over

5    again, he was just trying to learn more about STC's

6    investment, and that's it.

7            Now, the evidence is also pretty clear, and again

8    Mr. Karrenberg didn't talk a bunch about this, about the use.

9    I mean, there's two parts to this trade secret.  That's what

10   we're here about.  That's what this trade secret claim is

11   about.  It's about the Snapshot driver, and it's about the

12   incremental sector tracking.  The snapshot driver,

13   Mr. Barnes, STC's chief technology officer, says, oh, yeah.

14   There's four or five competitors that have that.  And he

15   listed those off for us.  He said, oh, yeah, Microsoft

16   developed the Volsnap, and lots of people use that.

17           There's absolutely no evidence at all that the

18   NetJapan product uses the VSnap Snapshot driver whatsoever.

19   Instead, you have speculation that maybe going back to a

20   version of Windows dated 2000, well, Volsnap doesn't exist for

21   that, but that's all we know.  There's no evidence anywhere.

22           The same is true for incremental sector tracking.

23   The only testimony we have heard on that, we heard two

24   testimonies.  Mr. Campbell says, I wrote it all, and Mr. Kirby

25   saying, I didn't have much of anything to do with it.  And we

1    heard the chief technology officer saying, oh, yeah, three or

2    four competitors have it.  It's not just us with the

3    incremental sector tracking.

4            And then, of course, the patent from IBM comes out.

5    So this is knowledge that no one had but STC, and it was only

6    contained in those boxes.  It was out there.  It was known.

7    Of course Mr. Campbell figured out how to do it.  He's been in

8    the industry 25, 30 years.  There's no reason to believe he

9    didn't.

10           There's also no evidence that Jamey Kirby was

11   involved in either of the Snapshot driver or the incremental

12   sector tracking for the NetJapan products.  But at some levels

13   that missed the point because while there's no evidence he

14   was, he could be.  He's allowed to use his brain.  He's

15   allowed to use his skills.  He's not allowed to use the VSnap

16   code, but he can use everything else.

17           And I think the testimony is pretty clear from

18   everything you heard about Mr. Kirby is he has ideas.  He has

19   thoughts.  He knows how to write code.  So there's no evidence

20   that he was involved with the NetJapan product in regard to

21   the issues of this case.  But even if he was, he's allowed to

22   be so.  He 's not restrained.

23           Now, we talked a little bit about a reasonable

24   royalty that Mr. Kilbourne has offered you, the $4.2 million.

25   And he tells you what he's trying to figure out is, well, if

1    two people sat down and negotiated that, what would they, what

2    would they come to?  And he tells you that even though he

3    says, I didn't analyze how Kirby used it other than giving it

4    to Mr. Crocker, I don't know if he uses it in a program, I

5    don't know if he used it for a doorstop, I don't know if he

6    used it to keep his fire going, it doesn't matter to him.

7         But that makes absolutely no sense.  If you're

8    going to negotiate a license agreement, the first thing you're

9    going to ask is, okay, you want my software.  How are you

10   going to use it?  And if the person says, well, I want to use

11   it for something really small, you don't charge very much.

12   You certainly don't charge $4.2 million.  If someone says I

13   want to use it for everything in the whole world, maybe you

14   charge more.  But Mr. Kilbourne didn't consider any of that.

15   He just said, well, it's valuable software, and therefore,

16   it's $4.2 million.

17        And Mr. Shreeve, Jeff Shreeve, we had a chance to

18   talk to him a little bit on direct or on cross about how you

19   use affects this licensing negotiation.  And I asked him, so

20   when you negotiated this license agreement with VMware, you

21   knew what VM wanted to use it for.

22        We did, he answered.

23        They had a specific use in mind; correct?

24        They did.

25        And that affected the price and the scope of the

```
 1    license, didn't it?

 2              That's correct.

 3              You would just assume naturally that makes sense;

 4    right?

 5              Well, this is what we bargained for; right?

 6              Correct.  At different scopes we're bargaining for

 7    something else.

 8              And I asked him on the next page:

 9              But my question is just a little different.  The

10    price and the terms were dictated by how VMware wanted to use

11    your software; right?

12              He answered:  How they were using it, what

13    ultimately ended up, correct, was how we came to a meeting of

14    the minds.  There is no doubt about it.

15              Mr. Kilbourne's analysis was flawed for many other

16    reasons including the fact that he thinks that STC paid

17    $2.5 million to develop the code, or he's changed from that

18    position so it would have taken a hypothetical company

19    $2.5 million, when in reality everyone knows the Russian

20    engineers were a lot cheaper and it didn't cost near that

21    much, not to mention that STC back when Mr. Kirby was in

22    charge didn't have $2.5 million to spend on anything.

23              In the end, the evidence set forth by STC is it's

24    based on speculations.  It's based on guesses.  It's not based

25    on hard evidence that Mr. Kirby knew he had that information
```

1    on his disk.  It's not based on hard evidence that any of that

2    source code has ever made its way into any product, especially

3    NetJapan's product.  It's just speculation.  It's just guess

4    work.  It's just assumption.

5         The law is clear that the burden is on STC to prove

6    that a trade secret was stolen, that it was used and that STC

7    was damaged.  STC must share that by a preponderance of the

8    evidence.

9         MR. KARRENBERG:  Excuse me -- you're right.

10   Clearly.  I'm sorry.

11        MR. ENSOR:  That's as well as we can go.

12        You know, I would close by saying I think the real

13   issue here is STC wishes that Jamey Kirby couldn't compete in

14   the backup software industry.  And I think STC is worried that

15   maybe Jamey Kirby will do something brilliant again.  They've

16   been riding off his ideas for the last 10 years doing very

17   well at it.  And having him out there not in the drink

18   business anymore as much, more in the backup industry concerns

19   them.

20        But that's not how the free market works.

21   Mr. Kirby never signed a noncompete.  Everybody knows that.

22   It's been almost eight years since he left StorageCraft.  He's

23   allowed to go out in the market and compete.  He's allowed to

24   develop new software, and the market will be better for it if

25   he does something brilliant again, notwithstanding STC's

1    speculations and guesses.

2           Mr. Kirby made a mistake, and he's paid for that

3    mistake already, and he's going to pay for it through the

4    copyright claim based on the damages number that you guys come

5    up with.  That is enough.  The idea behind damages in the law

6    is that you compensate someone for their loss.  That's the

7    concept.  You're not giving someone a windfall.  You're not

8    penalizing someone.  You compensate them for their loss.

9           The Judge told you that you are the seekers of the

10   truth, and that's right.  And when you go and find the truth

11   on these three claims, I think you'll see that the 75 --

12   excuse me -- for the copyright claim the $750 to $30,000 range

13   is more than appropriate, and I argue it should be on the low

14   side.  The breach of contract damages haven't been proved

15   whatsoever, and that Mr. Kirby never stole the trade secret.

16   And even if he accidentally had a trade secret, never using it

17   shouldn't be justification to impose a $4.2 million judgment.

18   Thank you.

19          THE COURT:  Mr. Karrenberg, your final summation?

20          MR. KARRENBERG:  Thank you, Your Honor.  On all

21   calculations I have about nine minutes since I stopped the

22   other one early.

23          Let me go to the extent to show you exactly the

24   extent of what they'll do to try to get out of this.  You

25   heard counsel say intent for the misappropriation.  You just

1    read every jury instruction, you heard Judge Nuffer read every

2    jury instruction.  I want you to go in there, and I want you

3    to find the word intent under any instruction this Court has

4    given you for actual liability or misappropriation.  It's not

5    there.  Making up the law.  Thank God we have it.

6          And here it is.  Instruction Number 30.  I believe

7    it's 30.  Misappropriation means acquisition of a trade secret

8    by a person who knows or has reason to know that a trade

9    secret was acquired by improper means.  Disclosure or use of a

10   trade secret of another without the express or implied consent

11   by a person.

12         You didn't hear the word disclosure talked about by

13   counsel, either.  And then the instruction goes on and tells

14   you what improper means is.

15         At the time of disclosure or use, the

16   misappropriator knew or had reason to know that its knowledge

17   of the trade secret was derived through a person who utilized

18   improper means to acquire it.

19         We had a contract that says it's not going to

20   happen.

21         Acquired under circumstances giving rise to a duty

22   to maintain its secrecy or limit its use.

23         What else do we do but to get him to sign a

24   contract that says he's not going to do it?

25         Derive from or through a person who owed a duty to

1  plaintiff to maintain its secrecy.

2          The duty is set forth in a document he signed on

3  the advice of some of the best lawyers in this town.  And

4  that's misappropriation.  It doesn't say someone who intended

5  to deprive you of it.  This is what the law is.

6          And they also don't like the law that we're

7  entitled to.  And that is, oh, a hypothetical reasonable

8  royalty.  Well, look at instruction Number 32.

9          Damages from misappropriation of a trade secret may

10  be measured by imposition of liability for a reasonable

11  loyalty for a misappropriator's authorized disclosure or use

12  of a trade secret.

13          So when Mr. Kilbourne gave you the reasonable

14  royalty, that's exactly what the law allows you to do, and

15  we're being criticized for following the law and by someone

16  who clearly did not.

17          And he says, well, you've got to go, just look at

18  Russ Shreeve's testimony about the VM license.  If you

19  remember, the VM license, the reason the use went down, the

20  price went down.  Of course, it was restricted.  It was

21  restricted.  It was restricted.  It was restricted more and

22  more.  It had to be bundled.  It didn't have the source code.

23  It didn't have a sector tracking technology.  It had to be

24  restricted.  So, yeah, when we have enforcement that's

25  restricted, you can get a cheaper price.

1          But what did Mr. Kirby have?  He had unrestricted

2     use of this because he wasn't supposed to have it in the first

3     place.  And as Mr. Kilbourne said, in reality that was the

4     value of the entire business.

5          And on to other things.  Oh, well, you shouldn't

6     have been upset giving it to Crocker.  He knew that they were

7     really partners getting along.  It wasn't to show them they

8     were entitled to it, but to show really, you know, it was okay

9     to give him that stuff.  This is the guy who recommended his

10    lawyers to go be hired to go sue them.  Yeah, he really

11    understood that he knew we were getting along.  Let me tell

12    you.  Clients don't like each other who are suing each other.

13    It's not the nature of the beast, all right?  It's not a very

14    hard concept at all.

15         And willful and malicious on all of these claims

16    for the increased statutory damages, which by the way again is

17    our statutory right.  We are allowed to do that, and we do

18    that because we've got the other damages covered under the

19    trade secret law.  So being criticized again for following the

20    law of the United States.  But both of those, willful and

21    malicious, include being reckless.

22         And just like counsel said, there were thousands of

23    e-mails with this stuff on it, and he had warranted to us he

24    had gotten rid of them.  And it's reckless not to check all of

25    these when you know time and time again that's what you're

1    sending.  And it's not just 11.  There's 11 full sets of the

2    VSnap source code on there.  And that's the core value of my

3    client's business.

4         And again, we don't have any other remedy.  This is

5    our only remedy under the American system.  We can bring a

6    lawsuit.  We can allege and prove that he breached this

7    contract, infringed our copyright, misappropriated our trade

8    secret.  And then what the law allows us for those is the

9    statutory damages for copyright, the reasonable royalty from

10   the trade secret, which is also the damages for the contract.

11   Why?  Because if he wanted to buy it, that's the minimum he

12   would have paid to get it.  And he warranted to us he wasn't

13   going to get it.

14        Thank you, ladies and gentlemen.  I really again

15   appreciate you.

16        THE COURT:  Ladies and gentlemen of the jury, I

17   will be delivering to you the official set of the instructions

18   and the verdict form.  Counsel and I are going to confer about

19   the exhibits which have actually been received, and they will

20   be delivered to you a little bit later in the juryroom.  But

21   we'll deliver these things to you now.

22        The court security officer will now take an oath to

23   take you to the juryroom for deliberation.

24        (Whereupon, the court security officer is sworn.)

25        COURT SECURITY OFFICER:  I do.

```
1              THE CLERK:  Thank you.

2              THE COURT:  Could I give you this book and verdict

3    to take with you to the juryroom?

4              COURT SECURITY OFFICER:  Oh, sure.

5              THE COURT:  Thank you.  All rise.

6              (Whereupon, the jury left the court proceedings.)

7              THE COURT:  All right.  Please be seated.  We need

8    just a minute I think to work out the issues with the

9    exhibits.  We don't need to do this on the record, so I'm

10   going to ask the clerk to step down and go over her list with

11   you.

12             MR. KARRENBERG:  We need to add these things in.

13             MS. SNEDDON:  We need to add those in, too.

14             THE COURT:  Right.  But we'll bring another cart

15   around to get those.  But there's discrepancies to cover with

16   you, but we don't need this on the record.  So we're off the

17   record until we go back on to confirm the exhibit list in just

18   a moment.  I'll bring the other cart.  We're in recess.

19             (Recess.)

20             THE COURT:  Before we move to the next sentencing,

21   I'd like counsel from STC to come forward and make a brief

22   record.  We're on the record again in StorageCraft vs. Kirby.

23             Counsel, have you reviewed the exhibit list that we

24   purged the un-admitted exhibits?

25             MS. SNEDDON:  Yes, Your Honor.
```

1              MR. ENSOR:  Yes, Your Honor.

2              THE COURT:  Did you approve it for delivery to the

3    jury?

4              MS. SNEDDON:  Yes, Your Honor.

5              MR. ENSOR:  Yes, Your Honor.

6              THE COURT:  We find it helps them in these cases

7    with lots of exhibits.

8              Did you approve the exhibits as compiled for

9    delivery to the jury making sure that no un-admitted exhibits

10   are included there?

11             MS. SNEDDON:  Yes.

12             MR. ENSOR:  Yes, Your Honor.

13             THE COURT:  All right.  Then we'll wheel the two

14   carts of exhibits into the jury.

15             MS. SNEDDON:  Thank you, Your Honor.

16             THE COURT:  I received our first note from the

17   jury.  They inform me that they have selected Kathleen

18   Nielson, juror Number 1, as their foreperson, and also say

19   that they would like us to order dinner.  So we intend to do

20   that, and we'll deliver these lists.

21             Anything else we should cover in this case?

22             MR. KARRENBERG:  No, Your Honor.

23             MS. SNEDDON:  No, Your Honor.

24             MR. ENSOR:  No, Your Honor.

25             MR. KARRENBERG:  We left our phone numbers with the

 1    clerk.

 2                THE COURT:  If you both have phone numbers, stay

 3    close.

 4                MR. KARRENBERG:  We're just across the street, and

 5    we'll be here in five minutes.

 6                THE COURT:  Okay.  That's great.  Last week's jury

 7    had four questions before we got done.

 8                All right.

 9                MR. KARRENBERG:  Thank you, Judge.  We'll get

10    everything cleaned up tomorrow morning.  Do you have anything

11    scheduled in the morning?

12                THE COURT:  No.  We have no morning.  We do have a

13    10 o'clock.

14                MS. SNEDDON:  We'll be out of here before that.

15                MR. KARRENBERG:  And we'll get it out of your hair.

16    We'll get everything out.

17                MR. ENSOR:  Judge, my paralegal is on his way down

18    to clean up, so maybe once you get done with your sentencing.

19                THE COURT:  That would be fine.

20                MR. ENSOR:  Thank you.

21                THE COURT:  Only one person to carry those big

22    boards?

23                MR. ENSOR:  I assume they'll call on me and ask for

24    help.

25                THE COURT:  Okay.  I think by 5:15 this room will

```
 1    be available.

 2              MR. ENSOR:  Thank you, Your Honor.

 3              (Recess.)

 4              THE COURT:  The court security officer is bringing

 5    the jury down.

 6              (Whereupon, the jury returned to the court

 7         proceedings.)

 8              THE COURT:  We're back in the courtroom in

 9    StorageCraft vs. Kirby convened with the jury and with

10    counsel.

11              Who has been elected as foreperson of the jury?

12              Thank you.  Has the jury reached a unanimous

13    verdict?

14              JUROR NUMBER 1:  Yes.

15              THE COURT:  I'll ask the clerk to retrieve the

16    verdict and deliver it to me.  While she's doing that, I want

17    to ask, is there any member of the jury who believes that this

18    verdict is not unanimous?  If so raise your hand.

19              Thank you.  I'll now examine the verdict for form.

20              The verdict appears to be in proper form.  I'll now

21    read the verdict.  This is publishing the verdict.

22              StorageCraft Technology Corporation vs. James

23    Kirby.

24              We, the jury, in the above entitled action

25    unanimously find as follows:
```

1          Question Number 1.  The Court has previously

2    determined that James Kirby is liable to STC for breaching the

3    parties' 2005 settlement agreement.  What amount of damages,

4    if any, was caused by Kirby's breach of contract?

5          $2.92 million.

6          Question Number 2.  The Court has previously

7    determined that James Kirby is liable to STC for having

8    infringed STC's copyright in the VSnap source code.  Did STC

9    prove by clear and convincing evidence that Kirby's copyright

10   infringement was willful?

11         Answer:  Yes.

12         Question Number 3.  What amount of statutory

13   damages is STC entitled to receive for Kirby's copyright

14   infringement?

15         $100,000.

16         Question Number 4.  Did Kirby misappropriate a

17   trade secret of STC?

18         Answer.  Yes.

19         Question Number 5.  What amount of damages, if any,

20   is STC entitled to recover as a result of Kirby's

21   misappropriation of SCT's trade secret?

22         $2.92 million.

23         Question Number 6.  Did STC prove by clear and

24   convincing evidence that Kirby's misappropriation of STC's

25   trade secret was willful and malicious?

1          Answer.  Yes.

2          The verdict is signed and dated by the jury

3     foreperson Kathleen Nielson.

4          I will now poll the jury.  This is my practice in

5     every case.

6          Juror Number 1, is this your verdict?

7          JUROR NUMBER 1:  Yes.

8          THE COURT:  Jury Number 2, is this your verdict?

9          JUROR NUMBER 2:  Yes, it is.

10         THE COURT:  Jury Number 3, is this your verdict?

11         JUROR NUMBER 3:  Yes.

12         THE COURT:  Juror Number 4, is this your verdict?

13         JUROR NUMBER 4:  Yes.

14         THE COURT:  Juror Number 5, is this your verdict?

15         JUROR NUMBER 5:  Yes.

16         THE COURT:  Juror Number 6, is this your verdict?

17         JUROR NUMBER 6:  Yes, sir.

18         THE COURT:  Juror Number 7, is this your verdict?

19         JUROR NUMBER 7:  Yes.  Yes, sir.

20         THE COURT:  Juror Number 8, is this your verdict?

21         JUROR NUMBER 8:  Yes.

22         THE COURT:  Juror Number 9, is this your verdict?

23         JUROR NUMBER 9:  Yes.

24         THE COURT:  Juror Number 10, is this your verdict?

25         JUROR NUMBER 10:  Yes.

1          THE COURT:  Juror Number 11, is this your verdict?

2          JUROR NUMBER 11:  Yes.

3          THE COURT:  Juror Number 12, is this your verdict?

4          JUROR NUMBER 12:  Yes.

5          THE COURT:  Do counsel believe that any further

6     proceedings are required before we excuse the jury?

7          MR KARRENBERG:  No, sir.

8          MR. ENSOR:  No, Your Honor.

9          THE COURT:  Then let me say on behalf of everyone

10    in this courtroom and persons interested in this case not in

11    this courtroom how much we appreciate your service.  You've

12    been diligent, you've been attentive, and you have really

13    fulfilled your oath as jurors.  Our country is unique in the

14    world entrusting the most important decisions in the judicial

15    system to ordinary citizens.  You have helped us keep the

16    faith of that system, and we appreciate very much your

17    service.

18          Please remember, there is evidence you have heard

19    which you are bound by your oath as jurors to maintain secret

20    and not disclose.  You may if you wish speak to persons about

21    other aspects of the case, but you are not required to speak

22    to anyone or answer anyone's questions about the case.  If you

23    have questions about that, you can contact the jury office

24    that you contacted with regard to your earlier service.

25          Thank you very much for your service.  All rise for

```
1    the jury.  The jury will now be excused from the courtroom.

2                (Whereupon, the jury left the court proceedings.)

3                THE COURT:  Please be seated.

4                Are there any further issue for us to handle this

5    evening?

6                MR. KARRENBERG:  No, Your Honor.  We'll pick up the

7    rest of our stuff in the morning.  We've already made

8    arrangements for that.  My tooth fell out tonight on a

9    crouton, so I at least got through that.

10               On the record, I would like to thank Mr. Ensor who

11   was a tremendous opponent on the merits, but on the procedural

12   things he behaved exactly what I hoped every lawyer in my firm

13   would behave correctly.  And I mean that sincerely.

14               MR. ENSOR:  Thank you, Tom.

15               MR. KARRENBERG:  You're welcome.

16               THE COURT:  And let me tell you both, counsel, it

17   was a well-tried case.  It's been a pleasure for us to work

18   with you this week.  You've both done excellent work, and I

19   think the presentation for the benefit of the jury was just as

20   it should be, very clear and very professional all the way

21   through.  So it's been a pleasure to try the case with you.

22               That said, I don't want to see you again for a

23   while because we spent plenty of time together.  But it really

24   has been a pleasure to work with all of you in this case.

25   Thank you very, very much for your excellent work.
```

1          MR. KARRENBERG:  Thank you, Your Honor.

2          MR. ENSOR:  Thank you, Your Honor.

3          MR. KARRENBERG:  I appreciate the courtesies from

4    the court staff.

5          MS. SNEDDON:  Thank you, Your Honor.

6          THE COURT:  Thank you.  We're in recess.

7       (Whereupon, the court proceedings were concluded.)

8                    *   *   *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH          )

 2                           ) ss.

 3    COUNTY OF SALT LAKE  )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7    the foregoing matter on August 9, 2012, and thereat reported

 8    in Stenotype all of the testimony and proceedings had, and

 9    caused said notes to be transcribed into typewriting; and the

10    foregoing pages number from 177 through 290 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this _____ day of

15    _____ 2012.

16

17

18

19

20              _____
                     KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```